# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF SAN JOSE, CALIFORNIA; CITY OF ORMOND BEACH, FLORIDA; TOWN OF CLINTON, MASSACHUSETTS; TOWN OF EASTON, MASSACHUSETTS; CITY OF WIGGINS, MISSISSIPPI; CHARITON COUNTY, MISSOURI; PEMISCOT COUNTY, MISSOURI; CITY OF ALAMOGORDO, NEW MEXICO; CITY OF ESPANOLA, NEW MEXICO; HIDALGO COUNTY, NEW MEXICO; CITY OF HOBBS, NEW MEXICO; BERTIE COUNTY, NORTH CAROLINA; CITY OF FAIRFIELD, OHIO; BOROUGH OF EDWARDSVILLE, PENNSYLVANIA; FORTY FORT TOWNSHIP, PENNSYLVANIA; CLAIBORNE COUNTY, TENNESSEE, CITY OF SAN ANTONIO, TEXAS; WISE COUNTY, VIRGINIA; CITY OF KENOSHA, WISCONSIN; VILLAGE OF PLEASANT PRAIRIE, WISCONSIN, | Civil Action No. 1:19-cv-09359 |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| RICHARD S. SACKLER, JONATHAN D. SACKLER, MORTIMER D.A. SACKLER, KATHE A. SACKLER, ILENE SACKLER LEFCOURT, BEVERLY SACKLER, THERESA SACKLER, DAVID A. SACKLER, TRUST FOR THE BENEFIT OF MEMBERS OF THE RAYMOND SACKLER FAMILY, | |
| Defendants. | |

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

II.    PARTIES ............................................................................................ 8

III.   JURISDICTION AND VENUE ......................................................... 10

IV.    FACTUAL ALLEGATIONS ............................................................. 11

    A.     Purdue's False Marketing Tactics Created an Overwhelming Demand for
Prescription Opioid and Purdue's Failure to Report Known Over-Proscribing Doctors
Supported the Explosive Market Growth of Opioids......................................... 11

      1.   The Defendants' Multi-Pronged Scheme to Change Prescriber Habits and Public
Perception and Increase Demand for Opioids..................................... 11

        a.   The Sackler Defendants, and Purdue Promoted Multiple
Falsehoods About Opioids ................................................... 12

      2.   The Sackler Defendants Deliberately Directed Purdue to Disregard Its Duties to
Maintain Effective Controls and to Identify, Report, and Take Steps to Halt
Suspicious Orders .......................................................................... 36

        a.   Purdue Has a Duty to Report Suspicious Orders and Not to Ship
Those Orders Unless Due Diligence Disproves Their Suspicions .......... 38

        b.   Defendants Kept Careful Track of Prescribing Data and Knew
About Suspicious Orders and Prescribers ............................... 42

    B.     The Sackler Defendants Utilized Purdue to Perpetrate their Scheme to Grow the
Demand for Prescription Opioids ................................................... 45

      1.   The Sackler Defendants' Misconduct Leading to the 2007 Judgment............... 47

      2.   The Sackler Defendants' Misconduct from the 2007 Judgment Until Today..... 54

        a.   2007....................................................................... 56

        b.   2008....................................................................... 59

        c.   2009....................................................................... 69

        d.   2010....................................................................... 75

        e.   2011....................................................................... 85

        f.   2012....................................................................... 95

        g.   2013..................................................................... 102

        h.   2014..................................................................... 112

        i.   2015..................................................................... 121

        j.   2016..................................................................... 124

        k.   2017..................................................................... 129

        l.   2018..................................................................... 132

    C.     The Sackler Defendants Created Rhodes to Perpetuate and Further Profit Off of

i

the Opioid Market that the Sackler Defendants had Created with Purdue ..................... 133

    1.    Similarities Between Rhodes and Purdue ......................................................... 134

    2.    How The Sackler Defendants Used Purdue and Rhodes Together to Further the Sackler Defendants' Scheme to Falsely Market Opioids .................................. 134

V.    CAUSES OF ACTION ................................................................................................ 136

FIRST CAUSE OF ACTION ................................................................................................ 136

SECOND CAUSE OF ACTION ........................................................................................... 137

THIRD CAUSE OF ACTION ............................................................................................... 149

FOURTH CAUSE OF ACTION ........................................................................................... 150

FIFTH CAUSE OF ACTION ................................................................................................ 151

PRAYER FOR RELIEF ....................................................................................................... 153

JURY DEMAND .................................................................................................................. 153

## I.    INTRODUCTION

1.    This nation is facing an unprecedented opioid addiction epidemic that was initiated and perpetuated by the Sackler Defendants for their own financial gain, to the detriment of each of the Plaintiffs and their residents.  The "Sackler Defendants" include Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler. The Sackler Defendants carried out their enterprise to falsely market prescription opioids as safe and non-addictive through their closely held companies including: Purdue Pharma L.P., the Purdue Frederick Company, Purdue Pharmaceutical Products L.P. and Purdue Products L.P. (collectively "Purdue") and Rhodes Pharmaceuticals L.P. ("Rhodes").

2.    In 2014, more than 47,000 people died in the United States from lethal drug overdoses.  In 2015, that number exceeded 52,000.[1]  In 2016, it exceeded 63,000 – more than the number of Americans who died during the entirety of the Vietnam War, and more than the number of Americans who die from breast cancer every year.[2]  Sadly, this trend shows no sign of slowing. The number of overdose deaths in 2017 is estimated to have been more than 72,000.[3]

3.    More than three out of five of those deaths involve opioids—a dangerous, highly addictive and often lethal class of natural, synthetic and semi-synthetic painkillers.[4]  Prescription opioids include brand-name medications like OxyContin, Opana, Subsys, Fentora and Duragesic, as well as generics like oxycodone, methadone and fentanyl.  In all, more than 200,000 people

---

[1]    *Overdose Death Rates*, National Institute of Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates (hereinafter, "*Overdose Death Rates*") (last visited Dec. 14, 2018).
[2]    *Vietnam War U.S. Military Fatal Casualty Statistics*, National Archives, https://www.archives.gov/research/military/vietnam-war/casualty-statistics.html (last visited Dec. 14, 2018); Rose A. Rudd et al., *Increases in Drug and Opioid Involved Overdose Deaths – United States, 2010-2015*, 65 Morbidity & Mortality Weekly Report 1445-52 (2016), https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm (hereinafter, "Rudd, *Increases in Drug and Opioid Involved Overdose*"); Nadia Kounang, *Opioids now kill more people than breast cancer*, CNN (Dec. 21, 2017), https://www.cnn.com/2017/12/21/health/drug-overdoses-2016-final-numbers/index.html.
[3]    Centers for Disease Control and Prevention National Center for Health Statistics, *Vital Statistics Rapid Release Provisional Drug overdose Death Counts*, https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited Dec. 14, 2018).
[4]    And nearly half of those involve legal opioids prescribed by doctors to treat pain.

died in the United States between 1999 and 2016 from overdoses directly related to prescription opioids.

4.      That number does not take into account the staggering number of additional illicit opioid deaths that can be related back to prescribed opioids.  Four out of five new heroin users began first with prescription opioid misuse.[5]  It is thus unsurprising that heroin overdose deaths increased in lockstep with those attributed to prescription opioids; the Centers for Disease Control found a fivefold increase in the heroin death rate between 2002 and 2014.[6]  According to an article published in the *New England Journal of Medicine*, two studies found that almost 80% of heroin users reported using prescription opioids before initiating heroin use.[7]  Further, heroin use increased almost 140% among non-medical users of prescription opioids from the period 2002-2004 to the period 2011-2013.[8]  These changes appear to be driven primarily by market forces – "increased accessibility, reduced price, and high purity of heroin appear to be major drivers of the recent increases in rates of heroin use" and predate most policies aimed at combatting the abuse and diversion of prescription opioids.[9]

5.      Further, according to Robert Anderson ("Anderson"), Chief of the Mortality Statistics Branch of the National Center for Health Statistics, deaths from synthetic opioids have undergone "more than an exponential increase"[10] with an expected trend line for 2017 deaths that "will be at least as steep as 2016, if not steeper."[11]  Between 2005 and 2016, fatal overdoses from

---

[5]     Christopher M. Jones, *Heroin use and heroin use risk behaviors among nonmedical users of prescription opioid pain relievers – United States, 2002-2004 and 2008-2010*, 132 (1-2) Drug and Alcohol Dependence 95-100 (Sept. 1, 2013), http://www.drugandalcoholdependence.com/article/ S0376-8716(13)00019-7/fulltext.

[6]     Centers for Disease Control and Prevention National Center for Health Statistics, *Number and age-adjusted rates of drug-poisoning deaths involving opioid analgesics and heroin: United States, 1999-2014*, http://www.cdc.gov/nchs/data/health_policy/AADR_drug_poisoning_involving_OA_Heroin_US_2000-2014.pdf (last visited Dec. 14, 2018).

[7]     Wilson M. Compton et al., *Relationship between Nonmedical Prescription-Opioid Use and Heroin Use*, 374 N. Eng. J. Med 154-63 (2016), https://www.nejm.org/doi/full/10.1056/ NEJMra1508490.

[8]     *Id.*

[9]     *Id.*

[10]    Internal quotation marks are omitted throughout this complaint except where the internal quotation marks set off a quote that resides within a longer quoted passage.

[11]    Christopher Ingraham, *CDC releases grim new opioid overdose figures: 'We're talking about more than an exponential increase,'* Wash. Post (Dec. 21, 2017), https://www.washingtonpost.com/news/wonk/wp/2017/12/21/cdc-releases-grim-new-opioid-overdose-figures-were-talking-about-more-than-an-exponential-increase/?utm_term=.ad8 576e16bea.

synthetic opioids doubled.  "This surge in overdose deaths resulted in the first two-year drop in average U.S. life expectancy since the early 1960s."  In all, more than 200,000 people died in the United States between 1999 and 2016 from overdoses directly related to prescription opioids.[12]

6.     Public health officials have called the current opioid epidemic the worst drug crisis in American history.[13]  According to Anderson, "I don't think we've ever seen anything like this. Certainly not in modern times."[14]  On October 26, 2017, President Donald Trump declared it a public health emergency.  According to recent estimates, as many as 145 people in the United States die every day from opioid overdoses.[15]

7.     The following charts[16] illustrate the rise of opioid-related overdose deaths in the United States:[17]



8.     The opioid crisis and related expenses continue to grow.  According to a report issued on February 13, 2018 by Altarum, a nonprofit health systems research and consulting

[12]   *Prescription Opioid Overdose Data*, Centers for Disease Control and Prevention: Opioid Overdose, https://www.cdc.gov/drugoverdose/data/overdose.html (last visited Dec. 14, 2018).

[13]   Julie Bosman, *Inside a Killer Drug Epidemic: A Look at America's Opioid Crisis*, N.Y. Times (Jan. 6, 2017), https://www.nytimes.com/2017/01/06/us/opioid-crisis-epidemic.html.

[14]   *Drug overdoses now kill more Americans than guns*, CBS News (Dec. 9, 2016), https://www.cbs news.com/news/drug-overdose-deaths-heroin-opioid-prescription-painkillers-more-than-guns/.

[15]   Patrick R. Keefe, *The Family that Built an Empire of Pain*, The New Yorker (Oct. 30, 2017), https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain   (hereinafter,   "Keefe, *Empire of Pain*").

[16]   German Lopez & Sarah Frostenson, *How the opioid epidemic became America's worst drug crisis ever, in 15 maps and charts*, Vox (Mar. 29, 2017), http://www.vox.com/science-and-health/2017/3/23/14987892/opioid-heroin-epidemic-charts (hereinafter, "Lopez, *How the opioid epidemic*").

[17]   *Overdose Death Rates*, *supra* note 1.

organization, the cost of the country's opioid crisis is estimated to have exceeded $1 trillion from 2001 to 2017, and is projected to cost an additional $500 billion by 2020:[18]



Indeed, the Council of Economic Advisers, an agency within the Executive Office of the President of the United States, concluded in a November 2017 report that the economic cost of the opioid crisis was $504 billion in 2015 alone.  That figure is 2.8% of the 2015 gross domestic product.[19]

9.     According to a Centers for Disease Control and Prevention ("CDC") report issued in March 2018, hospital emergency room visits for opioid overdoses rose 30% nationwide between July 2016 and September 2017, with overdoses increasing by 54% in large cities:

---

[18]   *Economic Toll Of Opioid Crisis In U.S. Exceeded $1 Trillion Since 2001*, Altarum (Feb. 13, 2018), https://altarum.org/about/news-and-events/economic-toll-of-opioid-crisis-in-u-s-exceeded-1-trillion-since-2001.
[19]   The Council of Economic Advisors, *The Underestimated Cost of the Opioid Crisis* 1 (Nov. 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/images/The%20Underestimated%20Cost%20of%20the%20Opioid%20Crisis.pdf.



Opioid overdoses continued to increase in cities and towns of all types.*

↑21%   ↑24%   ↑37%   ↑43%   ↑21%   ↑54%

Large and steady increases for large cities

MORE RURAL ←                              → MORE URBAN

SOURCE: CDC's Enhanced State Opioid Overdose Surveillance (ESOOS) Program, 16 states reporting percent changes from July 2016 through September 2017.

* From left to right, the categories are:
1) non-core (non-metro), 2) micropolitan (non-metro), 3) small metro, 4) medium metro, 5) large fringe metro, 6) large central metro.

    10.    Drug manufacturers' deceptive marketing and sale of opioids to treat chronic pain is one of the main drivers of the opioid epidemic.  Historically, prescription opioids had been used for short-term, post-surgical and trauma-related pain, and for palliative end-of-life care primarily in cancer patients.  Because opioids are highly addictive and dangerous, the U.S. Food and Drug Administration ("FDA") regulates them as Schedule II Controlled Substances, *i.e.*, drugs that have a high potential for abuse and that may lead to severe psychological or physical dependence.

    11.    This demonstrated need for caution comports with the historical understanding of both the medical community and the American culture at large regarding the serious consequences of opioid use and misuse.  Indeed, thousands of years of experience have taught that opioids' ability to relieve pain comes at a steep price; opioids are dangerously addictive and often lethal substances.  For generations, physicians were taught that opioid painkillers were highly addictive and should be used sparingly and primarily for patients near death.[20]  The medical community also understood that opioids were poorly suited for long-term use because tolerance would require escalating doses and dependence would make it extremely difficult to discontinue their use.

---

[20]    Harriet Ryan et al., *OxyContin goes global – "We're only just getting started*," L.A. Times (Dec. 18, 2016), http://www.latimes.com/projects/la-me-oxycontin-part3/ (hereinafter, "Ryan, *OxyContin goes global*").

12.     The prevailing and accurate understanding of the enormous risks and limited benefits of long-term opioid use constrained drug manufacturers' ability to drive sales.  In order to decrease reasonable concerns about opioids and to maximize profits, the Sackler Defendants engaged in a concerted, coordinated strategy through Purdue and Rhodes to shift the way in which doctors and patients think about pain and, specifically, to encourage the use of opioids to treat not just the relative few who suffer from acute post-surgical pain and end-stage cancer pain, but the masses who suffer from common chronic pain conditions.

13.     Borrowing from the tobacco industry's playbook, Purdue and the Sackler Defendants employed ingenious marketing strategies, as detailed further herein, designed to "reeducate" the public and prescribers.  Purdue and the Sackler Defendants deliberately conceived these strategies to create, and in fact did create, an entirely new "health care" narrative—one in which opioids are considered safe and effective for long-term use, and pain is aggressively treated at all costs.  According to this newly fabricated narrative, pain was seriously under-treated throughout the United States because opioids were under-prescribed, and doctors came under enormous pressure to treat all kinds of pain with opioids.

14.     Purdue and the Sackler Defendants' intention was to normalize aggressive prescribing of opioids for various kinds of pain by downplaying the very real risks of opioids, especially the risk of addiction, and by exaggerating the benefits of use.  To accomplish this goal, they intentionally misled doctors and patients about the appropriate uses, risks, safety and efficacy of prescription opioids.  They did so directly through sales representatives and marketing materials and indirectly through financial relationships with academic physicians, professional societies, hospitals, trade associations for state medical boards and seemingly neutral third-party foundations.

15.     Purdue assured the public and prescribers that the risk of becoming addicted to prescription opioids among patients being treated for pain was less than 1%.  In reality, many

people with no addiction history can become addicted after just weeks or even days of use.[21] According to estimates, as many as 56% of patients receiving long-term prescription opioid painkillers become addicted.[22]  Indeed, almost one in five people who receive an opioid prescription with ten days' supply will still be taking opioids one year later.[23]

16.    Put simply, Purdue and the Sackler Defendants manipulated and misrepresented medical science to serve their own agenda at great human cost.  Indeed, in a study published on March 6, 2018 in the *Journal of the American Medical Association* ("*JAMA*"),[24] researchers who conducted the first randomized clinical trial designed to compare the efficacy of opioids and non-opioids (including acetaminophen, ibuprofen and lidocaine) for the treatment of moderate to severe back pain, hip pain or knee osteoarthritis pain concluded that patients who took opioids over the long term experienced improvements in pain-related function no better than patients who used safer alternatives.

17.    Defendants wholly failed to meet their obligation to timely report and put a halt to these and other suspicious sales, fueling the flood of pills into each Plaintiff's jurisdictions.

18.    Defendants' scheme was tremendously successful, if measured by profit.—The Sackler family, which owns Purdue—a privately held company—is listed on *Fortune*'s list of America's wealthiest families; its "ruthless marketing of painkillers has generated billions of dollars—and millions of addicts."[25] The Sackler family wealth is estimated at $13 billion.

19.    The impact of opioid addiction has devastated the nation, emerging as one of the country's major health threats.  Former FDA Commissioner David A. Kessler has called the

---

[21]    Anna Lembke, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked, and Why It's So Hard to Stop* 22 (Johns Hopkins University Press 2016) (hereinafter, "Lembke (2016)").

[22]    Bridget A. Martell et al., *Systematic Review: Opioid Treatment for Chronic Back Pain: Prevalence, Efficacy, and Association with Addiction*, 146(2) Ann. Intern. Med. 116-27 (2007), http://annals.org/aim/article/732048/systematic-review-opioid-treatment-chronic-back-pain-prevalence-efficacy-association (hereinafter, "Martell, *Systematic Review*").

[23]    Sarah Frostenson, *The risk of a single 5-day opioid prescription, in one chart*, Vox (Mar. 18, 20107, 7:30 AM), www.vox.com/2017/3/18/14954626/one-simple-way-to-curb-opioid-overuse-prescribe-them-for-3-days-or-less.

[24]    Erin E. Krebs et al., *Effect of Opioid vs. Nonopioid Medications on Pain-Related Function in Patients with Chronic Back Pain or Hip or Knee Osteoarthritis Pain, The SPACE Randomized Clinical Trial*, 319(9) JAMA 872-82 (2018) (hereinafter, "Krebs, *Effect of Opioid vs. Nonopioid Medications*").

[25]    Keefe, *Empire of Pain*, *supra* note 15.

failure to recognize the dangers of painkillers "one of the greatest mistakes of modern medicine." As alleged herein, that "mistake" resulted in large part from defendants' false and misleading messaging, which was carefully calculated to reach as many prescribers as possible, as well as defendants' willingness to turn a blind eye to suspicious orders.

20.     Even though Purdue had previously been forced to admit the unlawful marketing and sale of opioids, the Sacklers Defendants continued to direct deceptive marketing strategies and turn a blind eye to suspicious orders.  The profits realized by the aggressive marketing and prescribing of opioids dwarf the penalties imposed as a result of violations found.  Thus, the incentive to push opioids remains.  The scheme was so financially successful, in fact, that despite the clear and obvious devastation it caused at home the Sackler Defendants continue to pursue the same strategy abroad.  As reported by the *Los Angeles Times* in 2016, Purdue stated "[w]e're only just getting started," and intends to "[p]ut the painkiller that set off the United States opioid crisis into medicine cabinets around the world."[26]

21.     As discussed in detail below, the Sackler Defendants orchestrated the growth of the prescription opioid market through deceptive and untruthful marketing tactics pioneered by Arthur Sackler. Not only did the Sackler Defendants create and aggressively market opioids for general and ubiquitous use, but the Sackler Defendants knew about the dangers of prescription opioids and pushed to increase sales despite the devastating consequences of the public health crisis.

## II.     PARTIES

22.     Plaintiffs, City of San Jose, California; City of Ormond Beach, Florida; Town of Clinton, Massachusetts; Town of Easton, Massachusetts; City of Wiggins, Mississippi; Chariton County, Missouri; Pemiscot County; Missouri; City of Alamogordo, New Mexico; City of Espanola, New Mexico; Hidalgo County, New Mexico; City of Hobbs, New Mexico; Bertie County, North Carolina; City of Fairfield, Ohio; Borough of Edwardsville, Pennsylvania; Forty

---

[26]     Ryan, *OxyContin goes global*, *supra* note 20.

Fort Township, Pennsylvania; Claiborne County, Tennessee; City of San Antonio, Texas; Wise County, Virginia; City of Kenosha, Wisconsin and Village of Pleasant Prairie, Wisconsin are political subdivisions of their respective states which have the power to sue in their own name and bring the claims set forth in this Complaint.

23.     Defendant Richard S. Sackler is a natural person residing in Travis County, Texas. He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

24.     Defendant Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut.  He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

25.     Defendant Mortimer D.A. Sackler is a natural person residing in New York County, New York.  He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

26.     Defendant Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut.  She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

27.     Defendant Ilene Sackler Lefcourt is a natural person residing in New York County, New York.  She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

28.     Defendant Beverly Sackler is a natural person residing in Fairfield County, Connecticut.  She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

29.     Defendant Theresa Sackler is a natural person residing in New York County, New York.  She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

30.     Defendant David A. Sackler is a natural person residing in New York County, New York.  He has served as a member of the Board of Directors of Purdue and Purdue-related entities since 2012.

31.     Defendant Trust for the Benefit of Members of the Raymond Sackler Family (the "Raymond Sackler Trust") is a trust for which Defendants Beverly Sackler, Richard S. Sackler and/or Jonathan D. Sackler are trustees.  It is the 50% direct or indirect beneficial owner of Purdue and the Purdue-related entities and the recipient of 50% of the profits from the sale of opioids by Purdue and Purdue-related entities.  Collectively, the defendants listed in ¶¶23-31 are referred to as the "Sackler Defendants" or "Sackler Families."

## III.    JURISDICTION AND VENUE

32.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants. Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are citizens.

33.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, raise a federal question. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964. This Court has personal jurisdiction over Defendants under 18 U.S.C. § 1965. This action is brought under 18 U.S.C. § 1964, and the ends of justice requires that any defendants not residing in this district be brought before this Court.

34.     In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding. This Court has supplemental jurisdiction over  the Plaintiffs' state-law claims under

28 U.S.C. § 1367 because those claims are so related to the RICO claim as to form part of the same case or controversy.

35.     This Court has personal jurisdiction over all Defendants under R.C. 2307.382 because the causes of action alleged in this Complaint arise out of each Defendants' transacting business in New York, contracting to supply services or goods in this state, causing tortious injury by an act or omission in this state, and because the Defendants regularly do or solicit business or engage in a persistent course of conduct or deriving substantial revenue from goods used or consumed or services rendered in this state. Defendants have purposefully directed their actions towards New York and/or have the requisite minimum contacts with New York to satisfy any statutory or constitutional requirements for personal jurisdiction.

36.     Venue is proper under 18 U.S.C. § 1965(a) because multiple Defendants reside, are found, have agents, or transact their affairs in the Southern District of New York. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Purdue's False Marketing Tactics Created an Overwhelming Demand for Prescription Opioid and Purdue's Failure to Report Known Over-Proscribing Doctors Supported the Explosive Market Growth of Opioids

#### 1.    The Defendants' Multi-Pronged Scheme to Change Prescriber Habits and Public Perception and Increase Demand for Opioids

37.     In order to accomplish the fundamental shift in perception that was key to successfully marketing their opioids, the Sackler Defendants, by and through Purdue, designed and implemented a sophisticated and deceptive marketing strategy. Lacking legitimate scientific research to support their claims, the Sackler Defendants turned to the marketing techniques first pioneered by Arthur Sackler to create a series of misperceptions in the medical community and ultimately reverse the long-settled understanding of the relative risks and benefits of opioids.

38.     The Sackler Defendants promoted, and profited from, their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their marketing was false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned Purdue of these risks. The Sackler Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths—all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC issued pronouncements based on existing medical evidence that conclusively expose the known falsity of these Defendants' misrepresentations.

39.     The marketing scheme to increase opioid prescriptions centered around nine categories of misrepresentations, which are discussed in detail below. The Sackler Defendants, and Purdue disseminated these misrepresentations through various channels, including through advertising, sales representatives, purportedly independent organizations these defendants funded and controlled, "Front Groups," so-called industry "Key Opinion Leaders," and Continuing Medical Education ("CME") programs discussed subsequently below.

### a.     The Sackler Defendants, and Purdue Promoted Multiple Falsehoods About Opioids

40.     The Sackler Defendants, and Purdue's misrepresentations fall into the following nine categories:

     (a)     The risk of addiction from chronic opioid therapy is low

     (b)     To the extent there is a risk of addiction, it can be easily identified and managed

     (c)     Signs of addictive behavior are "pseudoaddiction," requiring more opioids

     (d)     Opioid withdrawal can be avoided by tapering

     (e)     Opioid doses can be increased without limit or greater risks

(f)     Long-term opioid use improves functioning

(g)     Alternative forms of pain relief pose greater risks than opioids

(h)     OxyContin provides twelve hours of pain relief

(i)     New formulations of certain opioids successfully deter abuse

41.     Each of these propositions was false. The Sackler Defendants, and Purdue knew this, but they nonetheless set out to convince physicians, patients, and the public at large of the truth of each of these propositions in order to expand the market for their opioids.

42.     The categories of misrepresentations are offered to organize the numerous statements the Sackler Defendants designed and Purdue made and to explain their role in the overall marketing effort.  While this Complaint endeavors to document examples of each misrepresentation and the manner in which they were disseminated, they are just that—examples. The Complaint is not an exhaustive catalog of the nature and manner of each deceptive statement made by Purdue or directed by the Sackler Defendants.

### (1)     Falsehood #1: The risk of addiction from chronic opioid therapy is low

43.     Central to the Sackler Defendants, and Purdue's promotional scheme was the misrepresentation that opioids are rarely addictive when taken for chronic pain. Through their marketing efforts, the Sackler Defendants, and Purdue advanced the idea that the risk of addiction is low when opioids are taken as prescribed by "legitimate" pain patients. That, in turn, directly led to the expected and intended result that doctors prescribed more opioids to more patients—thereby enriching the Sackler Defendants, and Purdue and substantially contributing to the opioid epidemic.

44.     Purdue, at the Direction of the Sackler Defendants claimed that the potential for addiction from its opioids was relatively small or non-existent, even though there was no scientific evidence to support those claims.

45.     In fact, studies have shown that a substantial percentage of long-term users of opioids experience addiction. Addiction can result from the use of any opioid, "even at

recommended dose,"[27] and the risk substantially increases with more than three months of use.[28] As the CDC Guideline states, "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" (a diagnostic term for addiction).[29]

46.     When it launched OxyContin, Purdue knew it would need data to overcome decades of wariness regarding opioid use. It needed some sort of research to back up its messaging. But Purdue had not conducted any studies about abuse potential or addiction risk as part of its application for FDA approval for OxyContin. Purdue (and, the Sackler Defendants) found this "research" in the form of a one-paragraph letter to the editor published in the *New England Journal of Medicine* (NEJM) in 1980.

47.     This letter, by Dr. Hershel Jick and Jane Porter, declared the incidence of addiction "rare" for patients treated with opioids.[30] They had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. Porter and Jick considered a patient not addicted if there was no sign of addiction noted in patients' records.

48.     As Dr. Jick explained to a journalist years later, he submitted the statistics to NEJM as a letter because the data were not robust enough to be published as a study.[31]

---

[27] *FDA Announces Safety Labeling Changes and Postmarket Study Requirements for Extended- Release and Long-Acting Opioid Analgesics*, MagMutual (Aug. 18, 2016), https://www.magmutual.com/learning/article/fda-announces-safety-laveling-changes-and- postmarket-study-requirements-opioids; *see also* Press Release, U.S. Food & Drug Admin., FDA Announces Enhanced Warnings for Immediate-Release Opioid Pain Medications Related to Risks of Misuse, Abuse, Addiction, Overdose and Death, (Mar. 22, 2016), https://www.fda.gov/News Events/Newsroom/PressAnnouncements/ucm491739.htm.

[28] Deborah Dowell, M.D., *et al*., *CDC Guideline for Prescribing Opioids for Chronic Pain— United States 2016,* 65(1) Morbidity & Mortality Wkly. Rep. 1, 21 (Mar. 18, 2016) (hereinafter, "CDC Guideline").

[29] *Id.* at 2.

[30] Jane Porter & Herschel Jick, M.D., *Addiction Rare in Patients Treated with Narcotics*, 302(2) New Engl. J. Med. 123 (Jan. 10, 1980), http://www.nejm.org/doi/pdf/10.1056/NEJM198001103020221.

[31] Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* (St. Martin's Press, 1st ed. 2003).

**ADDICTION RARE IN PATIENTS TREATED
WITH NARCOTICS**

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program
Waltham, MA 02154     Boston University Medical Center

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

49.    Purdue nonetheless began repeatedly citing this letter in promotional and educational materials as evidence of the low risk of addiction, while failing to disclose that its source was a letter to the editor, not a peer-reviewed paper.[32] Citation of the letter, which was largely ignored for more than a decade, significantly increased after the introduction of OxyContin. While first Purdue used it to assert that their opioids were not addictive, "that's not in any shape or form what we suggested in our letter," according to Dr. Jick.

50.    Purdue specifically used the Porter and Jick letter in its 1998 promotional video, "I got my life back," in which Dr. Alan Spanos says, "In fact, the rate of addiction amongst pain patients who are treated by doctors *is much less than 1%*."[33] Purdue trained its sales representatives to tell prescribers that fewer than 1% of patients who took OxyContin became addicted. (In 1999, a Purdue-funded study of patients who used OxyContin for headaches found that the addiction rate was thirteen per cent.)[34]

---

[32] Porter & Jick, *supra* note 30.
[33] Our Amazing World, *Purdue Pharma OxyContin Commercial*, YouTube (Sept. 22, 2016), https://www.youtube.com/watch?v=Er78Dj5hyeI.
[34] Keefe, *Empire of Pain, supra* note 15.

51.     The enormous impact of Purdue's misleading amplification of this letter was well documented in another letter published in the NEJM on June 1, 2017, describing the way the one-paragraph 1980 letter had been irresponsibly cited and in some cases "grossly misrepresented." In particular,  the authors of this letter explained:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy.  We believe that this citation pattern contributed to the North American opioid crisis by  helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy . . .[35]

52.     "It's difficult to overstate the role of this letter," said Dr. David Juurlink of the University of Toronto, who led the analysis. "It was the key bit of literature that helped the opiate manufacturers convince front-line doctors that addiction is not a concern."[36]

53.     Alongside its use of the Porter and Jick letter, Purdue also crafted its own materials and spread its deceptive message through numerous additional channels. In its 1996 press release announcing the release of OxyContin, for example, Purdue declared, "The fear of addiction is exaggerated."[37]

54.     At a hearing before the House of Representatives' Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce in August 2001, Purdue emphasized "legitimate" treatment, dismissing cases of overdose and death as something that would not befall "legitimate" patients: "Virtually all of these reports involve people who are abusing  the

---

[35] Pamela T.M. Leung, B.Sc. Pharm*., et al., A 1980 Letter on the Risk of Opioid Addiction*, 376 New Engl. J. Med. 2194, 2194-95 (June 1, 2017), http://www.nejm.org/doi/full/10.1056/NEJMc1700150.

[36] Marilynn Marchione, Assoc. Press, *Painful Words: How a 1980 Letter Fueled the Opioid Epidemic*, STAT News (May 31, 2017), https://www.statnews.com/2017/05/31/opioid-epidemic- nejm-letter/.

[37] Press Release, Purdue Pharma, L.P., New Hope for Millions of Americans Suffering from Persistent Pain: Long-Acting   OxyContin   Tablets   Now   Available   to   Relieve   Pain   (May   31,   1996,   3:47pm), http://documents.latimes.com/oxycontin-press-release-1996/.

medication, not patients with legitimate medical needs under the treatment of a healthcare professional."[38]

55.    Purdue spun this baseless "legitimate use" distinction out even further in a patient brochure about OxyContin, called "A Guide to Your New Pain Medicine and How to Become a Partner Against Pain." In response to the question "Aren't opioid pain medications like OxyContin Tablets 'addicting'?," Purdue claimed that there was no need to worry about addiction if taking opioids for legitimate, "medical" purposes:

> Drug addiction means using a drug to get "high" rather than to relieve pain. You are taking opioid pain medication for medical purposes. The medical purposes are clear and the effects are beneficial, not harmful.

56.    Sales representatives marketed OxyContin as a product "to start with and to stay with."[39] Sales representatives also received training in overcoming doctors' concerns about addiction with talking points they knew to be untrue about the drug's abuse potential. One of Purdue's early training memos compared doctor visits to "firing at a target," declaring that "[a]s you prepare to fire your 'message,' you need to know where to aim and what you want to hit!"[40] According to the memo, the target is physician resistance based on concern about addiction: "The physician wants pain relief for these patients without addicting them to an opioid."[41]

57.    Former sales representative Steven May, who worked for Purdue from 1999 to 2005, explained to a journalist how he and his coworkers were trained to overcome doctors' objections to prescribing opioids. The most common objection he heard about prescribing OxyContin was that "it's just too addictive."[42] May and his coworkers were trained to "refocus"

---

[38] *OxyContin: Its Use and Abuse: Hearing Before the H. Subcomm. on Oversight and Investigations of the Comm. on Energy and Com.*, 107th Cong. 1 (Aug. 28, 2001) (Statement of Michael Friedman, Executive Vice President, Chief Operating Officer, Purdue Pharma, L.P.), https://www.gpo.gov/fdsys/pkg/CHRG-107hhrg75754/html/CHRG-107hhrg75754.htm.
[39] Keefe, *Empire of Pain*, *supra* note 15.
[40] Meier, *supra* note 31 at 102.
[41] *Id*.
[42] Interview by Patrick Keefe with Steven Mays, former sales representative for Purdue Pharma, L.P., *How OxyContin Was Sold to the Masses*, The New Yorker (Oct. 27, 2017), https://www.newyorker.com/podcast/the-new-yorker-radio-hour/how-oxycontin-was-sold-to-the- masses.

doctors on "legitimate" pain patients, and to represent that "legitimate" patients would not become addicted. In addition, they were trained to say that the 12-hour dosing made the extended-release opioids less "habit-forming" than painkillers that need to be taken every four hours.

58.     According to interviews with prescribers and former Purdue sales representatives, Purdue has continued to distort or omit the risk of addiction while failing to correct its earlier misrepresentations, leaving many doctors with the false impression that pain patients will only rarely become addicted to opioids.

59.     With regard to addiction, Purdue's label for OxyContin has not sufficiently disclosed the true risks to, and experiences of, its patients. Until 2014, the OxyContin label stated in a black-box warning that opioids have "abuse potential" and that the "risk of abuse is increased in patients with a personal or family history of substance abuse."

60.     However, the FDA made clear to Purdue as early as 2001 that the disclosures in its OxyContin label were insufficient. Senior FDA officials met with Purdue on April 23, 2001, to "provide comments and suggestions on a Risk Management program for OxyContin." Among other issues, the FDA noted that Purdue should add a black-box warning for overdose, abuse, and death to OxyContin's label.  Purdue acknowledged that it was aware of abuse of OxyContin orally (without tampering), as well as by snorting or injecting. It was not, the FDA explained, a matter of changing a few words in OxyContin's label; Dr. Cynthia McCormick, then director of the FDA division overseeing pain medication, declared that "'major overhaul is my message.' The prescribing of OxyContin is creeping into a whole population of people where it doesn't belong. Just rewriting the abuse and dependence section won't help much, that part of the insert is not a pivot point."

61.     Another FDA participant asked that Purdue "refocus our promotional materials and make the risks of abuse and diversion more prominent." In short, the FDA advised Purdue "that the information put in the label back at the time of product approval did not adequately address the risks associated with this product and this needs to be corrected."

62.     In 2001, Purdue revised the indication and warnings for OxyContin, but did not go nearly as far as the FDA recommended or the known risks of the product demanded.  In the United States, Purdue ceased distributing the 160 mg tablet of OxyContin. While Purdue agreed to "consider" changes to its label, it also expressed a reluctance to make significant changes not required for other prescription opioids. Dr. McCormick noted that the issues discussed at  the meeting were specific to OxyContin and that, while the Agency would talk with Purdue's competitors, "'we have a problem here and now with OxyContin.' In due time other manufacturers will be contacted but the first problem is this product."

63.     In the end, Purdue narrowed the recommended use of OxyContin to situations when "a continuous, around-the-clock analgesic is needed for an extended period of time" and added  a warning that "[t]aking broken, chewed, or crushed OxyContin tablets" could lead to a "potentially fatal dose." However, Purdue did not, until 2014, change the label as the FDA suggested, to indicate that OxyContin should not be the first therapy, or even the first opioid, used, and did  not disclose the incidence or risk of overdose and death even when OxyContin was not abused.  Purdue announced the label changes in a letter to health care providers but did not, as the FDA suggested, issue "a Medguide for patients on the risks of overdose and the abuse of opioids as well as  risks for use by others than those for whom it was prescribed" or undertake the  recommended promotional effort to educate patients about the potentially fatal risks of OxyContin.

64.     The FDA also informed Purdue what Purdue already knew, as noted  above—that "there is a perception that oxycodone is safer than morphine." A representative from the  FDA's Division of Drug Marketing, Advertising and Communications echoed this, calling for an "extensive educational effort to consumers and health care practitioners" to "correct  a misconception that [OxyContin] is different than morphine."  Upon information and belief, Purdue never undertook that effort.

### (2) Falsehood #2: To the extent there is a risk of addiction, it can be easily identified and managed

65.     While continuing to maintain that most patients can safely take opioids long-term for chronic pain without becoming addicted, Purdue asserted that to the extent that *some* patients are at risk of opioid addiction, doctors can effectively identify and manage that risk by using screening tools or questionnaires. In materials they produced, sponsored, or controlled, Defendants instructed patients and prescribers that screening tools can identify patients predisposed to addiction, thus making doctors feel more comfortable prescribing opioids to their patients and patients more comfortable starting opioid therapy for chronic pain. These tools, they say, identify those with higher addiction risks (stemming from personal or family histories of substance use, mental illness, trauma, or abuse) so that doctors can then more closely monitor those patients.

66.     Purdue shared its *Partners Against Pain* "Pain Management Kit," which contains several screening tools and catalogues of Purdue materials, which included these tools, with prescribers.

67.     Purdue sponsored a 2011 webinar entitled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This publication misleadingly taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths." Purdue sponsored another 2011 CME program titled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This presentation also deceptively instructed prescribers that screening tools, patient agreements, and urine tests prevented "overuse of prescriptions" and "overdose deaths."

68.     Purdue also funded a 2012 CME program called *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*. The presentation deceptively instructed doctors that, through the use of screening tools, more frequent refills, and other techniques, even high-risk patients showing signs of addiction could be treated with opioids.

69.     There are three fundamental flaws in the Sackler Defendants' and Purdue's representations that doctors can consistently identify and manage the risk of addiction. First, there is no reliable scientific evidence that doctors can depend on the screening tools currently available to materially limit the risk of addiction. Second, there is no reliable scientific evidence that high-risk patients identified through screening can take opioids long-term without triggering addiction, even with enhanced monitoring. Third, there is no reliable scientific evidence that patients who are not identified through such screening can take opioids long-term without significant danger of addiction.

### (3)     Falsehood #3: Signs of addictive behavior are "pseudoaddiction," requiring more opioids

70.     Purdue instructed patients and prescribers that signs of addiction are actually indications of untreated pain, such that the appropriate response is to prescribe even more opioids. Dr. David Haddox, who later became a Senior Medical Director for Purdue, published a study in 1989 coining the term "pseudoaddiction," which he characterized as "the iatrogenic syndrome of abnormal behavior developing as a direct consequence of inadequate pain management."[43] In other words, people on prescription opioids who exhibited classic signs of addiction—for example, asking for more and higher doses of opioids, self-escalating their doses, or claiming to have lost prescriptions in order to get more opioids—were not addicted, but rather simply suffering from under treatment of their pain.

71.     In the materials and outreach they produced, sponsored, or controlled, Purdue made each of these misrepresentations and omissions, and has never acknowledged, retracted, or corrected them.

72.     Purdue posted an unbranded pamphlet entitled *Clinical Issues in Opioid Prescribing* on its unbranded website, *www.PartnersAgainstPain.com*, in 2005, and circulated this

---

[43]  David E. Weissman & J. David Haddox, *Opioid Pseudoaddiction—An Iatrogenic Syndrome*, 36(3) Pain 363, 363-66 (Mar. 1989), https://www.ncbi.nlm.nih.gov/pubmed/2710565 ("Iatrogenic" describes a condition induced by medical treatment).

pamphlet through at least 2007 and on its website through at least 2013. The pamphlet listed conduct including "illicit drug use and deception" that it claimed was not evidence of true addiction but "pseudoaddiction" caused by untreated pain.

73.     According to documents provided by a former Purdue detailer, sales representatives were trained and tested on the meaning of pseudoaddiction, from which it can be inferred that sales representatives were directed to, and did, describe pseudoaddiction to prescribers. Purdue's Pain Management Kit is another example of publication used by Purdue's sales force that endorses pseudoaddiction by claiming that "pain-relief seeking behavior can be mistaken for drug-seeking behavior." Upon information and belief, the kit was in use from roughly 2011 through at least June 2016.

74.     The CDC Guideline nowhere recommends attempting to provide more opioids to patients exhibiting symptoms of addiction.

### (4)     Falsehood #4: Opioid withdrawal can be avoided by tapering

75.     In an effort to underplay the risk and impact of addiction, Purdue falsely claimed that, while patients become physically dependent on opioids, physical dependence is not the same as addiction and can be easily addressed, if and when pain relief is no longer desired, by gradually tapering patients' dose to avoid the adverse effects of withdrawal. Defendants failed to disclose the extremely difficult and painful effects that patients can experience when they are removed from opioids—adverse effects that also make it less likely that patients will be able to stop using the drugs. Defendants also failed to disclose how difficult it is for patients to stop using opioids after they have used them for prolonged periods.

76.     Purdue sponsored *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but the guide did not disclose the significant hardships that often accompany cessation of use.

77.     To this day, Purdue have not corrected or retracted  their misrepresentations regarding tapering as a solution to opioid withdrawal.

### (5)     Falsehood #5: Opioid doses can be increased without limit or greater risks

78.     In materials it produced, sponsored or controlled, Purdue instructed prescribers that they could safely increase a patient's dose to achieve pain relief.  Each of Purdue's claims was deceptive in that it omitted warnings of increased adverse effects that occur at higher doses, effects confirmed by scientific evidence.

79.     These misrepresentations were integral to Purdue's promotion of prescription opioids. As discussed above, patients develop a tolerance to opioids' analgesic effects, so that achieving long-term pain relief requires constantly increasing the dose.

80.     In a 1996 sales memo regarding OxyContin, for example, a regional manager for Purdue instructed sales representatives to inform physicians that there is "no[] upward limit"  for dosing and ask "if there are any reservations in using a dose of 240mg-320mg of OxyContin."[44] And the 2003 Conversion Guide for OxyContin contained the following diagram for increasing dose up to 320 mg:



_____

[44] Letter from Windell Fisher, Purdue Regional Manager, to B. Gergely, Purdue Employee (Nov. 7, 1996), http://documents.latimes.com/sales-manager-on12-hour-dosing-1996/ (last updated May 5, 2016) (hereinafter, "Letter from Fisher").

81.     In addition, sales representatives aggressively pushed doctors to prescribe stronger doses of opioids.  For example, one Purdue sales representative wrote about how his regional manager would drill the sales team on their upselling tactics:

> It went something like this.  "Doctor, what is the highest dose of OxyContin you have ever prescribed?" "20mg Q12h." "Doctor, if the patient tells you their pain score is still high you can increase the dose 100% to 40mg Q12h, will you do that?" "Okay." "Doctor, what if that patient them came back and said their pain score was still high, did you know that you could increase the OxyContin dose to 80mg Q12h, would you do that?" "I don't know, maybe." "Doctor, but you do agree that you would at least Rx the 40mg dose, right?" "Yes."
>
> The next week the rep would see that same doctor and go through the same discussion with the goal of selling higher and higher doses of OxyContin.

82.     These misrepresentations were particularly dangerous.  As noted above, opioid doses at or above 50 MME/day double the risk of overdose compared to 20 MME/day, and 50 MME is equal to just 33 mg of oxycodone.  The recommendation of 320 mg every twelve  hours is ten times that.

83.     In its 2010 Risk Evaluation and Mitigation Strategy ("REMS") for OxyContin, however, Purdue does not address the increased risk of respiratory depression and death from increasing dose, and instead advises prescribers that "dose adjustments may be made every 1- 2 days"; "it is most appropriate to increase the q12h dose"; the "total daily dose can usually be increased by 25% to 50%"; and if "significant adverse reactions occur, treat them aggressively until they are under control, then resume upward titration."[45]

84.     Purdue and the Sackler Defendants were aware of the greater dangers high-dose opioids posed.  In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events" and that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk

---

[45]     Purdue     Pharma,     L.P.,     *OxyContin     Risk     Evaluation     and     Mitigation     Strategy*, https://web.archive.org/web/20170215190303/https://www.fda.gov/downloads/Drugs/DrugSafet y/PostmarketDrugSafetyInformationforPatientsandProviders/UCM220990.pdf (last modified Nov. 2010).

of overdose and/or overdose mortality." A study of the Veterans Health Administration from 2004 to 2008 found the rate of overdose deaths is directly related to maximum daily dose.

### (6)   Falsehood #6: Long-term opioid use improves functioning

85.   Despite the lack of evidence of improved function and the existence of evidence to the contrary, Purdue consistently promoted opioids as capable of improving patients' function and quality of life because they viewed these claims as a critical part of their marketing strategies.  In recalibrating the risk-benefit analysis for opioids, increasing the perceived benefits of treatment was necessary to overcome its risks.

86.   Purdue at relevant times noted the need to compete with the messaging of its competitors, despite the lack of data supporting improvement in quality of life with OxyContin treatment:

> Janssen has been stressing decreased side effects, especially constipation, as well as patient quality of life, as supported by patient rating compared to sustained release morphine . . . We do not have such data to support OxyContin promotion. . . . In addition, Janssen has been using the "life uninterrupted" message in promotion of Duragesic for non-cancer pain, stressing that Duragesic "helps patients think less about their pain." This is a competitive advantage based on our inability to make any quality of life claims.[46]

87.   Despite its acknowledgment that "[w]e do not have such data to support OxyContin promotion," Purdue ran a full-page ad for OxyContin in the Journal of the American Medical Association, proclaiming, "There Can Be Life With Relief," and showing a man happily fly-fishing alongside his grandson, implying that OxyContin would help users' function. This ad earned a warning letter from the FDA, which admonished, "It is particularly disturbing that your November ad would tout 'Life With Relief' yet fail to warn that patients can die from taking OxyContin."[47]

---

[46] Meier, *supra* note 31, at 281.
[47] Chris Adams, *FDA Orders Purdue Pharma to Pull Its OxyContin Ads*, Wall St. J. (Jan. 23, 2003, 12:01am), https://www.wsj.com/articles/SB1043259665976915824.

88.     Purdue sponsored an article, titled *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients. But, the article cited as support for this in fact stated the contrary, noting the absence of long-term studies and concluding, "[f]or functional outcomes, the other analgesics were significantly more effective than were opioids."

89.     A series of medical journal advertisements for OxyContin in 2012 presented "Pain Vignettes"—case studies featuring patients with pain conditions persisting over several months—that implied functional improvement. For example, one advertisement described a "writer with osteoarthritis of the hands" and implied that OxyContin would help him work more effectively.

90.     Purdue's claims that long-term use of opioids improves patient function and quality of life are unsupported by clinical evidence. There are no controlled studies of the use of opioids beyond 16 weeks, and there is no evidence that opioids improve patients' pain and function long term. The FDA, for years, has made clear through warning letters to manufacturers the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life.[48] Based upon a review of the existing scientific evidence, the CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use."[49]

91.     Consistent with the CDC's findings, substantial evidence exists demonstrating that opioid drugs are ineffective for the treatment of chronic pain and worsen patients' health. For

---

[48] The FDA has warned other drugmakers that claims of improved function and quality of life were misleading. *See* Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008), (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). The FDA's warning letters were available to Defendants on the FDA website.
[49] CDC Guideline, *supra* note 28, at 20.

26

example, a 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments. The few longer-term studies of opioid use had "consistently poor results," and "several studies have showed that [using] opioids for chronic pain may actually worsen pain and functioning,"[50] along with general health, mental health, and social function. Over time, even high doses of potent opioids often fail to control pain, and patients exposed to such doses are unable to function normally.

92.     The available evidence indicates opioids may worsen patients' health and pain. Increased duration of opioid use is also strongly associated with increased prevalence of mental health disorders (depression, anxiety, post-traumatic stress disorder, and substance abuse), increased psychological distress, and greater health care utilization. The CDC Guideline concluded that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[51] According to the CDC, "for the vast majority of patients, the known, serious, and too-often-fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain]."[52]

93.     As one pain specialist observed, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[53] In fact, research such as a 2008 study in the journal *Spine* has shown that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work.[54] Another study demonstrated that injured workers who received a prescription opioid for more than seven days during the first six

[50] Thomas R. Frieden and Debra Houry, *Reducing the Risks of Relief—The CDC Opioid- Prescribing Guideline*, New Eng. J. of Med., at 1503 (Apr. 21, 2016).

[51] CDC Guideline, *supra* note 28, at 2, 18.

[52]  Frieden & Houry, *Reducing the Risks of Relief*, *supra* note 50, at 1503.

[53] Andrea Rubinstein, *Are We Making Pain Patients Worse?*, Sonoma Med. (Fall 2009), http://www.nbcms.org/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making-pain-patients-worse.aspx?pageid=144&tabid=747.

[54] Jeffrey Dersh, *et al.*, *Prescription Opioid Dependence is Associated With Poorer Outcomes in Disabling Spinal Disorders*, 33(20) Spine 2219-27 (Sept. 15, 2008).

weeks after the injury were 2.2 times more likely to remain on work disability a year later than workers with similar injuries who received no opioids at all.[55]

(7)    **Falsehood #7: Alternative forms of pain relief pose greater risks than opioids**

94.    In materials they produced, sponsored or controlled, Purdue omitted known risks of chronic opioid therapy and emphasized or exaggerated risks of competing products so that prescribers and patients would favor opioids over other therapies such as over- the-counter acetaminophen or over-the-counter or prescription NSAIDs.

95.    For example, in addition to failing to disclose in promotional materials the risks of addiction, overdose, and death, Purdue routinely ignored the risks  of hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time;"[56] hormonal dysfunction;[57] decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly;[58] neonatal abstinence syndrome (when an infant exposed to opioids prenatally suffers withdrawal after birth), and potentially fatal interactions with alcohol or with benzodiazepines, which are used to treat anxiety and may be co-prescribed with opioids, particularly to veterans suffering from pain.[59]

96.    The APF's *Treatment Options: A Guide for People Living with Pain*, co-sponsored by Purdue, warned that risks of NSAIDs increase if "taken for more than a period of  months," with no corresponding warning about opioids. The publication falsely attributed 10,000 to 20,000 deaths annually to NSAID overdoses, when the figure is closer to 3,200.

---

[55] GM Franklin, BD Stover, JA Turner, D Fulton-Kehoe, TM Wickizer, *Early Opioid Prescription and Subsequent Disability Among Workers With Back Injuries: The Disability Risk Identification Study Cohort*, 33(2) Spine 199, 201-202 (Jan. 15, 2008).
[56] Letter from Janet Woodcock, M.D., Dir. of Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. of Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).
[57] H.W. Daniell, *Hypogonadism in Men Consuming Sustained-Action Oral Opioids*, 3(5) J.Pain 377, 377-84 (2001).
[58] Bernhard M. Kuschel, *The Risk of Fall Injury in Relation to Commonly Prescribed Medications Among Older People—A Swedish Case-Control Study*, 25(3) Eur. J. Pub. H. 527, 527-32 (July 31, 2014).
[59] Karen H. Seal *et al.*, *Association of Mental Health Disorders With Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan*, 307(9) J. of Am. Med. Assoc. 940, 940-47 (2012).

97.     As a result of Purdue's deceptive promotion of opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and  2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID  and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing.

### (8)     Falsehood #8: OxyContin provides twelve hours of pain relief

98.     Purdue also dangerously misled doctors and patients about OxyContin's  duration and onset of action, making the knowingly false claim that OxyContin would provide 12 hours of pain relief for most patients. As laid out below, Purdue made this claim for two reasons. First, it provides the basis for both Purdue's patent and its market niche, allowing it to both protect and differentiate itself from competitors.  Second, it allowed Purdue to imply or state outright that OxyContin had a more even, stable release mechanism that avoided peaks and valleys and therefore the rush that fostered addiction and attracted abusers.

99.     Purdue promotes OxyContin as an extended-release opioid, but the oxycodone does not enter the body at a linear rate. OxyContin works by releasing a greater proportion  of oxycodone into the body upon administration, and the release gradually tapers, as illustrated in the following chart, which was apparently adapted from Purdue's own sales materials:



100.    The reduced release of the drug over time means that the oxycodone no longer provides the same level of pain relief; as a result, in many patients, OxyContin does not last for the twelve hours for which Purdue promotes it—a fact that Purdue has known at all times relevant to this action.

101.    OxyContin tablets provide an initial absorption of approximately 40% of the active medicine. This has a two-fold effect. First, the initial rush of nearly half of the powerful opioid triggers a powerful psychological response. OxyContin thus behaves more like an immediate-release opioid, which Purdue itself once claimed was more addicting in its original 1995 FDA-approved drug label. Second, the initial burst of oxycodone means that there is less of the drug at the end of the dosing period, which results in the drug not lasting for a full twelve hours and precipitates withdrawal symptoms in patients, a phenomenon known as "end of dose" failure. (The FDA found in 2008 that a "substantial number" of chronic pain patients will experience end-of-dose failure with OxyContin.)

102.    End-of-dose failure renders OxyContin even more dangerous because patients begin to experience withdrawal symptoms, followed by a euphoric rush with their next dose—a cycle that fuels a craving for OxyContin. For this reason, Dr. Theodore Cicero, a neuropharmacologist at the Washington University School of Medicine in St. Louis, has called OxyContin's 12-hour dosing "the perfect recipe for addiction."[60] Many patients will exacerbate this cycle by taking their next dose ahead of schedule or resorting to a rescue dose of another opioid, increasing the overall amount of opioids they are taking.

103.    It was Purdue's decision, at the direction of the Sackler Defendants, to submit OxyContin for approval with 12-hour dosing. While the OxyContin label indicates that "[t]here are no well-controlled clinical studies evaluating the safety and efficacy with dosing more frequently than every 12 hours," that is because Purdue has conducted no such studies.

---

[60] Harriet Ryan, *et al.*, "'*You Want a Description of Hell?' OxyContin's 12-Hour Problem*," L.A. Times, May 5, 2016, http://www.latimes.com/projects/oxycontin-part1/ (hereinafter, *"You Want a Description of Hell?"*).

104.    Purdue nevertheless has falsely promoted OxyContin as if it were effective for a full twelve hours. Its advertising in 2000 included claims that OxyContin provides "Consistent Plasma Levels Over 12 Hours." That claim was accompanied by a chart, mirroring the chart on the previous page. However, this version of the chart deceptively minimized the rate of end-of-dose failure by depicting 10 mg in a way that it appeared to be half of 100 mg in the table's y-axis. That chart, shown below, depicts the same information as the chart above, but does so in a way that makes the absorption rate appear more consistent:



105.    Purdue's 12-hour messaging was key to its competitive advantage over short-acting opioids that required patients to wake in the middle of the night to take their pills.  Purdue advertisements also emphasized "Q12h" dosing. These include an advertisement in the February 2005 *Journal of Pain* and 2006 *Clinical Journal of Pain* featuring an OxyContin logo with two pill cups, reinforcing the twice-a-day message. A Purdue memo to the OxyContin launch team stated that "OxyContin's positioning statement is 'all of the analgesic efficacy of immediate-

release oxycodone, with convenient q12h dosing,'" and further that "[t]he convenience of q12h dosing was emphasized as the most important benefit."[61]

106.    In keeping with this positioning statement, a Purdue regional manager emphasized in a 1996 sales strategy memo that representatives should "convince[e] the physician that there is no need" for prescribing OxyContin in shorter intervals than the recommended 12-hour interval, and instead the solution is prescribing higher doses.[62] One sales manager instructed her team that anything shorter than 12-hour dosing "needs to be nipped in the bud, NOW!!"[63]

107.    Purdue executives therefore maintained the messaging of twelve-hour dosing even when many reports surfaced that OxyContin did not last twelve hours. Instead of acknowledging a need for more frequent dosing, Purdue instructed its representatives to push higher-strength pills, even though higher dosing carries its own risks, as noted above. It also means that patients will experience higher highs and lower lows, increasing their craving for their next pill.  (Urging higher doses to avoid end-of-dose failure is like advising a pilot to avoid a crash by flying higher.) Nationwide, based on an analysis by the *Los Angeles Times*, more than 52% of patients taking OxyContin longer than three months are on doses greater than 60 milligrams per day—which converts to the 90 MED that the CDC Guideline urges prescribers to "avoid" or "carefully justify."[64]

108.    That OxyContin did not provide pain relief for a full twelve hours was known to Purdue, and Purdue's competitors, but was not disclosed to prescribers. Purdue's knowledge of some pain specialists' tendency to prescribe OxyContin three times per day instead of two was set out in Purdue's internal documents as early as 1999 and is apparent from MedWatch Adverse Event reports for OxyContin.

---

[61] Memorandum from Lydia Johnson, Marketing Executive at Purdue, to members of OxyContin Launch Team (Apr. 4, 1995), http://documents.latimes.com/oxycontin-launch-1995/ (last updated May 5, 2016).

[62] Letter from Fisher, *supra* note 44.

[63] *You Want a Description of Hell?*, *supra* note 60.

[64] CDC Guideline, *supra* note 28, at 16.

109.     Purdue's failure to disclose the prevalence of end-of-dose failure meant that prescribers were misinformed about the advantages of OxyContin in a manner that preserved Purdue's competitive advantage and profits, at the expense of patients, who were placed at greater risk of overdose, addiction, and other adverse effects.

### (9)     Falsehood #9: New formulations of certain opioids successfully deter abuse

110.     Rather than take the widespread opioid abuse of and addiction to opioids as reason to cease their untruthful marketing efforts, Purdue and the Sackler Defendants seized them as a competitive opportunity. Purdue developed and oversold "abuse-deterrent formulation" ("ADF") opioids as a solution to opioid abuse and as a reason that doctors could continue to safely prescribe their opioids, as well as an advantage of these expensive branded drugs over other opioids.  These Defendants' false and misleading marketing of the benefits of their ADF opioids preserved and expanded their sales and falsely reassured prescribers thereby  prolonging the opioid epidemic.

111.     The CDC Guideline confirms that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes."  Tom Frieden, the former Director of the CDC, reported that his staff could not find "any evidence showing the updated opioids  [ADF opioids] actually reduce rates of addiction, overdoses, or deaths."

112.     Reformulated ADF OxyContin was approved by the FDA in April 2010. It was not until 2013 that the FDA, in response to a citizen petition filed by Purdue, permitted reference to the abuse-deterrent properties in its label. When Hysingla ER (extended-release hydrocodone) launched in 2014, the product included similar abuse-deterrent properties and limitations. But  in the beginning, the FDA made clear the limited claims that could be made about ADF, noting that no evidence supported claims that ADF prevented tampering, oral abuse, or overall rates of abuse.

113.    It is unlikely a coincidence that reformulated OxyContin was introduced shortly before generic versions of OxyContin were to become available, threatening to erode Purdue's market share and the price it could charge. Purdue nonetheless touted its introduction of ADF opioids as evidence of its good corporate citizenship and commitment to address the opioid crisis.

114.    Despite its self-proclaimed good intention, Purdue merely incorporated its generally deceptive tactics with respect to ADF. Purdue sales representatives regularly overstated and misstated the evidence for and impact of the abuse-deterrent features of these opioids. Specifically, Purdue sales representatives:

(a)    claimed that Purdue's ADF opioids prevent tampering and that its ADFs could not be crushed or snorted;

(b)    claimed that Purdue's ADF opioids reduce opioid abuse and diversion;

(c)    asserted or suggested that its ADF opioids are non-addictive or less addictive;

(d)    asserted or suggested that Purdue's ADF opioids are safer than other opioids, could not be abused or tampered with, and were not sought out for diversion; and

(e)    failed to disclose that Purdue's ADF opioids do not impact oral abuse or misuse.

115.    If pressed, Purdue acknowledged that perhaps some "extreme" patients might still abuse the drug, but claimed the ADF features protect the majority of patients. These misrepresentations and omissions are misleading and contrary to Purdue's ADF labels, Purdue's own information, and publicly available data.

116.    Purdue knew or should have known that reformulated OxyContin is not  more tamper-resistant than the original OxyContin and is still regularly tampered with and abused.

117.    In 2009, the FDA noted in permitting ADF labeling that "the tamper-resistant properties will have no effect on abuse by the oral route (the most common mode of abuse)".  In the 2012 medical office review of Purdue's application to include an abuse-deterrence claim in its

34

label for OxyContin, the FDA noted that the overwhelming majority of deaths linked to OxyContin were associated with oral consumption, and that only 2% of deaths were associated with recent injection and only 0.2% with snorting the drug.

118.    The FDA's Director of the Division of Epidemiology stated in September 2015 that no data that she had seen suggested the reformulation of OxyContin "actually made a reduction in abuse," between continued oral abuse, shifts to injection of other drugs (including heroin), and defeat of the ADF mechanism. Even Purdue's own funded research shows that half of OxyContin abusers continued to abuse OxyContin orally after the reformulation rather than shift to other drugs.

119.    A 2013 article presented by Purdue employees based on review of data from poison control centers, concluded that ADF OxyContin can reduce abuse, but it ignored important negative findings. The study revealed that abuse merely shifted to other drugs and that, when the actual incidence of harmful exposures was calculated, there were *more* harmful exposures to opioids after the reformulation of OxyContin.  In short, the article deceptively emphasized the advantages and ignored the disadvantages of ADF OxyContin.

120.    Websites and message boards used by drug abusers, such as bluelight.org and reddit.com, report a variety of ways to tamper with OxyContin and Hysingla ER, including through grinding, microwaving then freezing, or drinking soda or fruit juice in which a tablet is dissolved. Purdue has been aware of these methods of abuse for more than a decade.

121.    One-third of the patients in a 2015 study defeated the ADF mechanism and  were able to continue inhaling or injecting the drug.  To the extent that the abuse of Purdue's ADF opioids was reduced, there was no meaningful reduction in opioid abuse overall, as many users simply shifted to other opioids such as heroin.

122.    In 2015, claiming a need to further assess its data, Purdue abruptly withdrew a supplemental new drug application related to reformulated OxyContin one day before FDA staff was to release its assessment of the application. The staff review preceded an FDA  advisory committee meeting related to new studies by Purdue "evaluating the misuse and/or abuse of

reformulated OxyContin" and whether those studies "have demonstrated that the reformulated OxyContin product has had a meaningful impact on abuse."[65] Upon information and belief, Purdue never presented the data to the FDA because the data would not have supported claims that OxyContin's ADF properties reduced abuse or misuse.

123.     Despite its own evidence of abuse, and the lack of evidence regarding the benefit of Purdue's ADF opioids in reducing abuse, Dr. J. David Haddox, the Vice President of Health Policy for Purdue, falsely claimed in 2016 that the evidence does not show that Purdue's ADF opioids are being abused in large numbers. Purdue's recent advertisements in national newspapers also continues to claim its ADF opioids as evidence of its efforts to reduce opioid abuse, continuing to mislead prescribers, patients, payors, and the public about the efficacy of its actions.

> **2.     The Sackler Defendants Deliberately Directed Purdue and Rhodes to Disregard Their Duties to Maintain Effective Controls and to Identify, Report, and Take Steps to Halt Suspicious Orders**

124.     The Sackler Defendants acted together to create a larger market for opioids than ever should have occurred. The Sackler Defendants compounded this harm by facilitating the supply of far more opioids than could have been justified to serve that market by knowing about but failing to report suspicious orders. The willful failure of the Defendants to maintain effective controls, and to investigate, report, and take steps to halt orders that they knew or should have known were suspicious breached both their statutory and common law duties.

125.     For over a decade, as the Sackler Defendants pushed to increase the demand for opioids, Purdue and Rhodes aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, pharmaceutical companies are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers. Rather,

---

[65] Jill Hartzler Warner, Assoc. Comm'r for Special Med. Programs, *Joint Meeting of the Drug Safety and Risk Management Advisory Committee and the Anesthetic and Analgesic Drug Products Advisory Committee*; *Notice of Meeting*, 80(103) Fed. Reg. 30686, 30686 (May 29, 2015).

as described below, they are subject to various duties to report the quantity of Schedule II controlled substances in order to monitor such substances and prevent oversupply and diversion into the illicit market.

126.   Purdue and Rhodes are required to register as either manufacturers or distributors pursuant to 21 U.S.C. § 823 and 21 C.F.R. §§ 1301.11, 1301.74.

127.   The Sackler Defendants' scheme was resoundingly successful. Chronic  opioid therapy—the prescribing of opioids long-term to treat chronic pain—has become a commonplace, and often first-line, treatment.  Purdue's deceptive marketing caused prescribing not only of  their opioids,  but of opioids as a  class, to skyrocket. Not only were the name brand drugs such as Purdue's OxyContin aggressively promoted, but the generic opioids sold by Rhodes were also in higher demand due to the Sackler Defendants' overall scheme to increase opioid use and market share in the United States.

128.   According to  the  CDC  opioid prescriptions, as measured by number of prescriptions and morphine milligram  equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S.  While previously a small minority of opioid sales, today between 80% and 90% of opioids (measured by weight) used are for chronic pain. Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids. Opioids are the most common treatment for chronic pain, and 20% of office  visits  now  include  the prescription of an  opioid.

129.    497. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has  quadrupled  since  1999  and  has  increased  in  parallel  with  [opioid]  overdoses." Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are

critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[66]

### a. Purdue and Rhodes Have a Duty to Report Suspicious Orders and Not to Ship Those Orders Unless Due Diligence Disproves Their Suspicions

130.     Multiple sources impose duties on companies such as Purdue and Rhodes to report suspicious orders  and further to not ship those orders unless due diligence disproves those suspicions.

131.     First, under the common law, Purdue and Rhodes had a duty to exercise reasonable care in delivering dangerous narcotic substances. By flooding the United States with more opioids than could be used for legitimate medical purposes and by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, Purdue and Rhodes breached that duty and both created and failed to prevent a foreseeable risk of harm.

132.     Second, each of Purdue and Rhodes assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

133.     Third, each of Purdue and  Rhodes were required to register with the DEA to manufacture and/or distribute Schedule II controlled substances. *See* 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100. As registrants, Purdue and Rhodes were required to "maint[ain] . . . effective controls against diversion" and to "design and operate a system to disclose . . . suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74. Purdue and Rhodes were further required  to take steps to halt suspicious orders.  Purdue and Rhodes violated their obligations under federal law.

134.     Fourth, as described below, Purdue and Rhodes also had duties under applicable state laws. Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970. The CSA and its implementing regulations created a closed-

---

[66] *Id.*

system of distribution for all controlled substances and listed chemicals. Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market. Congress was concerned with the diversion of drugs out of legitimate channels of distribution and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market." Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain. All registrants—which includes all manufacturers and distributors of controlled substances—must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion. When registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse. The result is the scourge of addiction that has occurred.

135. The CSA requires manufacturers and distributors of Schedule II substances like opioids to: (a) limit sales within a quota set by the DEA for the overall production of Schedule II substances like opioids; (b) register to manufacture or distribute opioids; (c) maintain effective controls against diversion of the controlled substances that they manufacture or distribute; and (d) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA.

136. Central to the closed-system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs." When evaluating production quotas, the DEA was instructed to consider the following information:

(a)     Information provided by the Department of Health and Human Services;

(b)     Total net disposal of the basic class [of each drug] by all manufacturers;

(c)     Trends in the national rate of disposal of the basic class [of drug];

(d)     An applicant's production cycle and current inventory position;

(e)     Total actual or estimated inventories of the class [of drug] and of all substances manufactured from the class and trends in inventory accumulation; and

(f)     Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.

137.   It is unlawful to manufacture a controlled substance in Schedule II, like prescription opioids, in excess of a quota assigned to that class of controlled substances by the DEA.

138.   To ensure that even drugs produced within quota are not diverted, federal regulations issued under the CSA mandate that all registrants, manufacturers and distributors alike, "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Registrants are not entitled to be passive (but profitable) observers, but rather "shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant." *Id*. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. *Id*. Other red flags may include, for example, "[o]rdering the same controlled substance from multiple distributors."

139.   These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a distributor or manufacturer need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of

the industry. For this reason, identification of suspicious orders serves also to identify excessive volume of the controlled substance being shipped to a particular region.

140.    In sum, Purdue and Rhodes have several responsibilities under the law with respect to control of the supply chain of opioids. First, they must set up a system to prevent diversion, including excessive volume and other suspicious orders. That would include reviewing their own data, relying on their observations of prescribers and pharmacies, and following up on reports or concerns of potential diversion. All suspicious orders must be reported to relevant enforcement authorities. Further, they must also stop shipment of any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, they can determine that the order is not likely to be diverted into illegal channels.

141.    State and federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent manufacturers would not fall. Together, these laws and industry guidelines make clear that distributors and manufacturers alike possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the diversion of prescription narcotics when the supply chain is not properly controlled.

142.    Further, these laws and industry guidelines make clear that Purdue and Rhodes have a duty and responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market even though they are merely the manufacturing entities and not the distributors.

143.    Purdue and Rhodes also have specialized and detailed knowledge of the potential suspicious prescribing and dispensing of opioids through their regular visits to doctors' offices and pharmacies, and from their purchase of data from commercial sources, such as IMS Health. Their extensive boots-on-the-ground activity through their sales force allowed Purdue, Rhodes, and the Sackler Defendants to observe the signs of suspicious prescribing and dispensing discussed elsewhere in the Complaint—lines of seemingly healthy patients, out-of-state license

plates, and cash transactions, to name only a few. In addition, Purdue and Rhodes regularly mined data, including, upon information and belief, chargeback data, which allowed them to monitor the volume and type of prescribing of doctors, including sudden increases in prescribing and unusually high dose prescribing, which would have alerted them, independent of their sales representatives, to suspicious prescribing.

144.    Such information was passed on directly to the Sackler Defendants, as discussed in detail below.  This information gave the Sackler Defendants insight into prescribing and dispensing conduct that enabled the Sackler Defendants to identify where sales tactics would be most effective. This information also could have allowed Purdue and Rhodes to play a valuable role in the preventing diversion and fulfilling their obligations under the CSA.

145.    Purdue and Rhodes have a duty, and are expected, to be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

146.    Purdue and Rhodes breached these duties, at the direction of the Sackler Defendants, by failing to: (a) control the supply chain; prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of serious problems of overuse of opioids.

### b.    Defendants Kept Careful Track of Prescribing Data and Knew About Suspicious Orders and Prescribers

147.    At all relevant times, Purdue and Rhodes and the Sackler Defendants were in possession of national, regional, state, and local prescriber- and patient-level data that allowed them to track prescribing patterns over time.  They obtained this information from data companies, including but not limited to:  IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").

148.    Purdue and Rhodes purchased nationwide, regional, state, and local prescriber- and patient- level data from the Data Vendors that allowed them to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify pill mills, etc. This information was then passed on directly to the Sackler Defendants in order for the Sackler Defendants to direct the marketing and sales strategies for opioid products.

149.    The use of prescriber level data was integral to the Sackler Defendants' scheme to increase the opioid market. Purdue maintained a contract with IMS health for many years to find which doctors to target with their deceptive advertising.[67] This relationship was a natural one for the Sackler Defendants as IMS was co-founded by non-other than Arthur Sackler.[68] Purdue and the Sackler Defendants in generating the massive market for opioids utilized Arthur Sackler's unique pharmaceutical sales techniques of "educating" doctors about the uses and benefits of a product.[69] Therefore, fine-grained data about the prescribing habits of individual doctors was essential in order for the Sackler Defendants to determine which doctors and areas to target for sales.

150.    Such data also could have been used to track patterns of abuse, but preventing abuse was at odds with the Sackler Defendants' scheme to grow the opioid market at all costs.[70] Data such as provided by IMS Health showed the Sackler Defendants which doctors were prescribing what opioids, and the Sackler Defendants could have easily reported high volume prescribers.[71] However, Purdue, as directed by the Sackler Defendants, did not feel that it was up to Purdue to asses "how well a physician practices medicine" and therefore repeatedly failed to report unlawful activity.[72]

151.    Defendants were, therefore, collectively aware of the suspicious orders that flowed daily from their manufacturing facilities and did little to nothing to stop them.

---

[67] Keefe, *Empire of Pain*, *supra* note 15.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*

152.    Moreover, Defendants' sales incentives rewarded sales representatives who happened to have pill mills within their territories, enticing those representatives to look the other way even when their in-person visits to such clinics should have raised numerous red flags. In one example, a pain clinic in South Carolina was diverting massive quantities of OxyContin. People traveled to the clinic from towns as far as 100 miles away to get prescriptions, the DEA's diversion unit raided the clinic, and prosecutors eventually filed criminal charges against the doctors. But, Purdue's sales representative for that territory, Eric Wilson, continued to promote OxyContin sales at the clinic. He reportedly told another local physician that this clinic accounted for 40% of the OxyContin sales in his territory. At that time, Wilson was Purdue's top-ranked sales representative. In response to news stories about this clinic, Purdue issued a statement, declaring that "if a doctor is intent on prescribing our medication inappropriately, such activity would continue regardless of whether we contacted the doctor or not."[73][64]

153.    In another example, a Purdue sales manager informed her supervisors in 2009 about a suspected pill mill in Los Angeles, reporting over email that when she visited the clinic with her sales representative, "it was packed with a line out the door, with people who looked like gang members," and that she felt "very certain that this an organized drug ring[.]"[74] She wrote, "This is clearly diversion. Shouldn't the DEA be contacted about this?" But her supervisor at Purdue responded that while they were "considering all angles," it was "really up to [the wholesaler] to make the report."[75] This pill mill was the source of 1.1 million pills trafficked to Everett, Washington, a city of around 100,000 people. Purdue waited until after the clinic was shut down in 2010 to inform the authorities.

154.    Purdue and Rhodes' obligation to report suspicious prescribing ran head-on into the Sackler Defendants' marketing strategy. The Sackler Defendants did identify doctors who were their most prolific prescribers—but not to report them, rather to market to them. It would

---

[73] Meier, *supra* note 31, at 298-300.
[74] Harriet Ryan *et al.*, *More Than 1 Million OxyContin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew*, Los Angeles Time (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.
[75] *Id.*

make little sense to focus on marketing to doctors who may be engaged in improper prescribing only to report them to law enforcement, nor to report those doctors who drove sales.

155.   Marketing visits were focused on increasing, sustaining, or converting the prescriptions of the biggest prescribers, particularly through aggressive, high frequency detailing visits. Overprescribing generated tremendous revenue for the Sackler Defendants through both Purdue and Rhodes.[76] Purdue sales representatives would refer to such doctors as "whales."[77] As discussed below, Richard Sackler explicitly directed managers of Purdue's sales department to continue to meet with the largest prescribers, encouraging weekly meetings with those persons in some cases.

156.   Diversion of opioids was a necessary part of the Sackler Defendants' scheme to grow the opioid market, and so the Sackler Defendants directed the activities of Purdue and Rhodes in furtherance of that scheme.

**B.     The Sackler Defendants Utilized Purdue to Perpetrate their Scheme to Grow the Demand for Prescription Opioids**

157.   This section of the Complaint identifies the individuals who are personally responsible for Purdue's illegal scheme.  The Sackler Defendants distanced themselves from Purdue on paper beginning in 2003, but for the relevant time period, the Sackler Defendants have been intimately involved in each of the decisions to grow and sustain the demand for opioids through deceptive and unlawful marketing.

158.   The breadth of control wielded by the Sackler family began as early as the 1960s. Estes Kefauver, a Tennessee senator, chaired a subcommittee that looked into the rapidly growing pharmaceutical industry.[78] Kefauver—who had previously investigated the mafia—generated a report noting: "The Sackler empire is a completely integrated operation" that "can devise a new drug in its drug development enterprise, have the drug clinically tested and secure favorable

---

[76] Keefe, *Empire of Pain*, *supra* note 15.
[77] *Id.*
[78] *Id.*

reports on the drug from the various hospitals with which they have connections, conceive the advertising approach and prepare the actual advertising copy with which to promote the drug, have the clinical articles as well as advertising copy published in their own medical journals, [and] prepare and plant articles in newspaper and magazines."[79]

159.    The Sackler Defendants have maintained their "empire" through the present by keeping the family businesses, Purdue and Rhodes, firmly within control of the Sackler Defendants. According to Robin Hogen, who was once a communications specialist for Purdue, the Sackler Defendants did not have an arm's length relationship with Purdue.[80] Rather, "[t]his was an active family and an active board."[81] Through the guilty pleas entered by the Purdue Frederick Company in 2007, and to the present, the Sackler Defendants have directed Purdue's deceptive and fraudulent marketing for the financial gain of the Sackler Family.

160.    The individual defendants were the chief architects and beneficiaries of Purdue's deception.  In summary:

> (a)    The individual defendants controlled the misconduct described in the paragraphs above.
>
> (b)    Each individual defendant knowingly and intentionally sent sales representatives to promote opioids to prescribers thousands of times.
>
> (c)    Each individual defendant knew and intended that the sales reps would unfairly and deceptively promote opioid sales that are risky for patients, including the nine falsehoods identified above.
>
> (d)    Each individual defendant knew and intended that the sales reps would not tell doctors and patients the truth about Purdue's opioids.  Indeed, they knew and intended these unfair and deceptive tactics achieved their purpose by concealing the truth.

---

[79] *Id.*
[80] *Id.*
[81] *Id.*

(e)     Each individual defendant knew and intended that prescribers, pharmacists, and patients would rely on Purdue's deceptive sales campaign to prescribe, dispense, and take Purdue opioids.  Securing that reliance was the purpose of the sales campaign.

(f)     Each individual defendant knew and intended that staff reporting to them would pay top prescribers tens of thousands of dollars to encourage other doctors to write dangerous prescriptions.

(g)     Each individual defendant knew and intended that staff reporting to them would reinforce these misleading acts through thousands of additional acts, including by sending deceptive publications to doctors and deceptively promoting Purdue opioids.

(h)     Each individual defendant knowingly and intentionally took money from Purdue's deceptive business.

(i)     Each individual defendant knowingly and intentionally sought to conceal his or her misconduct.

161.   Eight people in a single family made the choices that caused much of the opioid epidemic: Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler.  The Sackler family owns Purdue, and they always held a majority of the seats on its Board.  Because they controlled their own privately held drug company, the Sackler Defendants had the power to decide how addictive narcotics were sold.  They got more patients on opioids, at higher doses, for longer, than ever before.  They paid themselves billions of dollars.  They are responsible for addiction, overdose, and death that damaged millions of lives.  They should be held accountable now.

### 1.      The Sackler Defendants' Misconduct Leading to the 2007 Judgment

162.   The misconduct of Richard, Beverly, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler was particularly unfair, deceptive, unreasonable, and unlawful because they

already had been given a second chance.  From the 1990s until 2007, they directed a decade of misconduct, which led to criminal convictions, and commitments that Purdue would not deceive doctors and patients again.  That background confirms that their misconduct since 2007 was knowing and intentional.

163.    The Sackler family's first drug company was the Purdue Frederick Company, which they bought in 1952.  In 1990, they created Purdue Pharma Inc. and Purdue Pharma L.P. Richard, Beverly, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler took seats on the Board.[82]  For events before July 2012, this Complaint uses the "Sackler Defendants" to refer to them.  David Sackler joined the Board in July 2012.[83]  From that time forward, the "Sackler Defendants" includes him as well.

164.    The Sackler Defendants always insisted that their family control Purdue.  From 1990 until today, their family always held the majority of seats on the Board.  In 1994, Jonathan Sackler issued a memorandum to Purdue staff requiring that the Sackler Defendants should receive "all Quarterly Reports and any other reports directed to the Board."[84]

165.    Purdue launched OxyContin in 1996.  It became one of the deadliest drugs of all time.[85]  The FDA scientist who evaluated OxyContin wrote in his original review: "Care should be taken to limit competitive promotion."[86]  The Sackler Defendants did not agree.  From the beginning, the Sackler Defendants viewed limits on opioids as an obstacle to greater profits.  To make more money, the Sackler Defendants considered whether they could sell OxyContin in some countries as an uncontrolled drug.  Staff reported to Richard Sackler that selling OxyContin as "non-narcotic," without the safeguards that protect patients from addictive drugs, would provide

---

[82] Purdue Pharma Inc.'s 1991 filings with the Secretary of State of Connecticut state that it was incorporated in New York on October 2, 1990.  Richard, Ilene, Jonathan, and Kathe Sackler are all listed as directors on the earliest (1991) report.  Beverly, Mortimer, and Theresa all appear on the 1995 report.

[83] David Sackler affidavit.

[84] 1994-04-28 memo from Jonathan Sackler, PDD1701827936.

[85] *See, e.g.*, 2016-03-15 telebriefing by CDC Director Tom Frieden ("We know of no other medication that's routinely used for a nonfatal condition that kills patients so frequently … those who got the highest doses of opioids, more than 200 MMEs per day had a 1 in 32 chance of dying in just 2½ years … almost all the opioids on the market are just as addictive as heroin.), *available at* https://www.cdc.gov/media/releases/2016/t0315-prescribing-opioids-guidelines .html.

[86] 1995-10 Overall Conclusion to 1995 FDA review, Curtis Wright, #785793.1.

"a vast increase of the market potential."[87]  The inventor of OxyContin, Robert Kaiko, wrote to Richard to oppose this dangerous idea.  Kaiko wrote that he was "very concerned" about the danger of selling OxyContin without strict controls.  Kaiko warned: "I don't believe we have a sufficiently strong case to argue that OxyContin has minimal or no abuse liability."  To the contrary, Kaiko wrote, "oxycodone containing products are still among the most abused opioids in the U.S."  Kaiko predicted: "If OxyContin is uncontrolled, … it is highly likely that it will eventually be abused."[88]  Richard responded: "How substantially would it improve your sales?"[89]

166.    At the OxyContin launch party, Richard Sackler spoke as the Senior Vice President responsible for sales.  He asked the audience to imagine a series of natural disasters: an earthquake, a volcanic eruption, a hurricane, and a blizzard.  He said: "the launch of OxyContin Tablets will be followed by a blizzard of prescriptions that will bury the competition.  The prescription blizzard will be so deep, dense, and white…."[90]  Over the next twenty years, the Sackler Defendants made Richard's boast come true.  They created a manmade disaster.

167.    From the beginning, the Sackler Defendants were behind Purdue's decision to deceive doctors and patients.  In 1997, Richard Sackler, Kathe Sackler, and other Purdue executives determined—and recorded in secret internal correspondence—that doctors had the crucial misconception that OxyContin was weaker than morphine, which led them to prescribe OxyContin much more often, even as a substitute for Tylenol.[91]  In fact, OxyContin is more potent than morphine.  Richard directed Purdue staff not to tell doctors the truth, because the truth could reduce OxyContin sales.[92]

---

[87] 1997-02-27 email from Walter Wimmer, PDD1701346000.
[88] 1997-02-27 email from Robert Kaiko, PDD1701345999.
[89] 1997-03-02 email from Richard Sackler, PDD1701345999.
[90] PKY180280951.
[91] 1997-06-12 email from Richard Sackler, PDD8801141848 (Staff reported: "Since oxycodone is perceived as being a 'weaker' opioid than morphine, it has resulted in OxyContin being used much earlier for non-cancer pain.  Physicians are positioning this product where Percocet, hydrocodone, and Tylenol with Codeine have been traditionally used.  Since the non-cancer pain market is much greater than the cancer pain market, it is important that we allow this product to be positioned where it currently is in the physician's mind."  Richard Sackler replied: "I think you have this issue well in hand.  If there are developments, please let me know."); 1997-05-28 email from Richard Sackler PDD1508224773; 1997-04-23 email from Richard Sackler, PDD1701801141.
[92] 1997-06-12 email from Richard Sackler, PDD8801141848; 1997-05-28 email from Richard Sackler PDD1508224773; 1997-04-23 email from Richard Sackler, PDD1701801141.

168.    From the start, the Sackler Defendants were also the driving force behind Purdue's strategy to push opioids with the false promise that they create an enhanced "lifestyle."  In 1998, Richard Sackler instructed Purdue's executives that OxyContin tablets provide more than merely "therapeutic" value and instead "enhance personal performance," like Viagra.[93]

169.    Most of all, the Sackler Defendants cared about money.  Millions of dollars were not enough.  They wanted billions.  They cared more about money than about patients, or their employees, or the truth.  In 1999, when employee Michael Friedman reported to Richard Sackler that Purdue was making more than $20,000,000 per week, Richard replied immediately, at midnight, that the sales were "not so great."  "After all, if we are to do 900M this year, we should be running at 75M/month.  So it looks like this month could be 80 or 90M.  Blah, humbug.  Yawn.  Where was I?"[94]

170.    In 1999, Richard Sackler became the CEO of Purdue.  Jonathan, Kathe, and Mortimer were Vice Presidents.[95]  The company hired hundreds of sales representatives and taught them false claims to use to sell drugs.[96]  Purdue managers tested the sales reps on the most important false statements during training at company headquarters.  On the crucial issue of addiction, which would damage so many lives, Purdue trained its sales reps to deceive doctors that the risk of addiction was "less than one percent."[97]  Purdue mailed thousands of doctors promotional videos with that same false claim:

> "There's no question that our best, strongest pain medicines are the opioids.  But these are the same drugs that have a reputation for causing addiction and other terrible things.  Now, in fact, the rate of addiction amongst pain patients who are treated by doctors is much less than one percent.  They don't wear out, they go on working, they do not have serious medical side effects."[98]

---

[93] 1998-09-28 email from Richard Sackler, PDD1701546497.
[94] 1999-06-17 email from Michael Friedman, #228728.1.
[95] 2000-03-26, Peter Healy, Opening the Medicine Chest: Purdue Pharma prepares to raise its profile, #24865.1.
[96] 2003-12-23 GAO Report, pg. 19, PKY183266843 (increase from 771 reps in 1999 to 1,066 in 2001).
[97] Barry Meier, *Pain Killer* (1 ed. 2003) at 99.
[98] "I Got My Life Back" video, transcript, PDD9521403504.

A sales representative told a reporter: "We were directed to lie. Why mince words about it? Greed took hold and overruled everything. They saw that potential for billions of dollars and just went after it."[99]

171.    In 2000, the Sackler Defendants were warned that a reporter was "sniffing about the OxyContin abuse story."[100] The Sackler family put the threat on the agenda for the next Board meeting and began covering their tracks. They planned a response that "deflects attention away from the company owners."[101]

172.    In January 2001, Richard Sackler received a plea for help from a Purdue sales representative. The sales rep described a community meeting at a local high school, organized by mothers whose children overdosed on OxyContin and died. "Statements were made that OxyContin sales were at the expense of dead children and the only difference between heroin and OxyContin is that you can get OxyContin from a doctor."[102]

173.    The next month, a federal prosecutor reported 59 deaths from OxyContin in a single state.[103] The Sackler Defendants knew that the reports underestimated the destruction. Richard Sackler wrote to Purdue executives: "This is not too bad. It could have been far worse."[104] The next week, on February 14, a mother wrote a letter to Purdue:[105]

> "My son was only 28 years old when he died from Oxycontin on
> New Year's Day. We all miss him very much, his wife especially
> on Valentines' Day. Why would a company make a product that
> strong (80 and 160 mg) when they know they will kill young
> people? My son had a bad back and could have taken Motrin but
> his Dr. started him on Vicodin, then Oxycontin then Oxycontin
> SR. Now he is dead!"

A Purdue staff member noted: "I see a liability issue here. Any suggestions?"[106]

---

[99] 2017-10-16, Christopher Glazek, "The Secretive Family Making Billions From The Opioid Crisis," *Esquire* Magazine (quoting Purdue sales representative Shelby Sherman).
[100] 2000-11-30 email from Michael Friedman, PDD1706196247.
[101] 2000-12-01 email from Mortimer D. Sackler, PDD1706196246. Defendant Mortimer Sackler's father, the late Mortimer D. Sackler, was also involved in Purdue Pharma during his lifetime.
[102] 2001-01-26 email from Joseph Coggins, #171855.1.
[103] 2001-02-08 email from Mortimer Sacker, PDD8801151727.
[104] 2001-02-08 email from Richard Sackler, PDD8801151727.
[105] 2001-02-14 email to Robin Hogen, #3072810.1.
[106] 2001-02-14 email from James Heins, #3072810.1.

174.     That same month, Richard Sackler wrote down his solution to the overwhelming evidence of overdose and death: blame and stigmatize people who become addicted to opioids. Sackler wrote in a confidential email: "we have to hammer on the abusers in every way possible. They are the culprits and the problem.  They are reckless criminals."[107]  Richard followed that strategy for the rest of his career: collect millions from selling addictive drugs, and blame the terrible consequences on the people who became addicted.

175.     Not long after the mother's February 14 letter, the Sackler Defendants achieved a long-sought goal: the front page of the *New York Times* reported that "OxyContin's sales have hit $1 billion, more than even Viagra's."  The same article noted that "OxyContin has been a factor in the deaths of at least 120 people, and medical examiners are still counting."[108]

176.     When *Time* magazine published an article about OxyContin deaths in New England, Purdue employees told Richard Sackler they were concerned.  Richard responded with a message to his staff.  He wrote that *Time*'s coverage of people who lost their lives to OxyContin was not "balanced," and the deaths were the fault of "the drug addicts," instead of Purdue.  "We intend to stay the course and speak out for people in pain – who far outnumber the drug addicts abusing our product."[109]

177.     That spring, Purdue executives met with the U.S. Drug Enforcement Agency ("DEA").  A senior DEA official sat across from Richard Sackler.  Before the meeting ended, she leaned over the table and told Richard: "People are dying.  Do you understand that?"[110]

178.     As Purdue kept pushing opioids and people kept dying, the company was engulfed in a wave of investigations by state attorneys general, the DEA, and the U.S. Department of Justice.  In 2003, Richard Sackler left his position as President of Purdue.  After a few more years of investigation, Jonathan, Kathe, and Mortimer Sackler resigned from their positions as Vice

---

[107] 2001-02-01 email from Richard Sackler, PDD8801133516.
[108] 2001-03-05 article in *New York Times,* PDD9316101737.
[109] 2001-01-08 letter from Richard Sackler, PDD1501720041.
[110] 2001 meeting described in *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* by Barry Meier, pg. 158 (2003).  The DEA official was Laura Nagel, head of the DEA Office of Diversion Control.

Presidents. [111]  But those moves were for show.  The Sackler Defendants kept control of the company.  Their family owned Purdue.  They controlled the Board.  They paid themselves the profits.  And, as alleged in detail below, they continued to direct Purdue's deceptive marketing campaign.

179.    By 2006, prosecutors found damning evidence that Purdue intentionally deceived doctors and patients about its opioids.  The Sackler Defendants voted that their first drug company, the Purdue Frederick Company, should plead guilty to a felony for misbranding OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause adverse events and side effects than other pain medications.  The Sackler Defendants also voted on the Board that three Purdue executives (Michael Friedman, Paul Goldenheim, and Howard Udell) — but no member of the Sackler family — should plead guilty as individuals.[112]

180.    In May 2007, the Sackler Defendants voted again to have their company plead guilty and enter a series of agreements that Purdue would never deceive doctors and patients about opioids again.[113]  The Purdue Frederick Company confessed to a felony and effectively went out of business.  The Sackler Defendants continued their opioid business in two other companies: Purdue Pharma Inc. and Purdue Pharma L.P.

181.    The Sackler Defendants voted to admit in an Agreed Statement Of Facts that, for more than six years, supervisors and employees *intentionally* deceived doctors about OxyContin: "Beginning on or about December 12, 1995, and continuing until on or about June 30, 2000, certain Purdue supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."[114]

---

[111] 2018-09-05 declaration of Jonathan Sackler; 2018-09-08 declaration of Kathe Sackler; 2018-09-06 declaration of Mortimer Sackler.
[112] 2006-10-25 Board minutes, PKY183307486; 2006-10-25 agreement, PPLP004031281.
[113] 2007-05-03 Board minutes, PKY183307494.
[114] 2007-05-09 Agreed Statement of Facts, paragraph 20, *available at* https://www.documentcloud.org /documents/279028-purdue-guilty-plea.

182.    To remove any doubt, the Sackler Defendants voted to enter into a plea agreement that stated: "Purdue is pleading guilty as described above because Purdue is in fact guilty."[115] Those intentional violations of the law happened while Richard Sackler was CEO; Jonathan, Kathe, and Mortimer were Vice Presidents; and Richard, Jonathan, Kathe, Mortimer, Ilene, Beverly, and Theresa Sackler were all on the Board.

183.    The Sackler Defendants also voted for Purdue to enter a Corporate Integrity Agreement with the U.S. government.  The agreement required the Sackler Defendants to ensure that Purdue did not deceive doctors and patients again.  The Sackler Defendants promised to comply with rules that prohibit deception about Purdue opioids.  They were required to complete hours of training to ensure that they understood the rules.  They were required to report any deception.  Richard, Beverly, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler each certified in writing to the government that he or she had read and understood the rules and would obey them.[116]

184.    The 2007 Judgment and related agreements should have ended the Sackler Defendants' misconduct for good.  Instead, the Sackler Defendants decided to break the law again and again, expanding their deceptive sales campaign to make more money from more patients on more dangerous doses of opioids.

### 2.    The Sackler Defendants' Misconduct from the 2007 Judgment Until Today

185.    From the 2007 Judgment to 2018, the Sackler Defendants controlled Purdue's deceptive sales campaign.  They directed the company to hire hundreds more sales reps to visit doctors thousands more times.  They insisted that sales reps repeatedly visit the most prolific prescribers.  They directed reps to encourage doctors to prescribe more of the highest doses of opioids.  They studied unlawful tactics to keep patients on opioids longer and then ordered staff to use them.  They asked for detailed reports about doctors suspected of misconduct, how much

---

[115] 2007-05-09 Plea Agreement.
[116] 2007-05-09 Plea Agreement; 2007-05-04 Associate General Counsel's Certificate, PDD1712900054.

money Purdue made from them, and how few of them Purdue had reported to the authorities. They sometimes demanded more detail than anyone else in the entire company, so staff had to create special reports just for them. Richard Sackler even went into the field to promote opioids to doctors and supervise reps face to face.

186.    The Sackler Defendants' micromanagement was so intrusive that staff begged for relief. The VP of Sales and Marketing wrote to the CEO:

> "Anything you can do to reduce the direct contact of Richard into the organization is appreciated."[117]

187.    The Sackler Defendants' directions shot through the company with dangerous force. When the Sackler Defendants berated sales managers, the managers turned around and fired straight at reps in the field. When Richard Sackler wrote to managers, "This is bad,"[118] to criticize the sales of Purdue's Butrans opioid, the managers in turn drafted a warning for employees:

> "Just today, Dr. Richard sent another email, 'This is bad,' referring to current Butrans trends. I am quite sure that Dr. Richard would <u>not</u> be sympathetic to the plight of the Boston District."[119]

The manager then threatened to fire every sales rep in the Boston district:

> "I am much closer to dismissing the entire district than agreeing that they deserve a pass for poor market conditions."[120]

188.    The Sackler Defendants cared most of all about money. From 2007 to 2018, they voted to direct Purdue to pay their family *billions* of dollars, including tens of millions of dollars from opioids sold. These payments show the total control that the Sackler Defendants exercised over Purdue. The payments were the motivation for the Sackler Defendants' misconduct. And

---

[117] 2012-02-07 email from Russell Gasdia, PPLPC012000368569.
[118] 2012-02-07 email from Richard Sackler, PPLPC012000368430.
[119] 2012-02-07 email from Windell Fisher, PPLPC012000368500.
[120] 2012-02-07 email from Windell Fisher, PPLPC012000368500.

the payments were deliberate decisions to benefit from deception, at great cost to patients and families across the nation.

189.    As detailed below, the Sackler Defendants' misconduct continued from the 2007 convictions through 2018.

### a.    2007

190.    **In July 2007**, staff told the Sackler Defendants that more than 5,000 cases of adverse events had been reported to Purdue in just the first three months of 2007.  Staff also told the Sackler Defendants that Purdue received 572 Reports of Concern about abuse and diversion of Purdue opioids during Q2 2007.  Staff reported to the Sackler Defendants that they completed only 21 field inquiries in response.  Staff also told the Sackler Defendants that they received more than 100 calls to Purdue's compliance hotline during the quarter, which was a "significant increase," but Purdue did not report any of the hotline calls or Reports of Concern to the FDA, DEA, Department of Justice, or state authorities.[121]

191.    Purdue's self-interested failure to report abuse and diversion would continue, quarter after quarter, even though the 2007 Judgment required Purdue to report "potential abuse or diversion to appropriate medical, regulatory or law enforcement authorities."  Instead of reporting dangerous prescribers, or even directing sales reps to stop visiting them, the Sackler Defendants chose to keep pushing opioids to whoever prescribed the most.

192.    Staff also reported to the Sackler Defendants that they continued to mail out thousands of deceptive marketing materials, including 12,528 publications in the first half of 2007.  The single most-distributed material was volume #1 of Purdue's "*Focused and Customized Education Topic Selections in Pain Management*" (FACETS).[122]  In FACETS, Purdue falsely instructed doctors and patients that physical dependence on opioids is not dangerous and instead improves patients' "quality of life" — just as Richard Sackler had been saying since the 1990s.

---

[121] 2007-07-15 Board report, pgs. 33, 41, 54, PWG000300817, -825, -838.
[122] 2007-07-15 Board report, pg. 34, PWG000300818.

In the same material, Purdue also falsely told doctors and patients that signs of addiction are actually "pseudoaddiction," and that doctors should respond by prescribing more opioids.[123] Staff told the Sackler Defendants that another of the publications they had sent most often to doctors was "*Complexities in Caring for People in Pain*."[124]  In it, Purdue repeated again its false claim that warning signs of addiction are really "pseudoaddiction" that should be treated with more opioids.[125]

193.   At the same time, staff also reported to the Sackler Defendants that Purdue was making more money than expected.   A few months earlier, they had projected a profit of $407,000,000; now they expected more than $600,000,000.[126]

194.   Staff reported to the Sackler Defendants that "sales effort" was a key reason that profits were high.[127]  Staff told the Sackler Defendants that Purdue employed 301 sales reps to promote opioids and that sales reps were the largest group of Purdue employees by far.   In comparison, Purdue employed only 34 people in drug discovery.[128]

195.   From the 2007 convictions until today, the Sackler Defendants ordered Purdue to hire hundreds of sales reps to carry out their deceptive sales campaign.[129]

---

[123] 2007-08 FACETS Vol. 1, pgs. 51-53, PTN000004691-693.
[124] 2007-07-15 Board report, pg. 34, PWG000300818.
[125] 2007 Complexities of Caring for People in Pain, pg. 2, PTN000016806.
[126] 2007-07-15 Board report, pg. 46, PWG000300830.
[127] 2007-07-15 Board report, pg. 46, PWG000300830.
[128] 2007-07-15 Board report, pg. 52, PWG000300836.
[129] 2007-07-15 Board report, pg. 52, PWG000300836; 2007-10-15 Board report, pg. 58, PPLPC012000157459; 2008-01-15 Board report, pg. 22, PDD8901733995; 2008-10-15 Board report, pg. 26, PDD9316101027; 2009-04-16 Board report, pg. 28, PDD9316100624; 2009-07-30 Board report, pg. 19, PPLPC012000233249; 2009-10-22 Board



*Graphic based on Purdue documents*

196.   **In August**, Mr. Udell was still serving as Purdue's top lawyer, even after his criminal conviction.  He wrote to Richard, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler: "Over the last week there have been numerous news stories across the nation reporting on the Associated Press's analysis of DEA data showing very large increases in the use of opioids analgesics (particularly OxyContin) between the years 1997 and 2005.  Many of these articles have suggested that this increase is a negative development suggesting overpromotion and increasing abuse and diversion of these products."[130]

---

[130] 2007-08-30 email from Howard Udell, PPLPC012000153272.

197.    **In October**, staff told the Sackler Defendants that Purdue received 284 Reports of Concern about abuse and diversion of Purdue's opioids in Q3 2007, and they conducted only 46 field inquiries in response.  Staff reported to the Sackler Defendants that they received 39 tips to Purdue's compliance hotline during the quarter, but Purdue did not report any of them to the authorities.[131]

198.    Staff told the Sackler Defendants that Purdue had hired more sales reps and now employed 304.  They also reported to the Sackler Defendants that Purdue was succeeding at promoting its highest doses of opioids: "OxyContin 80mg is at Rx levels not seen in over 2 years."[132]

199.    In preparation for an upcoming Board meeting, Richard Sackler instructed staff to give him the spreadsheets underlying their sales analysis, so that he could do his own calculations.[133]  The spreadsheets showed that, in 2007, Purdue expected to collect more than half its total revenue from sales of 80mg OxyContin — its most powerful, most profitable, and most dangerous pill.[134]

200.    **In November**, the Sackler Defendants voted to spend $86,900,000 to employ sales reps in 2008 and another $1,000,000 to buy them laptops.  The Sackler Defendants also voted for a resolution regarding salary increases and bonus targets for the reps.[135]

### b.    2008

201.    **In January 2008**, staff told the Sackler Defendants that Purdue still employed 304 sales reps and they were succeeding at the goal of promoting higher doses of opioids: "OxyContin 80mg continues to grow."  Staff told the Sackler Defendants that, in 2007, Purdue's net sales were just over $1 billion, almost "DOUBLE" what the company had planned.  OxyContin was more than 90% of those sales.[136]

---

[131] 2007-10-15 Board report, pgs. 36, 60, PPLPC012000157437, -461.
[132] 2007-10-15 Board report, pgs. 4, 58, PPLPC012000157405, -459.
[133] 2007-10-28 email from Richard Sackler, PPLPC012000159168.
[134] 2007-10-28 attachment to email from Edward Mahony, PPLPC012000159170.
[135] 2007-11-01 Board minutes, PKY183212603-06; 2008 budget submission, pg. 20, PDD9273201033.
[136] 2008-01-15 Board report, pgs. 4, 22, 24, PDD8901733977, -995, -997.

202.   Staff also told the Sackler Defendants that Purdue received 689 Reports of Concern about abuse and diversion of Purdue's opioids in Q4 2007, and they conducted only 21 field inquiries in response.  Staff also reported to the Sackler Defendants that they received 83 tips to Purdue's compliance hotline during the quarter, but Purdue did not report any of them to the authorities.[137]

203.   The Sackler Defendants wanted more details on tactics for pushing sales.  Richard Sackler wrote to Russell Gasdia, Vice President of Sales and Marketing (hereinafter "Sales VP"), demanding information about Purdue's opioid savings cards.  Richard asked Gasdia how long the opioid savings cards lasted, how much savings they offered a patient, and whether there had been any changes since he had last been briefed on the opioid savings card scheme.  Richard sent Gasdia a detailed hypothetical scenario to make sure he understood the sales tactic down to the smallest details.[138]  Staff followed up with a presentation about opioid savings cards to the Sackler Defendants at the next Board meeting.[139]

204.   Meanwhile, when staff proposed a plan to get pharmacies to increase their inventory of OxyContin from 2 bottles to 3 bottles, Richard Sackler demanded to know why they couldn't get up to 4 bottles or more.[140]

205.   The Sackler Defendants didn't only sweat the small stuff.  They also made the fundamental decision to hire a sales force, and then to expand it.  At Purdue, hiring more sales reps was not a matter for middle management.  Selling opioids door-to-door, in visits to doctor's offices and hospitals, was the core business of the company.  The Sackler Defendants themselves made the decisions about how big the sales force would be and what it would do.

---

[137] 2008-01-15 Board report, pg. 16, 24, PDD8901733989, -997.
[138] 2008-01-30 emails from Richard Sackler, PPLPC012000168321-322.
[139] 2008-02-09 email from John Stewart, PPLPC012000170262 (opioid savings cards "were singled-out for presentation since they are an extraordinary item in the budget and there is good data showing a positive impact on OxyContin utilization").
[140] 2008-02-19 email from Richard Sackler, PPLPC004000150467.

206.   **In February**, the Sackler Defendants used their power on the Board of Directors to order Purdue to "begin expanding the sales force by an additional 100 sales representatives beginning effective as of April 1, 2008."[141]

**PURDUE PHARMA INC.**

**Minutes of a Meeting
of the Board of Directors**

**February 8, 2008**

RESOLVED that the Partnership be and it hereby is authorized and directed to begin expanding the sales force by an additional 100 sales representatives beginning effective as of April 1, 2008 at an additional cost in 2008 of $12.5 million, and in connection with the addition of such 100 sales representatives, to add 12 District Managers, 2 Regional Managers, 2 regional administrators, 2 trainers and 1 marketing/convention manager starting July 1, 2008; and further

207.   The Sackler Defendants knew and intended that, because of their orders, more sales reps would promote opioids to prescribers.  In preparation for the Sackler Defendants' vote, staff told them that adding 100 sales reps would allow Purdue to make 12,000 more sales visits to prescribers every month.[142]

208.   The Sackler Defendants also knew and intended that the sales reps would push higher doses of Purdue's opioids.  That same month, Richard Sackler directed Purdue management to "measure our performance by Rx's by strength, giving higher measures to higher strengths."[143]   He copied Jonathan and Mortimer Sackler on the instruction.  The Sackler Defendants knew higher doses put patients at higher risk.  As far back as the 1990s, Jonathan and

---

[141] 2008-02-08 Board minutes, PKY183212620.  The Sackler Defendants had long experience controlling the company's sales force.  They voted to direct Purdue to hire 50 more sales reps in 1998, and directed the company to prepare for a 100-rep expansion in 2007.  1998-04-27 Board minutes, #618527.1; 2007-04-26 Board minutes, PPLP004415274.

[142] 2007-10-26 Sales & Marketing presentation, PPLPC012000159022.

[143] 2008-02-13 email from Richard Sackler, PPLPC012000170948-949.

Kathe Sackler knew that patients frequently suffer harm when "high doses of an opioid are used for long periods of time."[144]

209.    On Valentine's Day, the Sackler Defendants voted to pay former CEO and criminal convict Michael Friedman $3,000,000.[145]   It was one of several multi-million-dollar payments to the convicted executives to maintain their loyalty and protect the Sackler family.

210.    By 2008, Purdue was working on a crush-proof reformulation of OxyContin to extend Purdue's patent monopoly.[146]   The Sackler Defendants learned that another company was planning clinical research to test whether crush-proof opioids are safer for patients.[147]   Mortimer Sackler suggested that Purdue conduct similar studies to find out whether reformulated OxyContin was really safer *before* selling it to millions of patients.   He wrote to Richard Sackler: "Purdue should be leading the charge on this type of research and should be generating the research to support our formulation.   Why are we playing catch up …?   Shouldn't we have studies like this …?"[148]   The Sackler Defendants decided not to do the research because they wanted the profits from a new product, regardless of whether the deaths continued.   Richard didn't want a paper trail, so he instructed Mortimer to call him, and CEO John Stewart met with his staff to plan how to phrase a carefully worded reply.[149]   Later that month, Stewart wrote to Richard that reformulating OxyContin "will not stop patients from the simple act of taking too many pills."[150]

---

[144] 1997-03-12 memo from John Stewart, PDD1701785443.

[145] 2008-02-14 Board minutes, PKY183212622.

[146] 2007-10-26 Sales & Marketing presentation, pg. 2, PPLPC012000159022.

[147] 2008-02-07 email from Robert Kaiko, PPLPC013000244844.

[148] 2008-02-12 email from Mortimer Sackler, PPLPC013000244843-844.

[149] 2008-02-12 email from Richard Sackler, PPLPC013000244843 ("My sentiments exactly the first time I read it. But you should read it again.   If you do and ask yourself what it means, I think you may come to a very different conclusion, as I now have … We should talk about it.   Give me a call at home."); 2008-02-13 email from John Stewart, PPLPC013000244843.

[150] 2008-02-22 email from John Stewart, PPLPC012000172201.   Five years later, Purdue published two studies about the crush-proof formulation.   Neither concluded the crush-proof tablets lowered the risks of addiction, overdose and death associated with OxyContin use.   One was a single-session research study conducted by three full-time Purdue employees and a paid Purdue consultant to assess "the attractiveness" of the crush-proof tablets to recreational drug users.   Thirty recreational opioid users were interviewed by two researchers.   "This study did not include safety, pharmacokinetic, or efficacy evaluations, and no drugs were administered."   Participants' answers to "open-ended questions" indicated that the crush-proof tablets "might be less attractive to recreational opioid abusers" than original OxyContin.   The study concluded that "among the available opioid products that we included in this study, recreational opioid users judged [crush-proof OxyContin tablets] to be the least attractive, the least valuable and the least desirable, with the least likelihood for tampering and the lowest street value."   PTN000002031-2034.   In the second study, by

211.  Meanwhile, staff gave Jonathan, Kathe, Mortimer and Richard Sackler projections indicating that OxyContin sales could plateau.[151]  Mortimer demanded answers to a series of questions about why sales would not grow.[152]  Richard chimed in at 8:30 p.m. to instruct the staff to find answers "before tomorrow."[153]  Staff emailed among themselves about how the Sackler Defendants' demands were unrealistic and harmful and then decided it was safer to discuss the problem by phone.[154]

212.  **In March**, Richard Sackler dug into Purdue's strategy for selling more OxyContin.  He directed sales and marketing staff to turn over thousands of pieces of data about sales trends, including data to distinguish the kilograms of active drug from the number of prescriptions, so he could analyze higher doses.[155]  Staff delivered the data early Sunday morning; Richard responded with detailed instructions for new data that he wanted that same day.[156]  An employee sent Richard the additional data only a few hours later and pleaded with Richard: "I have done as much as I can."  The employee explained that he needed to attend to family visiting from out of town.[157]  Richard responded by calling him at home, insisting that the sales forecast was too low, and threatening that he would have the Board reject it.[158]  On Monday, staff emailed among themselves to prepare for meeting with Richard, highlighting that Richard was looking for

---

the same Purdue authors, 29 volunteers snorted OxyContin (original and crush-proof), oxycodone, and a placebo over a seven-day treatment phase and rated the drugs.  The study concluded that "reformulated OxyContin has a reduced abuse potential compared to the original formulation upon intranasal administration." PTN000002031, -2044.  Purdue amended its OxyContin label to reference these studies in 2013.

[151] 2008-02-26 email from Edward Mahony, PPLPC012000172585; attachment PPLPC012000172587.

[152] 2008-02-26 email from Mortimer Sackler, PPLPC12000172674.

[153] 2008-02-26 email from Richard Sackler, PPLPC12000172674.

[154] 2008-02-26 email from John Stewart, PPLPC012000172677.

[155] 2008-03-09 email from David Rosen, PPLPC012000174478.

[156] 2008-03-09 email from Richard Sackler, PPLPC012000174477.

[157] 2008-03-09 email from David Rosen, PPLPC012000174204.

[158] 2008-03-09 email from David Rosen, PPLPC012000174202.  A month earlier, when an employee did not answer a call from Richard Sackler during a Sunday morning church service, Richard immediately contacted the CEO to complain.  2008-02-17 email from Mike Innaurato, PPLPC012000171496.  Richard then wrote that he expected answers from four different sales staff members the next day (President's Day) even though Purdue was closed.  2008-02-17 email from Richard Sackler, PPLPC012000171511.  *See also* 2008-11-02 email from Mike Innaurato, PPLPC019000241631.

results that could only be achieved by hiring more sales reps.  Meanwhile, Richard met with John Stewart to discuss his analysis of the weekend's data and new graphs Richard had made.[159]

213.    Sales VP Russell Gasdia was struggling to handle the pressure.  When Richard Sackler sent Gasdia a list of seven sales questions to answer on a Saturday (and copied Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler), Gasdia wrote to John Stewart:

> "John, I know it is tricky, but Dr. Richard has to back off somewhat.  He is pulling people in all directions, creating a lot of extra work and increasing pressure and stress.  I will draft a response but he is not realistic in his expectations and it is very difficult to get him to understand."[160]

214.    Richard Sackler did not back off.  Instead, he pushed staff to sell more of the highest doses of opioids and get more pills in each prescription.  That same Saturday night, Richard sent Gasdia yet another set of instructions, directing him to identify tactics for "exceeding 2007 Rx numbers on an adjusted basis (adjusted for strength and average number of tablets per Rx)."[161]  The very next day, Gasdia was writing up plans for how adding sales reps, opioid savings cards, and promoting more intermediate doses of OxyContin could help increase sales.[162]

215.    Richard Sackler followed through on his weekend threat that he would have the Board reject the sales plan.  Two days later, Richard circulated his own sales analysis to the Board, ordered the Secretary to "put this high in the Board agenda," and proposed that he and Mortimer Sackler oversee a redo of the annual plan as well as the 5-year plan for Purdue's opioids.[163]

216.    At the same time, Jonathan, Kathe, and Mortimer Sackler were also pushing staff about sales.  Staff told those three Sacklers that they would use opioid savings cards to meet the challenge of keeping OxyContin scripts at the same level in 2008 as in 2007, "in spite of all the

---

[159] 2008-03-10 emails from David Rosen and John Stewart, PPLPC012000174476.
[160] 2008-03-08 email from Russell Gasdia, PPLPC012000174127.
[161] 2008-03-08 email from Richard Sackler, PPLPC012000175157.
[162] 2008-03-09 email from Russell Gasdia, PPLPC012000174161.
[163] 2008-03-10 email from Richard Sackler, PPLPC023000164605.

pressures."[164] Kathe demanded that staff identify the "pressures" and provide "quantification of their negative impact on projected sales."[165]

217.    **In April**, staff told the Sackler Defendants that Purdue employed 304 sales reps. Staff reported to the Sackler Defendants that the reps had obtained data showing which pharmacies stocked higher strengths of OxyContin, which helped them convince area doctors to prescribe the highest doses. Staff also told the Sackler Defendants that Purdue received 853 Reports of Concern about abuse and diversion of Purdue opioids in Q1 2008, and they had conducted only 17 field inquiries in response. Staff also reported to the Sackler Defendants that they received 83 tips to Purdue's compliance hotline during the quarter, but did not report any of them to the authorities.[166]

218.    On April 18, Richard Sackler sent Kathe, Ilene, David, Jonathan, and Mortimer Sackler a secret memo about how to keep money flowing to their family. Richard wrote that Purdue's business posed a "dangerous concentration of risk." After the criminal investigations that almost reached the Sackler Defendants, Richard wrote that it was crucial to install a CEO who would be loyal to the family: "People who will shift their loyalties rapidly under stress and temptation can become a liability from the owners' viewpoint." Richard recommended John Stewart for CEO because of his loyalty. Richard also proposed that the family should either sell Purdue in 2008 or, if they could not find a buyer, milk the profits out of the business and "distribute more free cash flow" to themselves.[167]

219.    That month, the Sackler Defendants voted to have Purdue pay their family $50,000,000. From the 2007 convictions until 2018, the Sackler Defendants voted dozens of times to pay out Purdue's opioid profits to their family — in total ***more than four billion dollars***.[168]

---

[164] 2008-03-09 email from Edward Mahony, PPLPC012000175155-156.
[165] 2008-03-11 email from Kathe Sackler, PPLPC012000175155.
[166] 2008-03-15 Board report, pgs. 17, 23, 24, 27, PDD8901724450, -456, -457, -460.
[167] 2008-04-18 email and attached memo from Richard Sackler, PDD9316300629-631.
[168] 2008-04-18 Board minutes, PKY183212631-633; 2008-06-27 Board minutes, PKY183212647; 2008-09-25 Board minutes, PKY183212654; 2008-11-06 Board minutes, PKY183212662; 2009-03-05 Board minutes, PKY183212705; 2009-06-26 Board minutes, PKY183212742; 2009-09-23 Board minutes, PKY183212772; 2010-02-04 Board



*Graphic based on Purdue's internal Board documents*

220.    On April 18, the Sackler Defendants voted to increase the 2008 budget for Sales and Promotion to $155,802,000.[169]  Then, Richard Sackler sent Sales VP Russell Gasdia a series of questions about Purdue's efforts to get patients to take higher doses and stay on opioids for longer times.  Richard wanted to know: how many Purdue patients had insurance that would let them take unlimited quantities of Purdue opioids; how many patients were limited to 60 tablets per month; and how many patients had any limit on the number of tablets or dose or number of tablets per day.  He demanded that sales staff be assigned to answer his questions "by tomorrow

---

minutes, PKY183212818; 2010-04-01 Board minutes, PKY183212829; 2010-09-10 Board minutes, PKY183212844; 2010-12-02 Board minutes, PKY183212869-70; 2011-04-06 Board minutes, PKY183212896-97; 2011-06-24 Board minutes, PKY183212924-25; 2011-09-01 Board minutes, PKY183212927-28; 2012-07-27 Board report, pg. 44, PPLP004367403; 2012-03-05 email from Edward Mahony, PPLPC012000368627; 2013-11-01 Board report, pg. 3, PPLPC002000186913; 2014-12-03 November flash report, slide 8, PPLPC016000266403; 2015-06-05 mid-year strategic review, slide 55, PPLPC011000036000; 2017-09-14 10 year plan spreadsheet, page "CF – Internal," PPLPC021000904588.
[169] 2008-04-18 Board minutes, PKY183212634-37.

morning."[170]  When the sales staff pleaded for a few more hours to collect the data, Richard agreed to give them until the end of the day.[171]

221.  **In May**, staff sent the Sackler Defendants more ideas about ways to promote Purdue's opioids.  The proposal matched the Sackler Defendants' own plan, which Richard had written out as CEO: deflect blame from Purdue's addictive drugs by stigmatizing people who become addicted.  "KEY MESSAGES THAT WORK" included this dangerous lie: "It's not addiction, it's abuse.  It's about personal responsibility."[172]

222.  **In June**, the Sackler Defendants voted to appoint John Stewart as President and CEO of Purdue Pharma Inc. and Purdue Pharma LP.  The appointment followed through on Richard Sackler's suggestion in his secret memo that the Sackler Defendants should put a premium on loyalty to the family.  On the same day, the Sackler Defendants voted to pay their family $250,000,000.[173]  The payment followed Richard Sackler's suggestion in the memo to "distribute more free cash flow" to themselves.

223.  Meanwhile, Richard Sackler asked sales staff for more information about Purdue's opioid savings cards.[174]  Staff reported to Richard, Jonathan, Kathe, and Mortimer Sackler that 67,951 patients had used Purdue's opioid savings cards, and that the cards provided a discount on a patient's first five prescriptions.[175]

224.  After five prescriptions, many patients would face significant withdrawal symptoms if they tried to stop taking opioids.  Staff told Richard, Jonathan, Kathe, and Mortimer Sackler that 27% of patients (more than 18,000 people) had used the cards for all five prescriptions.[176]

---

[170] 2008-04-22 email from Richard Sackler, PPLPC012000179497.
[171] 2008-04-22 email from Richard Sackler, PPLPC012000179679.
[172] 2008-05-16 email from Pamela Taylor, PPLPC012000183254; 2008-04-16 Executive Committee notes, PPLPC012000183256; 2008-04-16 presentation by Luntz, Maslansky Strategic Research, PPLPC012000183259.
[173] 2008-06-27 Board minutes, PKY183212646-647.
[174] 2008-06-14 email from Richard Sackler, PPLPC012000186396.
[175] 2008-06-16 email from Russell Gasdia, PPLPC012000186394-395.
[176] 2008-06-16 email from Russell Gasdia, PPLPC012000186395.

225.  **In July**, Purdue's Fleet Department reported to the Sackler Defendants that Purdue had bought one hundred new Pontiac Vibes for the expanded sales force.  Staff also told the Sackler Defendants that Purdue received 890 Reports of Concern regarding abuse and diversion of Purdue's opioids in Q2 2008 and had conducted only 25 field inquiries in response.  Staff reported to the Sackler Defendants that they received 93 tips to Purdue's compliance hotline during the quarter, but did not report any of them to the authorities.[177]

226.  **In September**, the Sackler Defendants voted to pay their family $199,012,182.[178]

227.  **In October**, staff told the Sackler Defendants that surveillance data monitored by Purdue indicated a "wide geographic dispersion" of abuse and diversion of OxyContin "throughout the United States."  Staff told the Sackler Defendants that "availability of the product" and "prescribing practices" were key factors driving abuse and diversion of OxyContin." On the same day, staff told the Sackler Defendants that Purdue had begun a new "Toppers Club sales contest" for sales reps to win bonuses, based on how much a rep increased OxyContin use in her territory and how much the rep increased the broader prescribing of opioids — the same "availability of product" and "prescribing practices" factors that worsen the risk of diversion and abuse.  In the same report, staff told the Sackler Defendants that they received 163 tips to Purdue's compliance hotline during Q3 2008, but did not report any of them to the authorities.[179]

228.  Staff also told the Sackler Defendants that the Board-ordered sales force expansion had been implemented and Purdue now employed 414 sales reps.[180]  The Sackler Defendants' decision to expand the sales force caused the effect they intended in each of the Plaintiffs' jurisdictions.

229.  **In November**, the Sackler Defendants turned to expanding the sales force again. Purdue's 2009 budget identified expanding the sales force as the #1 sales and marketing

---

[177] 2008-07-15 Board report, pgs. 21, 28, 30, PPLP004367317, -324, -326.
[178] 2008-09-25 Board minutes, PKY183212654.
[179] 2008-10-15 Board report, pgs. 19, 24, 28, PDD9316101020, -025, 029.
[180] 2008-10-15 Board report, pg. 26, PDD9316101027.

objective.[181]  The Sackler Defendants voted to spend $112,400,000 on sales reps.[182]  Staff told the Sackler Defendants that their decision would pay an average sales rep salary of $89,708 and bonus of $43,470, and the sales reps would visit prescribers 518,359 times.[183]

230.    That same month, the Sackler Defendants voted to pay their family $325,000,000.[184]  They also voted to pay $5,000,000 to Howard Udell—their lawyer and convicted criminal.[185]  Like their Valentine's Day payment to Friedman, the Sackler Defendants spent millions to keep the loyalty of people who knew the truth.

### c.    2009

231.    **In March**, the Sackler Defendants voted to pay Purdue sales reps and sales managers bonuses of 103 percent of Purdue's target because they sold so many opioids in 2008. The Sackler Defendants also voted to increase the base pay of sales staff for 2009.  On the same day, the Sackler Defendants voted to pay their family $200,000,000.[186]

232.    **In April**, staff told the Sackler Defendants that Purdue employed 412 sales reps and had made dramatic progress promoting higher doses: "for the first time since January 2008, OxyContin 80mg strength tablets exceeded the 40mg strength."[187]  The Sackler Defendants had a detailed conversation with Sales VP Russell Gasdia about the staffing of the sales force, how many sales reps the company should employ, and how many prescribers each rep would visit each year.[188]  The Sackler Defendants told sales executives to hire a new staff member who would contact prescribers electronically and would promote Purdue opioids through the deceptive website *Partners Against Pain*.[189]

---

[181] 2008-11 budget submission, pg. 10, PPLP004401590.
[182] 2008-11-06 Board minutes, PKY183212663, 66; 2008-11 budget submission, PDD9273201117 (Field Operations $112.4M).
[183] 2008-11 budget submission, pg. 104-106, PDD9273201186-88.
[184] 2008-11-06 Board minutes, PKY183212662.
[185] 2008-11-21 Board minutes, PKY183212680.
[186] 2009-03-05 Board minutes, PKY183212703-711.
[187] 2009-04-16 Board report, pgs. 5, 28, PDD9316100601, -624.
[188] 2009-04-21 email from Russell Gasdia, PPLPC012000220948.
[189] 2009-04-30 email from Russell Gasdia, PPLPC012000221936.

233.   Staff told the Sackler Defendants that they received 122 tips to Purdue's compliance hotline during Q1 2009, and revealed one of them to an outside monitor.  Staff reported to the Sackler Defendants that the compliance problems included improper use of OxyContin marketing materials and opioid savings cards.[190]

234.   **In May**, staff told the Sackler Defendants that Purdue had violated its Corporate Integrity Agreement with the U.S. government by failing to supervise its sales reps.[191]  Because sales reps lobbying doctors poses a high risk of misconduct (no witnesses, and the rep is paid to increase opioid sales), the United States required that Purdue managers supervise sales reps in person at least 5 days each year.[192]  Purdue management disregarded that obligation and did not even set up a system to track it.[193]  Even though Purdue executives had ignored the requirement and not monitored it, they responded to the violation by firing three employees in the field and letting all the executives at headquarters keep their jobs.[194]

235.   **In June**, Richard Sackler asked sales staff how a competing drug company had increased sales: "What is happening???"[195]  Staff replied that it was all about sales reps:

> "They have 500 reps actively promoting to top decile MDs …
> Their messaging is 'we are not OxyContin,' alluding to not having
> the 'baggage' that comes with OxyContin.
>
> Interestingly, their share is highest with MDs we have not called
> on due to our downsizing and up until last year, having half as
> many reps.  Where we are competing head to head, we decrease
> their share by about 50%."[196]

236.   A few days later, staff reported to the Sackler Defendants that Purdue had expanded its sales force at the Board's direction: "As approved in the 2009 Budget, 50 New Sales Territories have been created."  Staff told the Sackler Defendants the expansion was focused on

---

[190] 2009-04-16 Board report, pgs. 24-25, PDD9316304336-337.
[191] 2009-05-08 corporate compliance quarterly report to the Board 1Q09, slide 6, PPLPC029000274906.
[192] Purdue Corporate Integrity Agreement section III.K.
[193] 2009-05-08 corporate compliance quarterly report to the Board 1Q09, slide 6, PPLPC029000274906 ("Compliance was not monitoring against the 'five full days' requirement").
[194] 2009-07-30 Board report, pg. 16, PPLPC012000233246.
[195] 2009-06-12 email from Richard Sackler, PPLPC021000235124.
[196] 2009-06-13 email from Russell Gasdia, PPLPC021000235124.

the most prolific opioid prescribers, because "there are a significant number of the top prescribers" that Purdue had not been able to visit with its smaller force of sales reps.[197]  Later that month, the Sackler Defendants voted to pay their family $162,000,000.[198]

237.  **In July**, staff told the Sackler Defendants that Purdue employed 429 sales reps.[199] Richard Sackler told staff that he was not satisfied with OxyContin sales and demanded a plan to "boost" them.  He asked for the topic to be added to the agenda for the Board.[200]

238.  **In August**, Richard Sackler convened a meeting of Board members and staff about "all the efforts Sales and Marketing is doing and planning to do to reverse the decline in OxyContin tablets market."  He emphasized that $200,000,000 in profit was at stake.[201]  At the meeting, staff told the Sackler Defendants that the 80mg OxyContin pill was far-and-away Purdue's best performing drug.  Purdue sold many more kilograms of active ingredient in the 80mg dose than any other dose (about 1,000 kilograms: literally a ton of oxycodone).[202]

239.  Staff also reported to the Sackler Defendants about their newest OxyContin sales campaign, with the slogan: *Options*.[203]  The *Options* campaign set the pattern that Purdue would follow for years: pushing doctors and patients up the ladder to higher doses.  To make it easy for sales reps to promote higher doses, the campaign materials emphasized the "range of tablet strengths," provided a picture of each dose, and said: "You can adjust your patient's dose every 1 to 2 days."  Staff told the Sackler Defendants that they would advertise the *Options* campaign in medical journals reaching 245,000 doctors.[204]

---

[197] 2009-06-16 email from Pamela Taylor, PPLPC012000226604; 2009-05-20 Executive Committee notes, PPLPC012000226606.
[198] 2009-06-26 Board minutes, PKY183212742.
[199] 2009-07-30 Board report, pg. 19, PPLPC012000233249.
[200] 2009-07-20 email from Richard Sackler, PPLPC012000232016.
[201] 2009-08-12 email from Richard Sackler, PPLPC012000234970-971; *see also* 2009-08-10 email from John Stewart, PPLPC012000234801 ("Richard has asked me about this at least 5 times over the past few weeks").
[202] 2009-08-19 Board slides, slide 7, PPLPC012000235542.
[203] 2009-08-12 email from Russell Gasdia, PPLPC012000235039.
[204] 2009-08-19 Board slides, slides 12, 16, PPLPC012000235543; *Options* marketing materials, PMA000189015.





TABLETS NOT ACTUAL SIZE

Through a wide range of tablet strengths,
OxyContin® provides options to meet the individual
therapeutic needs of your appropriate patient

- Q12h dosing with as few as 2 tablets per day
- When converting from other opioids, the 7 OxyContin® Tablet strengths
  enable you to closely approximate the calculated conversion dose
- OxyContin® is a single-entity opioid
- You can adjust your patient's dose every 1 to 2 days, if needed, because
  steady-state plasma concentrations are approximated within 24 to 36 hours

*Purdue's 2009 marketing campaign 'Options'*

240.    Staff also reported to the Sackler Defendants that more than 160,000 patients had

used Purdue's opioid savings cards, more than doubling the result reported to the Sackler

Defendants the summer before.[205]   Staff also told the Sackler Defendants that they would

advertise OxyContin using a special television network: thousands of doctors would be given free

digital video recorders for their home televisions, in exchange for watching advertisements for

drugs.[206]

---

[205] 2009-08-19 Board slides, slide 12, PPLPC012000235543.  Compare with 67,951 in June 2008.  2008-06-16 email
from Russell Gasdia, PPLPC012000186394.
[206] 2009-08-19 Board slides, slide 19, PPLPC012000235543.  Purdue spent approximately $100 for each doctor who
watched the advertisement, but it made the money back when the doctors prescribed Purdue's opioids.  2009-04-27
email from Lindsay Wolf, PPLPC012000221091.

241.    Immediately after meeting with sales staff, Richard Sackler asked for the raw data underlying their presentation.   When staff had not responded within five minutes, he asked again.[207]

242.    **In September**, the Sackler Defendants voted to pay their family $173,000,000.[208] But Mortimer Sackler was concerned that staff were not selling Purdue's opioids aggressively enough.   He demanded to know why staff predicted a decline in OxyContin sales when he believed the market should grow.[209]

243.    **In October**, staff told the Sackler Defendants that Purdue had expanded its sales force by 50 territories and now employed 475 sales reps.[210]   Richard Sackler directed staff to send him weekly reports on OxyContin sales.[211]   No one in the company received reports that often, so staff were not sure how to reply.[212]   Staff considered telling Richard that there were no weekly reports, but they decided to make a new report just for him instead.[213]   The CEO also instructed the Sales Department to report to the Sackler Defendants with more explanation about its activities.[214]

244.    That same month, the Sackler Defendants and staff discussed federal sunshine legislation that would create a public database to disclose drug companies' payments to doctors. Purdue was paying many doctors to promote its opioids, but the payments could often be kept

---

[207] 2009-08-19 emails from Richard Sackler, PPLPC023000236021-022.
[208] 2009-09-23 Board minutes, PKY183212770-772.
[209] 2009-09-28 email from Mortimer Sackler, PPLPC012000240032
[210] 2009-10-22 Board report, pgs. 4, 21, PPLPC016000007322, -339.
[211] 2009-10-08 email from Richard Sackler, PPLPC012000241516; *see also* PDD9316309168.
[212] 2009-10-08 email from Robert Barmore, PPLPC012000241515; *see also* PPLPC022000283453.
[213] 2009-10-08 email from David Rosen, PPLPC012000241515 ("Hi, guys … Someone needs to alert Dr. Richard that we no longer do a weekly report.   Can either one of you help …); 2009-10-08 email from Dipti Jinwala, PPLPC012000241526 ("we have not been providing the OxyContin weekly report since May 09"); 2009-10-08 email from Richard Sackler, PPLPC012000241586 ("I'd like to have the weekly updates."); 2009-10-08 email from David Rosen, PPLPC012000241586 ("If we do as dr. richard requests, we will be adding work and providing him near worthless data"); 2009-10-08 email from Russell Gasdia, PPLPC012000241586 ("Tell her not to respond."); 2009-10-08 email from John Stewart, PPLPC012000241647; 2009-10-09 email from Rob Barmore, PPLPC022000283690 ("For the record, my concerns regarding workload and being able to meet demands of all the reporting, primary research, ad hocs while maintaining quality and reasonable levels of group morale remain.").
[214] 2009-10-20 email from John Stewart, PPLPC012000242813.

secret. Some of the Sackler Defendants were concerned that doctors would be "much less willing" to work for Purdue if the payments were disclosed.[215]

245.    **In November**, the Sackler Defendants voted to spend $121,628,000 to employ sales reps in 2010. Kathe and Richard Sackler were designated to review the sales projections.[216] They also voted to pay disgraced former employee Howard Udell up to another $1,000,000, and to pay $2,700,000 to settle personal injury claims by people harmed by Purdue's opioids.[217]

246.    At the Board meeting that month, Kathe and Richard Sackler asked staff to "identify specific programs that Sales and Marketing will implement to profitably grow the OER [extended-release oxycodone] market and OxyContin in light of competition; provide analytics around why/how the proposed increase in share-of-voice translates into sales and profitability growth; clarify the situation with respect to OxyContin being used by 35% of new patients, but only retaining 30% of ongoing patients;" and give the Sackler Defendants a copy of a report from McKinsey on tactics to increase OxyContin sales.[218] The McKinsey report instructed sales reps to maximize profits by "emphasizing [the] broad range of doses" — which was code for pushing the doses that were highest and most profitable.[219]

247.    At the same meeting, Richard Sackler also asked staff, "What are OxyContin's clinical advantages vs. Opana ER, MS Contin, Kadian, Exalgo, Avinza, Nucynta and Duragesic? How are these differences communicated?" In response, staff reported to all the Sackler Defendants a list of purported advantages of OxyContin over competing products, including that OxyContin purportedly reduces pain faster, has less variability in blood levels, and works for more pain conditions than competing drugs.[220] These were all improper, unfair, and deceptive claims that Purdue had admitted were prohibited.

---

[215] 2009-10-19 email from John Stewart, PPLPC032000114702.
[216] 2009-11-03 Board minutes, PKY183212802-804; 2009-11 budget submission, pg. 12, PDD9273201222.
[217] 2009-11-20 Board minutes, PKY183212814; 2009-11-25 Board minutes, PKY183212815.
[218] 2009-11-02 budget presentation, PPLPC012000249328; 2009-12-22 email from Edward Mahony, PPLPC012000249327 ("a list of questions raised at the November Board meeting and answers or actions on each").
[219] 2009-10-26 steering committee meeting presentation by McKinsey, slide 19, PPLPC018000346294.
[220] 2009-11-02 budget presentation, PPLPC012000249329.

248.    Richard Sackler also asked staff why Purdue's operating margin in 2010 was less than in 2009.  Staff responded to all the Sackler Defendants that one of the biggest reasons for the reduced margin was the cost of the expanded sales force that Sacklers had ordered.[221]

249.    **In December**, Kathe and Richard Sackler met with sales staff to review plans for 2010.  Staff warned the two Sacklers that, although OxyContin sales were at record-breaking levels (nearly $3 billion per year), the decade-long rise in the total kilograms of oxycodone prescribed in America was beginning to flatten.[222]  Higher doses contain more of that active ingredient and are more profitable to Purdue.

### d.    2010

250.    **In January 2010**, Richard Sackler started the year by asking sales staff for new customized reports.[223]  Staff complained to each other until Sales VP Russell Gasdia asked CEO John Stewart to intervene: "Can you help with this? It seems like every week we get one off requests from Dr. Richard."[224]  Neither Stewart nor anyone else could keep Richard out of sales.[225]  Days later, Richard was writing to the sales employee on Saturday morning, ordering that his need to review the sales plan was "urgent" and should be satisfied "this weekend."[226]

251.    **In February**, Purdue's Sales and Marketing Department told the Sackler Defendants that a key objective for 2010 would be to "Meet or exceed total prescriber call targets of 545,000" visits to prescribers to promote Purdue opioids.  For the next four years or more, a key objective for the sales employees was to meet a quota of sales visits, and the Sackler Defendants tracked their performance.  The target rose from 545,000 prescriber visits in 2010, to 712,000 visits in 2011, 752,417 visits in 2012, and 744,777 visits in 2013.[227]

---

[221] 2009-11-02 budget presentation, PPLPC012000249336.
[222] 2009-12-03 email from Mike Innaurato, PPLPC012000247640, attachment PPLPC012000247642.
[223] 2010-01-05 email from Richard Sackler, PPLPC023000259671.
[224] 2010-01-05 email from Russell Gasdia, PPLPC023000259670.
[225] 2010-01-08 email from John Stewart, PPLPC023000259669 ("PS  You are not alone in receiving requests for extraordinary analyses and reports.").
[226] 2010-01-16, email from Richard Sackler, PPLPC023000260293.
[227] 2010-02-01 Board report, pg. 23, PPLPC012000252797; 2011-05-02 Board report, pg. 3, PPLPC012000322428; 2012-04-30 Board report, pg. 3, PPLPC012000374793; 2013-05-13 Board report, pg. 7, PPLP004367546.

252.    To achieve the target for sales visits, staff told the Sackler Defendants that another sales force expansion ordered by the Board had been implemented and Purdue employed 490 sales reps.[228]

253.    Staff also told the Sackler Defendants that McKinsey estimated that new tactics by Purdue sales reps would generate $200,000,000 to $400,000,000 more sales of OxyContin, and that sales reps had been practicing the new tactics in front of management.[229]  McKinsey had reported to Purdue on opportunities to increase prescriptions by convincing doctors that opioids provide "freedom" and "peace of mind" and give patients "the best possible chance to live a full and active life."  McKinsey also suggested sales "drivers" based on the ideas that opioids reduce stress and make patients more optimistic and less isolated.[230]  In fact, becoming addicted to opioids makes patients more stressed, more isolated, and less likely to survive.

254.    The Sackler Defendants voted to spend $226,000,000 on Sales and Promotion in 2010, and to pay their family $236,650,000.[231]

255.    **In March**, Richard Sackler instructed sales staff to send him monthly reports on sales of OxyContin and its competitors.  They complied within ten minutes.[232]  The report showed that Purdue was selling more pills of its 80mg OxyContin (the highest dose) than any other dose, and that the highest dose pills were responsible for the greatest share of Purdue's revenue by far.[233]

256.    Staff also told the Sackler Defendants that a key selling point for OxyContin compared to a competitor's product was that OxyContin could be used by patients who had not taken opioids before.[234]  Deceptively promoting opioids for opioid-naive patients who had not taken them before was one of the ways Purdue put patients at risk.

---

[228] 2010-02-01 Board report, pgs. 4, 19, PPLPC012000252778, -793.

[229] 2010-02-09 email from Pamela Taylor, PPLPC012000257443; 2010-01-20 Executive Committee notes, PPLPC012000257446.

[230] 2009-09-11 McKinsey presentation, PPLPC023000239858, slide 22.

[231] 2010-02-04 Board minutes, PKY183212818-820.

[232] 2010-03-15 emails from Richard Sackler and Mike Innaurato, PPLPC012000262889.

[233] 2010-03-11 January 2010 OxyContin monthly report, slides 10, 15, PPLPC012000262892.

[234] 2010-03-17 Executive Committee notes, PPLPC012000267960.

257.  **In April**, the Sackler Defendants voted to pay their family another $141,000,000.[235] Meanwhile, staff told the Sackler Defendants that they were pushing back against the "threat" of public health rules that would limit high doses of opioids.  They told the Sackler Defendants that Purdue would oppose precautions that asked doctors to consult with specialists before prescribing the highest doses.[236]

### (1)  The Sackler Defendants' Control of Sales Visits

258.  That same month (April 2010), staff gave the Sackler Defendants one of many detailed reports on sales reps' visits to prescribers.  As with every reference to "the Sackler Defendants" before July 2012, that includes Beverly, Ilene, Jonathan, Kathe, Mortimer, Richard, and Theresa Sackler.

259.  The Sackler Defendants required each rep to visit an average of 7.5 prescribers per day.  In April 2010, staff reported that they were falling short.  During Q1 2010, reps had averaged only 7.0 visits per day.[237]  Staff promised to try harder.  The Sackler Defendants continued to set a target for daily sales visits for every sales rep, and they tracked the results, quarter by quarter, for at least the next four years.  The results were always close to 7 visits per day.

---

[235] 2010-04-01 Board minutes, PKY183212829.
[236] 2010-04-21 Board report, pg. 16, PWG000423155.
[237] 2010-04-21 Board report, pg. 4, PWG000423143.



*Graphic based on Purdue's internal Board documents*

260.   The Sackler Defendants also set targets for the total number of sales visits by the entire sales force per quarter—huge numbers that were always more than a hundred thousand visits.  Meeting those targets was a top priority for the entire company.  For Q1 2010, the target was to visit prescribers 127,376 times.  Staff told the Sackler Defendants that Purdue employed 489 sales reps and that, during Q1 2010, they achieved the goal.[238]  As with the daily visits per rep, the Sackler Defendants tracked the total number of sales visits per quarter, every quarter, for at least the next four years.

---

[238] 2010-04-21 Board report, pgs. 4, 20, PWG000423143, -159.  They exceeded the goal and visited prescribers 133,561 times.



*Graphic based on Purdue's internal Board documents*

261.    The Sackler Defendants also tracked the cost of the sales visits.  In April 2010, staff reported to the Sackler Defendants that each visit to a prescriber cost Purdue $219, and they were working to lower the cost to a target of $201.[239]

262.    **In June 2010**, staff gave the Sackler Defendants an updated 10-year plan for growing Purdue's opioid sales.  According to the plan, the Sackler Defendants expected Purdue to pay their family at least $700,000,000 each year from 2010 through 2020.  Beginning on page one, staff emphasized that selling as many opioids as the Sackler Defendants wanted "will require

---

[239] 2010-04-21 Board report, pg. 4, PWG000423143.

significant salesforce support" so the plan detailed the "optimization" of sales visits and the number of reps they would require.  Sales VP Gasdia wrote to the Sackler Defendants that they planned for each rep to visit prescribers 1,540 times per year, so that 500 reps could make 770,000 visits at a cost of $212 per visit.  He proposed to grow the sales force to 1,050 sales reps by 2015.  To reach the Sackler Defendants' expectations, Gasdia projected that Purdue would convince doctors to switch patients from Tylenol to Purdue's soon-to-be-released Butrans opioid, and Butrans would become a billion-dollar drug.[240]

263.    **In July 2010**, Richard Sackler emailed staff just before the July 4th holiday weekend to demand more details about sales and marketing.  Richard directed them to send to the Board plans for "the marketing program" and "the sales program," with instructions to "get this out before the weekend."[241]  A despondent staff member wrote to the CEO: "Are you expecting us to provide the marketing plan by tomorrow?"[242]  Staff came close to telling Richard Sackler no.  Instead, they negotiated an extension and promised to provide full details about sales and marketing at the July Board meeting in Bermuda.[243]  To enforce the deal, Kathe Sackler ordered staff to circulate materials before the meeting.[244]

264.    By the Sackler Defendants' choice, sitting on the Board of Purdue Pharma Inc. was a globe-trotting endeavor.  The Sackler Defendants held Board meetings for their U.S. drug company in a castle in Ireland, and in Bermuda, London, Portugal, Switzerland, New York, and Connecticut.[245]

265.    In Bermuda, the Sackler Defendants focused on sales tactics again.  Staff presented plans for selling Purdue's new Butrans opioid.  Staff reported that sales reps would try to switch patients to opioids from NSAIDs like ibuprofen and explained tactics for convincing doctors that

---

[240] 2010-06-24 Purdue Pharma 2010 10-Year Plan, pgs. 1-15, Key Assumptions pg. 6, PPLPC012000277155-169, -217.
[241] 2010-07-01 email from Richard Sackler, PPLPC012000277480.
[242] 2010-07-01 email from Russell Gasdia, PPLPC012000277480.
[243] 2010-07-06 email from John Stewart, PPLPC012000277864.
[244] 2010-07-09 email from Kathe Sackler, PPLPC012000278272.
[245] #618541.1 (Ireland 1998-06-25); PPLPC012000277864 (Bermuda 2010-07-22); #618564.1 (London 1998-11-20); PDD1715108129 (Portugal 1995-06-24); #2938358.1 (New York 2003-03-04); #618062.1 (Switzerland 1996-06-28); PKY183307494 (Connecticut 2007-05-03).

patients needed the new drug.  Staff told the Sackler Defendants that they had identified 82,092 prescribers to target with the Butrans sales campaign.  Staff reported that they planned to add 125 sales reps and increase the number of prescriber visits by 30%.[246]

266.    Emails between staff and the Sackler Defendants show that "the Board" (the Sackler Defendants and at that point three other directors) responded with dozens of questions and orders about the sales campaign.  The Board asked staff to determine whether sales would increase if they gave doctors free samples of opioids.  The Board ordered staff to provide forecasts focused on higher doses of opioids.[247]  The Board demanded details about tactics Purdue sales staff used to influence doctors that Purdue viewed as "key opinion leaders," who could influence other doctors to prescribe more opioids: "Provide the Board with more information on the strategy/tactics with respect to [Key Opinion Leaders], how they are identified, how do we plan to interact with them, how do we see them helping build appropriate utilization of Butrans -  and any other relevant information that will/could influence the prescribing of the product."[248]

267.    The Board pushed staff about whether they were describing the benefits of opioids aggressively enough.  Purdue was not legally allowed to say that Butrans was effective for 7 days, because the evidence did not show that, but the Board wanted to know why Purdue didn't claim 7 days of effectiveness in its marketing.[249]

268.    Purdue was not legally allowed to say that Butrans was effective for osteoarthritis ("OA"), because the clinical trials testing Butrans for patients with osteoarthritis had failed, but the Board wanted to know if sales reps could sell more by remaining silent about the failed trial: "What can be said in response to a prescriber who asks directly or indirectly, 'can this product be

---

[246] 2010-07-22 Butrans Commercial Strategy Plan Board Presentation, slides 17, 66, 81, PPLPC018000404193; 2010-06-01 email from William Mallin, PPLPC012000273600.
[247] 2010-07-22 questions during Board meeting, PPLPC012000283164 ("month by month sales forecast, decompose by strengths, show price and units as well by strength, show kg of Buprenorphine by strength").
[248] 2010-07-22 questions during Board meeting, PPLPC012000283165.
[249] 2010-07-22 questions during Board meeting, PPLPC012000283167 ("Why is there no reference to efficacy data in the marketing materials? … a specific reference or statement to Butrans providing efficacy for 7 days seems to be the desired statement … we may not have data that supports efficacy at that specific time point.").

prescribed for my patient with OA?'  In responding are we required to specifically mention the failed trials in OA?"[250]

### (2)  "Region Zero"

269.  At the July 2010 Board meeting in Bermuda, the Sackler Defendants and other Board members asked staff about opioid sales generated by doctors who were suspected of diversion and abuse, which Purdue had collected on a list code-named *Region Zero*.  Staff assured the Board that Purdue tracked prescriptions by *Region Zero* doctors, including the exact prescriptions, units, and dollars from each prescriber.[251]  Staff then sent the data on those prescriptions to the Board.  Staff gave the Board a list of the specific problem prescribers by name, along with the exact number of prescriptions and dollars of revenue each provided to Purdue.[252] The reports of inappropriate prescribing that staff reported to the Board were accurate. No one knew more about prescribing of Purdue opioids than Purdue.

270.  At that same Board meeting in Bermuda, the Sackler Defendants voted to expand the sales force by 125 more sales reps.  They ordered that the hiring begin in September 2010 and be completed before the National Sales Meeting in January 2011.  They also directed Purdue to hire 18 more managers to supervise the reps.[253]

271.  At the same meeting, the Sackler Defendants voted to pay $10,000,000 to settle lawsuits by people injured by OxyContin.[254]

272.  Later that month, staff told the Sackler Defendants that Purdue employed 491 sales reps and that, during Q2 2010, they visited prescribers 135,824 times.[255]  Meanwhile, staff told

---

[250] 2010-07-22 questions during Board meeting, PPLPC012000283167.

[251] 2010-07-22 questions during Board meeting, PPLPC012000283169, -170.

[252]  2010-08-16 email from William Mallin, PPLPC012000283162; 2010-08-11 *Region Zero* prescribers, PPLPC012000283175.

[253] 2010-07-22 Board minutes, PKY183212838 ("After discussion, and on motion duly made and seconded, it was unanimously decided … that the Partnership be and it is hereby authorized and directed to approve the following sales force expansion …").

[254] 2010-07-22 Board minutes, PKY183212838.

[255] 2010-07-27 Board report, pgs. 5, 27, PWG000422481, -503.  Staff told the Sackler Defendants that the target for visits was 142,657; that reps visited 7.0 prescribers per day, on average, compared to the target of 7.5; that the average cost of a visit was $219; and that they were still working to lower the cost to $201.

the Sackler Defendants that Purdue had paid their family $389,000,000 in the first six months of 2010.[256]

273.    **In August**, the Sackler Defendants continued to focus on the sales force. That month, they decided not to acquire a new insomnia drug because of the risk that promoting it could distract sales reps from selling Purdue's opioids. Richard Sackler concluded that "loss of focus" in sales reps' meetings with prescribers was too great a risk, and the Sackler Defendants decided not to go through with the deal.[257]

274.    A few days later, the Sackler Defendants discussed abuse of OxyContin. Staff told them that the most common way of abusing oxycodone, by far, was swallowing it — which a crush-proof coating on OxyContin did not affect. Staff also reported to the Sackler Defendants that data from a prescription monitoring program showed far higher rates of "doctor-shopping" for OxyContin prescriptions than for any other opioid.[258] The prescription monitoring program identifies "doctor-shopping" when a patient gets opioids from multiple prescribers—an indication that the patient is at risk of addiction, overdose, and death.

275.    **In September**, staff reported to the Sackler Defendants about the Board's July 2010 decision to hire more sales reps. Staff said they were working to implement the decision, adding 125 sales territories.[259] Staff also told the Sackler Defendants that 82% of prescriptions for OxyContin were to patients who were already on the drug — a key ingredient in Purdue's plans to keep patients on opioids longer.[260] The Sackler Defendants voted to pay their family $240,000,000.[261]

---

[256] 2010-07-27 Board report, pg. 18, PWG000422494.
[257] 2010-08-14 email from Richard Sackler, PPLPC012000283047.
[258] 2010-08-16 email from Stuart Baker, PPLPC012000283342-43; 2010-08-19 presentation by Paul Coplan, slides 7, 31, PPLPC012000283469.
[259] 2010-09-15 Executive Committee notes, PPLPC012000290686.
[260] 2010-09-15 presentation by Russell Gasdia, slide 10, PPLPC012000290691.
[261] 2010-09-10 Board minutes, PKY183212844.

276.    **In October**, staff told the Sackler Defendants that Purdue employed 506 sales reps and, during Q3 2010, they visited prescribers 141,116 times.[262]

277.    Meanwhile, staff told the Sackler Defendants that Purdue had paid their family $629,000,000 in the first nine months of 2010.[263]  The Sackler Defendants voted to pay another $12,000,000 to settle claims of more patients injured by OxyContin.[264]

278.    **In November**, staff warned the Sackler Defendants that doctors were not prescribing Purdue's highest dose and most profitable opioids as much as the company had expected, so it might be necessary to cut the family's quarter-end payout from $320,000,000 to $260,000,000 and distribute it in two parts: one in early December and one closer to the end of the month.[265]  Mortimer Sackler objected to the decrease and the division into two payments, and he demanded answers from staff: "Why are you BOTH reducing the amount of the distribution and delaying it and splitting it in two?"  "Just a few weeks ago you agreed to distribute the full 320 [million dollars] in November."[266]

279.    Staff also told the Sackler Defendants that the expansion of the sales force that the Sackler Defendants had ordered was being implemented, including 125 new sales territories.[267] The Sackler Defendants voted to spend $158,086,000 to employ sales reps in 2011.[268]

280.    Staff also reported to the Sackler Defendants that drug company leaders can be punished for breaking the law and "owners, officers, and managers will especially face even more serious scrutiny in the future."[269]

281.    **In December**, the Sackler Defendants voted to pay their family $260,000,000.[270]

---

[262] 2010-10-25 Board report, pgs. 3, 26, PWG000421967, -990.  Staff told the Sackler Defendants the target was 144,414; reps visited 6.8 prescribers per day, on average, compared to the target of 7.5; each sales rep visit to a prescriber cost Purdue $219; and they were working to lower the cost to $201.
[263] 2010-10-25 Board report, pg. 15, PWG000421979.
[264] 2010-04-01 Board minutes, PKY183212854; draft meeting materials, PPLPC012000294206.
[265] 2010-11-23 email from Edward Mahony, PPLPC012000302682-683.
[266] 2010-11-23 and 2010-11-24 emails from Mortimer Sackler, PPLPC012000299869-870.
[267] 2010-11-10 Executive Committee notes, PPLPC012000299854.
[268] 2010-11-03 Board minutes, 2011 budget, PKY183212865; 2010-11 budget submission, pg. 18, PDD9273201306.
[269] 2010-11-10 Executive Committee notes, PPLPC012000299855; 2010-11-10 Slideshow presentation by Bert Weinstein, slide 7, PPLPC012000299866.
[270] 2010-12-02 Board minutes, PKY183212869-70.

### e.      2011

282.     **In January 2011**, Richard Sackler met with sales reps for several days at the Butrans Launch Meeting and discussed how they would promote Purdue's newest opioid.[271] Richard quickly followed up with sales management to demand a briefing on how the sales visits were going in the field:

> "I'd like a briefing on the field experience and intelligence regarding Butrans.  How are we doing, are we encountering the resistance that we expected and how well are we overcoming it, and are the responses similar to, better, or worse than when we marketed OxyContin® tablets?"[272]

283.     Richard's interventions into sales tactics made employees nervous.  When Richard followed up to ask for information "tomorrow," CEO John Stewart tried to slow things down, warning staff that Richard's requests would be "never-ending."[273]   Stewart was right about Richard, but wrong to think he could stand in the way.

284.     Two hours after sending his request, Richard ordered Sales VP Russell Gasdia to call him, on a Sunday morning, on his cell phone.[274]  Richard wanted to discuss "the resistance" and how Purdue's sales reps were "overcoming" it right away.

285.     Richard Sackler kept pushing for more sales.  After one week of prescriptions doubled Purdue's forecast, Richard wrote to the sales staff: "I had hoped for better results."[275]  In a follow-up message, Richard asked staff to tell him the ratio of prescriptions per sales representative visit to a prescriber, divided out by the prescribers' specialties.  He asked for a Board discussion of the barriers that sales reps were encountering during promotion.[276]  After trying to answer Richard's questions and getting another dissatisfied response, sales staff wrote to the CEO to ask him to intervene.[277]  In a later message, Richard wrote to the staff again: "What

---

[271] 2011-01-21 email from Russell Gasdia, PPLPC012000308393.
[272] 2011-01-30 email from Richard Sackler, PPLPC021000352206.
[273] 2011-01-31 email from John Stewart, PPLPC021000352205.
[274] 2011-01-30 email from Richard Sackler, PPLPC012000308371.
[275] 2011-02-15 email from Richard Sackler, PPLPC012000311654.
[276] 2011-02-25 email from Richard Sackler, PPLPC012000313544.
[277] 2011-02-28 email from Russell Gasdia, PPLPC012000313542.

do I have to do to get a weekly report on Butrans sales without having to ask for it?"[278]   One exasperated staff member begged another to respond.[279]   The CEO announced that, from then on, staff would send a sales report to the Sackler Defendants every week.[280]   When staff sent the first weekly report, Richard responded immediately: "What else more can we do to energize the sales and grow at a faster rate?"[281]   The next week, Richard wrote to the sales staff to ask about the performance of a specific sales rep.[282]

286.   Mortimer Sackler jumped in, asking staff for more information about sales.  When two days passed without an answer, Mortimer insisted: "Any answer to this yet?"[283]   Staff rushed to prepare answers to share with all the Sackler Defendants.[284]

287.   The people who worked for the Sackler Defendants knew their appetite for sales was extreme.  When the launch of Purdue's Butrans opioid was on track to beat every drug in its class, Richard Sackler asked sales staff: "Do you share my disappointment?"[285]   Sales VP Russell Gasdia replied privately to the CEO: "As far as his disappointment, I do not share that."[286]

288.   Throughout that spring of 2011, the Sackler Defendants kept up a drumbeat of aggressive sales tactics, multi-million-dollar payouts, and disregard for the law.  In January, the Sackler Defendants voted to pay the legal expenses of specific individuals if they were defendants or witnesses in investigations of Purdue, including several sales executives and John Crowley, Executive Director of Controlled Substances Act Compliance.[287]   The Sackler Defendants knew these employees were aware of misconduct because they had directed it.  In September 2009, a Purdue sales manager had emailed Crowley that Purdue was promoting opioids to an illegal pill mill: "I feel very certain this is an organized drug ring," and "Shouldn't the DEA be contacted

---

[278] 2011-03-08 email from Richard Sackler, PPLPC012000314972.
[279] 2011-03-09 email from Mike Innaurato, PPLPC012000314972.
[280] 2011-03-09 email from John Stewart, PPLPC012000314985; PPLPC022000412102.
[281] 2011-03-16 email from Richard Sackler, PPLPC012000316128.
[282] 2011-03-22 email from Richard Sackler, PPLPC012000317190.
[283] 2011-04-05 and 2011-04-08 emails from Mortimer Sackler, PPLPC012000320102-103.
[284] 2011-04-08 email from Russell Gasdia, PPLPC012000320101.
[285] 2011-03-09 email from Richard Sackler, PPLPC012000315176.
[286] 2001-03-10 email from Russell Gasdia, PPLPC012000315176.
[287] 2011-01-20 Board minutes, PKY183212882-892.

86

about this?" Purdue sat on the information and did not report it to the authorities *for more than two years*, until after the pill mill doctor had already been arrested and the Sackler Defendants had arranged for lawyers in case Crowley was questioned.[288]

289.    In January 2011, staff reported to the Sackler Defendants that a key initiative in Q4 2010 had been the expansion of the sales force. Staff told the Sackler Defendants that Purdue employed 590 sales reps and, during Q4 2010, they visited prescribers 125,712 times.[289]

290.    Staff told the Sackler Defendants that Purdue paid their family $889,000,000 in 2010. But staff reported that Purdue's revenue was still hundreds of millions of dollars less than expected because doctors were prescribing less of Purdue's highest dose opioids.[290] Staff told the Sackler Defendants that sales of the highest doses continued to fall below expectations, and the gap had cost the company $120,000,000 in the month of December 2010 alone.[291] The Sackler Defendants faced the prospect that, if doctors did not prescribe more of the highest doses, their payouts would shrink.

291.    **In February**, staff reported to the Sackler Defendants that law enforcement was increasingly concerned about lawbreaking by drug companies and the resulting "danger to public safety."[292] Staff also told the Sackler Defendants that Purdue was receiving a rising volume of hotline calls and other compliance matters, reaching an all-time high during Q4 2010. Staff reported to the Sackler Defendants that sales reps had engaged in improper promotion of Purdue opioids, but the company had decided not to report the violations to the government. Staff also reported to the Sackler Defendants about the risks of OxyContin, including that 83% of patients in substance abuse treatment centers began abusing opioids by swallowing pills, and that it took,

---

[288] 2016-07-10 "More than 1 Million OxyContin Pills Ended up in the Hands of Criminals and Addicts. What the Drugmaker Knew," by Harriet Ryan, Lisa Girion, and Scott Glover, *Los Angeles Times*.

[289] 2011-01-24 Board report, pgs. 4, 5, 35, PWG000421551, -552, -582. Staff told the Sackler Defendants that, at the Board's direction, Purdue had hired 74 more sales reps and planned to hire 51 more. Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 125,553 visits; and that reps visited 6.2 prescribers per day, on average, compared to a target of 7.5; and that each visit cost Purdue $219. They were still working to lower the cost to $201.

[290] 2011-01-24 Board report, pg. 22, PWG000421569.

[291] 2011-01-21 email from Sharon Salwan, PPLPC012000307015.

[292] 2001-02-03 Board meeting materials, slide 48, PDD8901468062.

on average, 20 months for a patient to get treatment.  Staff reported to the Sackler Defendants that Purdue tracked to individual zip codes the correlation between poison control calls for OxyContin overdose, pharmacy thefts, and prescribers Purdue suspected of abuse and diversion in *Region Zero*.[293]

292.    Staff even gave the Sackler Defendants a map correlating dangerous prescribers with reports of oxycodone poisonings, burglaries, and robberies.[294]



*Map presented to the Purdue Board in 2011*

293.    **In March**, staff reported to the Sackler Defendants on OxyContin sales and again focused on revenue from doctors in *Region Zero* — prescribers that Purdue suspected of improper prescribing but that Purdue had not reported to the authorities.  Staff told the Sackler Defendants

---

[293] 2011-02-03 presentation by Bert Weinstein, slides 22-24, 86, 94-95, PDD8901468036-038, -100, -108-109.
[294] 2011-02-03 presentation by Bert Weinstein, slide 95, PDD8901468109.

that if *Region Zero* doctors stopped prescribing opioids, Purdue would lose almost 10% of its sales.[295]

294.   **In April**, the Sackler Defendants met with Sales VP Russell Gasdia to talk about sales.  He told them that OxyContin was the best-selling painkiller in America, with more than three billion dollars in annual sales —almost double the second-place drug.[296]   The Sackler Defendants voted to pay their family $189,700,000.[297]

295.   **In May**, in response to the Sackler Defendants' repeated requests, staff sent Richard, Jonathan, Kathe, Mortimer, and Theresa Sackler a report on the sales tactics reps were using to push Butrans.  The first tactic reported to these Sacklers was focusing on a select "core" of physicians that Purdue calculated would be most susceptible to sales reps lobbying to prescribe more opioids.[298]   Purdue sales reps repeatedly reported concerns that these doctors wrote inappropriate prescriptions, but Purdue ordered the reps to keep promoting opioids to these doctors anyway.  Dozens of their patients overdosed and died.

296.   The second tactic staff reported to Richard, Jonathan, Kathe, Mortimer, and Theresa Sackler in the May 25, 2011 email was "positioning of Butrans for specific patient types."[299]   Promotion for "specific patient types" included pushing opioids for elderly patients with arthritis.  Sales reps recorded in their notes that they urged doctors to prescribe opioids for elderly patients more than a thousand times in 2011.  The reps even went to pharmacies to ask pharmacists to encourage doctors to prescribe opioids for the elderly.

297.   A third tactic reported to these five Sacklers was getting prescribers to commit to put specific patients on opioids.[300]   Sales reps recorded in their notes that they asked doctors to commit to prescribe opioids more than a thousand times in 2011.  Sales reps repeatedly asked prescribers to commit to prescribe opioids without disclosing significant risks.

---

[295] 2011-03-01 2011 OxyContin Tablets Sales Trends and Projections, PPLP004405801, -809.
[296] 2011-04-14 Board presentation, PPLP004405866, -880.
[297] 2011-04-06 Board minutes, PKY183212896-897.
[298] 2011-05-25 email from Russell Gasdia, PPLPC012000326017.
[299] 2011-05-25 email from Russell Gasdia, PPLPC012000326017.
[300] 2011-05-25 email from Russell Gasdia, PPLPC012000326017.

298.    Jonathan Sackler was not satisfied that these tactics would be enough to boost sales.  He wrote to John Stewart: "this is starting to look ugly.  Let's talk."[301]  Stewart and the sales team scrambled to put together a response and set up a meeting with Jonathan for the following week.[302]

299.    That same month, staff reported to the Sackler Defendants that Purdue had hired 47 more sales reps according to the Sackler Defendants' orders.  Staff told the Sackler Defendants that Purdue employed 639 sales reps and, during Q1 2011, they visited prescribers 173,647 times.[303]

300.    Meanwhile, the Sackler Defendants voted to pay $10,000,000 to try to settle a lawsuit by the Attorney General of Kentucky regarding Purdue's marketing of OxyContin.[304]  The Sackler Defendants were on notice that Purdue's unfair and deceptive marketing raised serious concerns.  Staff also told the Sackler Defendants that they had received another 88 calls to Purdue's compliance hotline, but not reported any of them to the authorities.[305]

301.    **In June**, staff reported to the Sackler Defendants that Purdue's opioid sales were hundreds of millions of dollars less than expected and that a prime reason was that doctors were not prescribing enough of the highest doses.[306]  The headline presented at the Board meeting read: "40 and 80mg tablet prescriptions have decreased significantly.  The 10mg and 20mg tablet prescriptions initially increased, but given their lower value not enough to offset the higher strength decline."  Staff told the Sackler Defendants: "As a result of the change in prescriptions by strength, OxyContin brand Kgs dispensed are below mid 2010 levels."  Staff reported to the Sackler Defendants that Purdue would rely on sales rep visits and paid physician spokespersons

---

[301] 2011-05-25 email from Jonathan Sackler, PPLPC012000326194.
[302] 2011-05-25 email from John Stewart, PPLPC012000326193.
[303] 2011-05-02 Board report, pgs. 5, 6, 36, PPLPC012000322430, -431, -461.  Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 168,210 visits; and that reps visited 6.66 prescribers per day, on average, compared to a target of 7.0.
[304] 2011-05-20 Board minutes, PKY183212910.
[305] 2011-05-20 compliance report, PPLP004406033.
[306] 2011-05-12 Executive Committee notes, PPLPC012000327303.

to maintain demand.  For a "Super Core" of "Very High Potential" opioid prescribers, Purdue would order its sales reps to make sales visits *every week*.[307]

302.    The Sackler Defendants immediately pushed to find ways to increase sales. Richard Sackler asked Sales VP Russell Gasdia to include him in a meeting with District Managers who were the day-to-day supervisors of the sales reps.  Then, having missed the meeting, he engaged Gasdia again by email.  Gasdia told Richard that Purdue had hired 147 new sales reps at the Board's direction.  Gasdia told Richard that Purdue instructed the sales reps to focus on converting patients who had never been on opioids or patients taking "low dose Vicodin, Percocet, or tramadol"—all patients for whom Purdue's opioids posed an increase in risk.[308]

303.    Sales reps reported to Purdue that they encouraged doctors to prescribe opioids to opioid-naive patients more than a thousand times in 2011.

304.    Gasdia told Richard Sackler (again) that Purdue instructed sales reps to focus on the few highest-prescribing doctors in their territory and visit them over and over.  Gasdia also told Richard that staff had initiated performance enhancement plans for sales reps who were not generating enough opioid prescriptions.[309]

305.    In response to Gasdia's message about the sales reps, Richard Sackler wrote back six minutes later and asked to meet with Gasdia without delay.[310]  Gasdia scrambled to schedule a meeting about sales tactics with Richard for first thing the next morning.[311]  Richard would not wait until the morning and instructed Gasdia to call him that same day.[312]

306.    Richard Sackler continued the correspondence that day, criticizing Purdue's managers for allowing sales reps to target "non-high potential prescribers."  "How can our managers have allowed this to happen?"[313]  Richard insisted that sales reps push the doctors who prescribed the most drugs.

---

[307] 2011-06-21 Mid-Year Update, PPLP004406102-123.
[308] 2011-06-16 email from Russell Gasdia, PPLPC012000329609.
[309] 2011-06-16 email from Russell Gasdia, PPLPC012000329609.
[310] 2011-06-16 email from Richard Sackler, PPLPC012000329608.
[311] 2011-06-16 email from Russell Gasdia, PPLPC012000329607.
[312] 2011-06-16 email from Richard Sackler, PPLPC012000329621.
[313] 2011-06-16 email from Richard Sackler, PPLPC012000329706.

307.    To make sure his orders were followed, Richard Sackler demanded to be sent into the field with the sales reps.[314]  Richard wanted a week shadowing Purdue sales reps, two reps per day.  In horror, Gasdia appealed to Purdue's Chief Compliance Officer, warning that Richard Sackler promoting opioids was "a potential compliance risk."[315]  Compliance replied: "LOL."[316]  To make sure the Sackler Defendants' involvement in marketing stayed secret, staff instructed: "Richard needs to be mum and be anonymous."



> **To:**        Gasdia, Russell[Russell.Gasdia@pharma.com]
> **From:**    Weinstein, Bert
> **Sent:**     Thur 6/16/2011 7:47:14 PM
> **Subject:** Re: Feedback from District Manager Advisory Council - FYI
>
> LOL - I told him you raised concerns with me. We agreed Richard needs to be mum and be anonymous

> **From:** Gasdia, Russell
> **To:** Weinstein, Bert
> **Sent:** Thu Jun 16 17:08:15 2011
> **Subject:** Fw: Feedback from District Manager Advisory Council - FYI
>
> I spoke to John and he said Stuart cleared Dr Richard observing calls with reps. I told him I spoke with you and you have concerns...he said he'd speak with you.

> **From:** Sackler, Dr Richard
> **To:** Gasdia, Russell
> **Cc:** JHS (US)
> **Sent:** Thu Jun 16 16:45:56 2011
> **Subject:** Re: Feedback from District Manager Advisory Council - FYI
>
> Russ,
> One more thing.  Who have you chosen for me to go to the field with the week after the budget meetings?  Where are they?  Can we conveniently do two reps each day especially if I travel to get to the right place as I probably should do.

*Purdue internal emails*

---

[314] 2011-06-16 email from Richard Sackler, PPLPC012000329706.
[315] 2011-06-16 email from Russell Gasdia, PPLPC012000329494 ("Based on our discussions, perhaps you could sit down with JS on your thoughts.  Also, I haven't spoken to him about RS going to field with reps.  Perhaps you could also say something to JS and indicate I came to you for counsel as I saw this as a potential compliance risk?").
[316] 2011-06-16 email from Bert Weinstein, PPLPC012000329722.

308.   A slew of executives, including the CEO, got involved in planning Richard Sackler's sales visits.  All of them were worried.  One wrote:

> "About 5 last night, John [Stewart, the CEO] was walking by my office – I yelled out to stop him – and said that you had mentioned to me that Richard wanted to go into the field, and that you had raised concerns with me.  John seemed angry, and asked if I had concerns.  I told him could be issues and Richard could be out on a limb if he spoke about product at all or got into conversations with HCPs, or identified himself, especially with FDA Bad Ad possibilities.  John agreed Richard would have to be mum throughout, and not identify himself other than as a home office person."[317]

309.   Richard Sackler indeed went into the field to promote opioids to doctors alongside a sales rep.  When he returned, Richard argued to the Vice President of Sales that a legally-required warning about Purdue's opioids wasn't needed.  He asserted that the warning "implies a danger of untoward reactions and hazards that simply aren't there."  Richard insisted there should be "less threatening" ways to describe Purdue opioids.[318]

310.   Meanwhile, the Sackler Defendants voted to pay their family $200,000,000.[319]

311.   A few days later, sales and marketing staff scrambled to prepare responses to questions from the Sackler Defendants.  Mortimer Sackler asked about launching a generic version of OxyContin to "capture more cost sensitive patients."  Kathe Sackler recommended looking at the characteristics of patients who had switched to OxyContin to see if Purdue could identify more patients to convert.  Jonathan Sackler wanted to study changes in market share for opioids, focusing on dose strength.[320]

312.   At the same time, sales staff were organizing more ways for Richard Sackler to oversee their work in the field.  Gasdia proposed to Richard:

> "In addition to field contacts with representatives, you may want to consider attending one of the upcoming conventions where we will

---

[317] 2011-07-17 email from Bert Weinstein, PPLPC012000329783.
[318] 2011-07-20 email from Richard Sackler, PPLPC001000091102.
[319] 2011-06-24 Board minutes, PKY183212924-925.
[320] 2011-06-28 email from Edward Mahony, PPLPC012000331343; attachment PPLPC012000331345.

be attending. At each of the ones listed below, we will have a promotional booth for OxyContin & Butrans.  In addition, we are sponsoring educational programs for Butrans and OxyContin in the form of a 'Product Theater.'

This would provide you the opportunity to be on the convention floor, observing numerous presentations being provided by our representatives and see a wide range of interactions over the course of a day.  In addition, we can arrange for one-on-one meetings with key opinion leaders who are attending, many of them are approved consultants/advisors for us and you can have some open conversations regarding the market, perceptions around Butrans and OxyContin.  Finally, you could observe the Product Theaters we are implementing."[321]

313.    **In July**, staff assured the Sackler Defendants that Purdue prohibited sales reps from writing their sales pitches to prescribers in email.[322]

314.    **In August**, staff told the Sackler Defendants that Purdue employed 640 sales reps and, during Q2 2011, they visited prescribers 189,650 times.[323]

315.    Meanwhile, staff reported to the Sackler Defendants that, in the first seven months of 2011, Purdue paid the family $411,000,000.[324]

316.    **In September**, Richard Sackler directed staff to study a savings card program for a widely-used cholesterol medication (not an addictive narcotic) to learn how Purdue could use it for opioids.[325]  That same month, the Sackler Defendants voted to pay their family $140,800,000 more.[326]

---

[321] 2011-07-26 email from Russell Gasdia, PPLPC012000336250.
[322] 2011-07-21 Board meeting presentation, PPLP004406488-490.
[323] 2011-08-03 Board report, pgs. 6, 42, PWG000420318, -354.  Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 187,950 visits; and that reps visited 7.2 prescribers per day, on average, compared to a target of 7.0.
[324] 2011-08-03 Board report, pg. 29, PWG000420341.
[325] 2001-09-28 email from Richard Sackler, PPLPC012000345892.
[326] 2011-09-01 Board minutes, PKY183212927-928.

317.   **In November**, staff told the Sackler Defendants that Purdue still employed 640 sales reps and, during Q3 2011, they visited prescribers 189,698 times.[327]  Looking ahead, the Sackler Defendants voted to spend $162,682,000 to employ sales reps in 2012.[328]

318.   Meanwhile, staff told the Sackler Defendants that, in the first nine months of 2011, Purdue paid their family $551,000,000.[329]

### f.      2012

319.   **In January 2012**, Jonathan Sackler started the year pressing Sales VP Russell Gasdia for weekly updates on sales.[330]  A few days later, Richard Sackler jumped into the weeds with the sales staff, this time about advertising.  Richard noticed that online ads appeared indiscriminately on webpages with content associated with the ad — regardless of whether the association was positive or negative.[331]  Staff assured Richard that, when Purdue bought online advertising for opioids, it specified that the ads appear only on pages expressing positive views toward opioids, and would not appear with articles "about how useless or damaging or dangerous is our product that we are trying to promote."[332]

320.   That same month, staff told the Sackler Defendants that Purdue employed 632 sales reps and, during Q4 2011, they visited prescribers 165,994 times.[333]

321.   The Sackler Defendants were not satisfied with the sales effort.  **In February**, staff reported to the Sackler Defendants that prescriptions had dropped, and that a decrease in sales rep visits to prescribers was a major driver of the decline.  Staff asked the Sackler Defendants to be patient, because reps had missed work for December holidays and the company's mandatory

---

[327] 2011-11-09 Board report, pgs. 5, 41, PWG000419307, -343.  Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 189,525 visits; and that reps visited 7.2 prescribers per day, on average, compared to a target of 7.0.

[328] 2011-11-18 Board minutes, 2012 budget, PKY183212941-942; 2012 budget submission, pg. 22, PDD9273201436.

[329] 2011-11-09 Board report, pg. 26, PWG000419328.

[330] 2012-01-09 email from Jonathan Sackler, PPLPC012000358983.

[331] 2012-01-22 email from Richard Sackler, PPLPC012000361065-066.

[332] 2012-01-26 email from Russell Gasdia, PPLPC012000361064.

[333] 2012-01-25 Board report, pgs. 7, 48, PPLPC012000362250, -291.  Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 166,315 visits; and that reps visited 7.03 prescribers per day, on average, achieving the target of 7.0.

National Sales Meeting in January.[334]  Mortimer Sackler was not pleased.  He suggested that, "in future years we should not plan the national sales meeting so close following the winter break as it extends the period of time since the doctor last saw our rep."  Mortimer wrote: "Wouldn't it be better to have the reps get back to work for January and back in front of doctors."[335]  Mortimer was agitated by the thought of doctors going too many days without a sales rep visiting to promote Purdue opioids.  If Purdue rescheduled its meeting, "At least then the doctors will have gotten at least one reminder visit from our reps in the last month whereas now they might go two months without seeing one of our reps??"  Staff replied to Mortimer, arguing for "balance."[336]  Richard Sackler replied within minutes that, since the National Sales Meeting prevented sales reps from visiting doctors, "Maybe the thing to have done was not have the meeting at all."[337]  Purdue's compliance officer forwarded the exchange to his staff, commenting: "Oh dear."[338]

322.    Meanwhile, Richard Sackler interrupted sales staff many times a day, often in a hurry: "I had hoped you would have updated this," "Will I have it by noon?" "get to this ASAP."[339]  Staff advised each other: "avoid as much e mail with dr. r as you can."[340]  Sales VP Gasdia wrote to the CEO in exasperation: "I'm not sure what we can do about Dr. Richard."[341]

323.    Throughout the spring, the Sackler Defendants pressed staff to promote Purdue's opioids more aggressively.  In February, Gasdia wrote to sales staff that the Board of Directors ("BOD") was not satisfied with the money coming in: "Things are not good at the BOD level."[342]  When sales dropped for one week on account of the Presidents' Day holiday, Richard Sackler wrote to sales management: "This is bad."[343]  Gasdia forwarded Richard's message to his

---

[334] 2012-02-07 email from Russell Gasdia, PPLPC026000095656.
[335] 2012-02-07 email from Mortimer Sackler, PPLPC026000095656.
[336] 2012-02-08 email from Russell Gasdia, PPLPC026000095655.
[337] 2012-02-08 email from Richard Sackler, PPLPC026000095655.
[338] 2012-02-08 email from Bert Weinstein, PPLPC026000095655.
[339] 2012-02-02 and 2012-02-03 emails from Richard Sackler, PPLPC021000439058, PPLPC021000439090; *see also* 2012-02-22 emails from Richard Sackler, PPLPC021000443801.
[340] 2012-01-09 email from William Mallin, PPLPC028000396626.
[341] 2012-02-01 email from Russell Gasdia, PPLPC012000361862.
[342] 2012-02-07 email from Russell Gasdia, PPLPC012000364017.
[343] 2012-02-07 email from Richard Sackler, PPLPC012000368430.

colleagues, asking how they could "create a greater sense of urgency at the regional management and district management level."[344]

324.    The sales manager who reported to Gasdia had an immediate answer.  That same night, he drafted a message to the leader of one of Purdue's sales districts.  He wrote that the district "is failing."  Then the sales manager went person by person through a list of sales reps and criticized them for not increasing opioid prescriptions enough.  He emphasized that the pressure was coming from Richard Sackler himself:

> "Russ, as well as Mike and myself are constantly defending the launch of Butrans to BOD members.  Just today, Dr. Richard sent another email 'This is bad,' referring to current Butrans trends.  I am quite sure that Dr. Richard would not be sympathetic to the plight of the Boston District."

The manager ended his email by threatening to fire every sales rep in the district:

> "I must tell you that I am much closer to dismissing the entire district than agreeing that they deserve a pass for poor market conditions." [345]

The manager sent his draft to Gasdia, who asked him to run it by someone in marketing.  Gasdia agreed that they should consider firing the sales reps, because "that will send a message."[346]

325.    Meanwhile, Gasdia pleaded with the CEO to defend him against Richard Sackler's micromanagement of sales: "Anything you can do to reduce the direct contact of Richard into the organization is appreciated."[347]  A week later, Richard wrote to sales management again to criticize them for U.S. sales being "among the worst" in the world.[348]

326.    **In March**, staff sent the Sackler Defendants a revised 2012 budget that cut the proposed payout to their family from $472,500,000 to $418,200,000.[349]

---

[344] 2012-02-07 email from Russell Gasdia, PPLPC012000368430.
[345] 2012-02-07 email from Windell Fisher, PPLPC012000368509.
[346] 2012-02-08 email from Russell Gasdia, PPLPC012000368509.
[347] 2012-02-07 email from Russell Gasdia, PPLPC012000368569.
[348] 2012-02-10 email from Richard Sackler, PPLPC012000368823.
[349] 2012-03-05 email from Edward Mahony, PPLPC012000368627.

327.     On one Saturday morning, Richard Sackler wrote to marketing staff, demanding monthly data for all extended release pain medications for the past twelve years and an immediate meeting that Monday night.[350]  Gasdia and Stewart stood by helpless, writing: "Do let us know how this goes."[351]  Later that month, staff created for Richard a historical summary of key events determining OxyContin sales.  Eleven of the key events in sales history were changes in the size of the Purdue sales force — all known to Richard because the Sackler Defendants had ordered them.[352]

328.     A few days later, staff sent Richard Sackler an assessment of recently-improved opioid sales.  Staff told Richard that the increase in prescriptions was caused by tactics that Purdue taught sales reps: pushing opioids for elderly patients with arthritis ("proper patient selection") and encouraging doctors to use higher doses of opioids ("quick titration").[353]  In the coming months, Purdue would study, document, and expand the use of higher doses to increase sales.

329.     Richard Sackler wrote that he was not satisfied with a report on sales and instructed Gasdia to discuss it with him within a day.[354]  Gasdia scrambled to schedule the meeting.[355]  Then Richard raised the stakes and asked Gasdia to address both Butrans sales tactics and a decline in OxyContin sales and propose corrective actions.[356]  John Stewart suggested that Richard's frustrations could be linked to dosing: he encouraged Gasdia to tell Richard that patients on lower doses seemed to stop taking opioids sooner, and that much of the profit that Purdue had lost had been from doctors backing off the highest dose of OxyContin (80mg).[357]

330.     Richard Sackler was not satisfied.  Days later, after sales did not increase, staff told him that they were starting quantitative research to determine why patients stay on opioids, so they could find ways to sell more opioids at higher doses for longer.[358]

---

[350] 2012-03-17 email from Richard Sackler, PPLPC012000369328.
[351] 2012-03-18 email from Russell Gasdia, PPLPC012000369328.
[352] 2012-03-28 presentation, PPLPC012000371063.
[353] 2012-03-28 email from David Rosen, PPLPC012000371301.
[354] 2012-04-12 email from Richard Sackler, PPLPC012000372338-339.
[355] 2012-04-12 email from Russell Gasdia, PPLPC012000372338.
[356] 2012-04-15 email from Richard Sackler, PPLPC012000372585.
[357] 2012-04-16 email from John Stewart, PPLPC012000372620.
[358] 2012-04-20 email from David Rosen, PPLPC012000374532.

331.   **In April**, staff told the Sackler Defendants that Purdue employed 630 sales reps and, during Q1 2012, they visited prescribers 179,554 times.[359]

332.   Meanwhile, Richard Sackler kept pushing the staff to increase sales.  When the mandatory weekly report to the Sackler Defendants showed that sales reps achieved 9,021 prescriptions in a week, Richard asked Sales VP Russell Gasdia for a commitment that the reps would get weekly prescriptions to 10,000: "Are you committed to breaking 10K/wk Rx's this month?"[360]  A colleague replied incredulously to Gasdia: "Is there any question of your commitment?"[361]  Even for people who worked in sales, Richard's conviction that sales reps should just make doctors prescribe opioids seemed crazy.

333.   Gasdia tried to assure Richard Sackler that they were selling opioids aggressively: "Windell and the sales force, as well as Mike and the marketing team (initiatives being implemented) are focused and committed to accelerating the growth trend … everyone in the commercial organization is focused on exceeding the annual forecast."[362]  Richard wanted more. Richard wanted to know what tactics sales staff would use to get more prescriptions, and he wanted to talk about it right away.  First he wrote: "give me the table of weekly Rx plan and the actual.  Then show how you plan to make up the current shortfall."[363]  Then he asked for a meeting within 24 hours.[364]  Then Richard didn't want to wait that long: "Can we meet in person today?"[365] On Friday the 13th, sales and marketing staff met with Richard to review how they would sell more opioids.[366]

334.   **In May**, executives emphasized to the managers overseeing sales reps that the Sackler Defendants were tracking their efforts, and that Richard Sackler required weekly

---

[359] 2012-04-30 Board report, pgs. 6, 33, PPLPC012000374796, -823.  Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 171,024 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1.
[360] 2012-04-11 email from Richard Sackler, PPLPC012000372336.
[361] 2012-04-11 email from David Rosen, PPLPC012000372240.
[362] 2012-04-12 email from Russell Gasdia, PPLPC012000372336.
[363] 2012-04-12 email from Richard Sackler, PPLPC012000372335-336.
[364] 2012-04-12 email from Richard Sackler, PPLPC012000372336.
[365] 2012-04-12 email from Richard Sackler, PPLPC012000372335.
[366] 2012-04-12 email from Russell Gasdia, PPLPC012000372335; 2012-04-13 invitation from Donna Condon, PPLPC012000372332.

reports.[367]  Staff gave the only reply that was acceptable at Purdue: "All our efforts are focused on attaining the objective" of increased opioid prescriptions that the Sackler Defendants set.[368]

335.    **In June**, the Sackler Defendants discussed sales and marketing again.[369]  Staff reported to the Sackler Defendants that they had added 120,000 sales visits to drive sales of OxyContin.[370]

336.    Staff also told the Sackler Defendants that they expanded the opioid savings cards, because Purdue's latest data showed opioid savings cards led to 60% more patients remaining on OxyContin longer than 90 days.  The Sackler Defendants reviewed the results of Purdue's confidential studies showing that opioid savings cards kept more patients on opioids for 90 day, 120 days, 150 days, 180 days, 210 days, 240 days — even an entire year.[371]



*Purdue internal analysis about keeping patients on opioids longer*

Keeping patients on opioids for these lengths of time was especially dangerous for the patients and especially profitable for Purdue.

---

[367] 2012-05-15 email from Mike Innaurato, PPLPC023000468013.
[368] 2012-05-15 email from Gary Lewandowski, PPLPC023000468016.
[369] 2012-05-29 email from John Stewart, PPLPC012000377890; attachment PPLPC012000377892.
[370] 2012-06-18 Mid Year Sales and Marketing Board Update, slide 10, PPLPC012000382119.
[371] 2012-06-18 Mid Year Sales and Marketing Board Update, slides 11-12, PPLPC012000382119.

337.     Staff also told the Sackler Defendants that (as they had in 2009) they were again targeting prescribers for OxyContin promotion through a special television network.[372]  The video featured a doctor paid by Purdue to promote opioids, and encouraged prescribers to use opioid savings cards.[373]

338.     **In July**, David Sackler (Richard Sackler's son) took a seat on the Board.  For events after July 2012, this Complaint includes David in "the Sackler Defendants."

339.     Staff calculated that Purdue was spending more than $9,000,000 per year to buy food for doctors who prescribe opioids.[374]  Staff also told the Sackler Defendants that Purdue employed 633 sales reps and, during Q2 2012, they visited prescribers 183,636 times.[375]

340.     **In August**, the Sackler Defendants voted to direct Purdue to recruit an additional marketing executive and make candidates available to meet with members of the Board.[376]

341.     **In November**, staff told the Sackler Defendants the confidential results of a study of 57,000 patients that Purdue performed explicitly to determine how opioid dose "influences patient length of therapy."  The results showed that patients on the highest doses "are the most persistent."  The "Recommended Actions" presented to the Sackler Defendants included "additional workshops for the sales force" and "specific direction" to the sales representatives about using higher doses to keep patients on drugs longer.  Staff told the Sackler Defendants that encouraging higher doses "is a focal point of our promotion," and that sales reps would "emphasize the importance" of increasing patients' opioid doses, as soon as 3 days after starting treatment.[377]

---

[372] 2012-06-18 Mid Year Sales and Marketing Board Update, slide 10, PPLPC012000382119.
[373] Video: "A Treatment Plan for Moderate to Severe Low Back Pain That Includes Converting to an Extended-Release Opioid Analgesic," PPLP003276093.
[374] 2014-06-16 budget information, PPLPC031001202294 ($9,119,250; food budget for each sales rep: $18,000).
[375]  2012-07-23 Board report, pgs. 6, 44, PPLPC012000387074, -112; 2012-07 Marketing and Sales report, PPLP004149354.  Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 190,662 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1.
[376] 2012-08-16 Board minutes, PKY183212960.
[377] 2012-11-01 Board report, pgs. 18, 30, PPLPC012000396634, -646.

342.    That same month, the Sackler Defendants voted to set Purdue's budget for Sales and Promotion for 2013 at $312,563,000.[378]  Staff told the Sackler Defendants that Purdue employed 622 sales reps and, during Q3 2012, they visited prescribers 180,723 times.[379]

### g.    2013

343.    **In January 2013**, in what was becoming a yearly ritual, Richard Sackler questioned staff about the drop in opioid prescriptions caused by Purdue sales reps taking time off for the holidays.  Richard wasn't satisfied: "Really don't understand why this happens.  What about refills last week?  Was our share up or down?"[380]  Staff assured Richard that doctors were "sensitive" to sales rep visits and, as soon as the reps got back into action, they would "boost" opioid prescriptions again.[381]

344.    Staff told the Sackler Defendants that they continued to reinforce the *Individualize The Dose* campaign, which the Sackler Defendants knew and intended would promote higher doses.  Staff also told the Sackler Defendants that sales reps would place greater emphasis on the opioid savings cards, which the Sackler Defendants knew and intended would keep patients on opioids longer.  Staff reported to the Sackler Defendants that Purdue had conducted a sensitivity analysis on the opioid savings cards to maximize their impact and, as a result, had increased the dollar value and set the program period to be *15 months* long.  Staff also reported to the Sackler Defendants that Purdue had created promotional materials to support these tactics and had distributed them to the sales force.  Staff also told the Sackler Defendants that Purdue showed an opioid promotional video to 5,250 physicians on the Physician's Television Network.[382]  The video urged doctors to give patients Purdue's opioid savings cards.[383]

---

[378] 2012-11-16 Board minutes, 2013 budget, PKY183212995-998.
[379] 2012-11-01 Board report, pgs. 15, 54, PWG000414901, -940.  Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 199,466 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1.
[380] 2013-01-07 email from Richard Sackler, PPLPC022000584388.
[381] 2013-01-07 email from David Rosen, PPLPC022000584388.
[382] 2013-01-28 Board report, pgs. 12-14, PPLPC012000407138-140.
[383] Butrans promotional video, PPLP003297185.

345.    That same month, staff told the Sackler Defendants that Purdue employed 609 sales reps and, during Q4 2012, they visited prescribers 153,890 times.[384]

346.    **In February**, the Sackler Defendants met with staff about tactics for promoting Purdue's opioids.  They discussed research on what influences prescriptions, how doctors had responded to Purdue's increased promotion, and sales force promotion themes.[385]  On the same day, the Sackler Defendants voted to award bonuses and salary increases to executives, including those involved in marketing Purdue's opioids.[386]

347.    **In March**, staff reported to the Sackler Defendants on the devastation caused by prescription opioids.  Staff told the Sackler Defendants that drug overdose deaths had more than tripled since 1990 — the period during which Purdue had made OxyContin the best-selling painkiller.  Staff told the Sackler Defendants that tens of thousands of deaths were only the "tip of the iceberg."  Staff reported that, for every death, there were more than a hundred people suffering from prescription opioid dependence or abuse.[387]

348.    **In May**, staff reported to the Sackler Defendants again that they were successfully using opioid savings cards to get patients to "remain on therapy longer."  Staff told the Sackler Defendants that they were using direct mail and email, as well as sales visits, to push the opioid savings cards.[388]

349.    Staff reported to the Sackler Defendants that, despite these sales efforts, they were not achieving the goals of getting enough patients on higher doses of opioids and getting doctors to prescribe more pills in each prescription.  Staff told them that "there is an 'unfavorable' mix of prescriptions across strengths," and Purdue was losing tens of millions of dollars in revenue because sales of the highest doses (60mg and 80mg) were too low.  Staff told the Sackler Defendants that there was also a second problem: "lower average tablet counts per prescription."

---

[384] 2013-01-28 Board report, pgs. 10, 56, PPLPC012000407136, -182.  Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 191,264 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1.
[385] 2013-01-30 email from William Mallin, PPLPC012000406335.
[386] 2013-02-13 Board minutes, PKY183213007.
[387] 2013-03-21 Board presentation, PPLP004409513-514.
[388] 2013-05-13 Board report, pg. 18, PPLP004367557.

Because doctors were not prescribing enough pills during each patient visit, Purdue was losing tens of millions of dollars in revenue. Staff promised the Sackler Defendants: "A deeper analysis is underway to determine the cause of the decline in the 30mg, 60mg, and 80mg tablet strengths, as well as the lower than budgeted average tablets per prescription. Once the analysis is complete, we will have a better sense of what tactics to implement to address both issues."[389]

350.    The Sackler Defendants met with Sales VP Russell Gasdia about the strategy for selling high doses. Gasdia told the Sackler Defendants that "Titration up to higher strengths, especially the 40mg and 80mg strengths is declining." He analyzed the "Causes of OxyContin's Decline in Higher Strengths," and how Purdue would reverse that decline. He told the Sackler Defendants that Purdue's #1 tactic to sell higher doses was sending sales reps to visit prescribers. The #2 tactic was a marketing campaign designed to promote high doses—Purdue's *Individualize The Dose* campaign. After that, Gasdia told the Sackler Defendants, came opioid savings cards. After that, special focus on the most prolific opioid prescribers.[390]

351.    Gasdia told the Sackler Defendants that the staff would develop even more tactics to sell higher doses. They were using Purdue's data on thousands of doctors and patients to learn what made people willing to use high doses of opioids. They had started a study of physician characteristics and a "patient level analysis to determine what patient characteristics" were associated with "higher dose volume."[391]

352.    That same month, staff told the Sackler Defendants that Purdue employed 637 sales reps and, during Q1 2013, they visited prescribers 155,354 times.[392]

353.    **In July**, the Sackler Defendants discussed "threats" to their business from data on long-term opioid use, as public health authorities reacted to the danger of keeping patients on

---

[389] 2013-05-13 Board report, pg. 8, PPLP004367547.
[390] 2013-05 Board presentation by Russell Gasdia, PPLP004409727-728.
[391] 2013-05 Board presentation by Russell Gasdia, PPLP004409729.
[392] 2013-05-13 Board report, pgs. 12, 62, PPLP004367551, -601. Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 172,788 visits; and that reps visited 6.8 prescribers per day, on average, compared to a target of 7.1. Staff assured the Sackler Defendants that "call productivity is expected to increase towards the targeted goal throughout 2013."

opioids for longer periods of time.[393]   Meanwhile, staff sent the Sackler Defendants a "Flash Report" that OxyContin sales had dropped $96,400,000 from the year before.  Staff explained to the Sackler Defendants that insufficient volume of sales rep visits to promote OxyContin to prescribers was an important reason for the dropping sales.  Staff told the Sackler Defendants that they would increase the number of sales visits and had hired McKinsey to study how to get doctors to prescribe more OxyContin.[394]

354.   Staff also reported to the Sackler Defendants that key priorities were to reverse "the decline in higher strengths" of Purdue opioids, and the decline in "tablets per Rx," which were reducing Purdue's profit.  They told the Sackler Defendants that Purdue staff were studying ways to fight these trends, and McKinsey would analyze the data down to the level of individual physicians.[395]

355.   Mortimer Sackler asked for more detail on what was being done to increase sales.[396] Staff told the Sackler Defendants that McKinsey would analyze whether sales reps were targeting the prescribers who were most susceptible to increasing opioid use.  Staff told the Sackler Defendants that McKinsey would study whether Purdue could use incentive compensation to push reps to generate more prescriptions.  Making the sales reps' income depend on increasing prescriptions could be a powerful lever.  Staff told the Sackler Defendants that McKinsey would study using "patient pushback" to get doctors to prescribe more opioids: when doctors hesitated to prescribe Purdue opioids, Purdue could get patients to lobby for the drugs. Staff told the Sackler Defendants that McKinsey would also study techniques for keeping patients on opioids longer, including the need for sales reps "to make a lot of calls on physicians with a high number of continuing patients."[397]

356.   Staff also reported to the Sackler Defendants that they had trained Purdue's sales reps to use new sales materials designed to get patients on higher doses of opioids for longer

---

[393] 2013-07-24 Communications and External Affairs Committee minutes, PPLPC012000433553.
[394] 2013-07-05 email from Edward Mahony, PPLPC012000431312-313.
[395] 2013-07-23 Board report, pg. 25, PPLPC012000433412.
[396] 2013-07-06 email from Mortimer Sackler, PPLPC012000431311.
[397] 2013-07-07 email from John Stewart, PPLPC012000431262; attachment PPLPC012000431266-278.

periods.  Staff told the Sackler Defendants that Purdue employed 634 sales reps and, during Q2 2013, they visited prescribers 177,773 times.[398]  Staff assured the Sackler Defendants that they were trying to achieve even more sales visits by monitoring the reps.[399]

357.    Before the month ended, the Sackler Defendants met to discuss a report on sales tactics that McKinsey had prepared for them: *Identifying Granular Growth Opportunities for OxyContin: First Board Update*.  McKinsey confirmed that Purdue's sales visits generated opioid prescriptions.  They urged the Sackler Defendants to demand more sales visits from sales reps, increasing each rep's annual quota from 1,400 towards 1,700.  McKinsey also advised the Sackler Defendants to control the sales reps' target lists more strictly, to make reps visit doctors who give the biggest payoff.  Based on a review of data, McKinsey also suggested that the Sackler Defendants should have staff emphasize opioid savings cards in neighborhoods with high concentration of Walgreens pharmacies.  To allow even more targeted promotion of high doses, McKinsey asked the Sackler Defendants to obtain "prescriber level milligram dosing data" so they could analyze the doses prescribed by individual doctors.[400]

358.    Days later, staff told the Sackler Defendants that Purdue paid their family $42,000,000.[401]

359.    **In August**, the Sackler Defendants met to discuss a new McKinsey report on sales tactics: *Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates*.  McKinsey recommended that the Sackler Defendants immediately order a series of actions to increase sales.  McKinsey urged the Sackler Defendants to direct sales reps to the most prolific opioid prescribers.  The consultants told the Sackler Defendants that prescribers in the more prolific group write "25 times as many OxyContin scripts" as less prolific prescribers.  They also reported to the Sackler Defendants that sales rep visits to these prolific prescribers

---

[398] 2013-07-23 Board report, pgs. 11, 12, 59, PPLPC012000433398, -399, -446.  Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 191,184 visits; and that reps visited 6.9 prescribers per day, on average, compared to a target of 7.1.
[399] 2013-07-23 Board report, pgs. 10-11, PPLPC012000433397-398.
[400] 2013-07-18 Identifying Granular Growth Opportunities for OxyContin: First Board Update, PPLP004409871.
[401] 2013-08-06 email from Edward Mahony, PPLPC012000435338.

cause them to prescribe even more opioids: if Purdue ordered reps to focus on the most prolific prescribers, it could increase sales.[402]

360.    Second, McKinsey recommended that the Sackler Defendants fight back against steps that the DEA, the U.S. Department of Justice, and others were taking to stop illegal drug sales.  Two months earlier, the Walgreens pharmacy company admitted that it broke the law by filling illegitimate prescriptions, and it agreed to new safeguards to stop illegal prescribing.[403] McKinsey told the Sackler Defendants that "deep examination of Purdue's available pharmacy purchasing data shows that Walgreens has reduced its units by 18%."  Even worse for the Sackler Defendants, the new safeguards were hurting sales of the highest doses: "the Walgreens data also shows a significant impact on higher OxyContin dosages" — specifically the 80mg dose. McKinsey urged the Sackler Defendants to lobby Walgreens' leaders to loosen up.  For the longer term, McKinsey advised the Sackler Defendants to develop a "direct-to-patient mail order" business for Purdue opioids, so they could sell the high doses without pharmacies getting in the way.[404]

361.    Third, McKinsey advised the Sackler Defendants that they should use their power on the Board to insist on increasing sales, with monthly accountability: "Establish a revenue growth goal (*e.g.*, $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."  McKinsey knew what the Sackler Defendants were looking for: they reported that "the value at stake is significant — hundreds of millions, not tens of millions."  The consultants urged the Sackler Defendants to make "a clear go-no go decision to 'Turbocharge the Sales Engine.'"[405]

---

[402] 2013-08-08 Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates, PPLP004409892.
[403] 2013 Walgreens agreement, https://www.justice.gov/sites/default/files/usao-sdfl/legacy/2013/06/19/130611-01.WalgreensMOA%26Addendum.pdf.
[404] 2013-08-08 Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates, PPLP004409896-897.
[405] 2013-08-08 Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates, PPLP004409897-898.

362.   **In September and October**, the Sackler Defendants met again to discuss implementation of the sales tactics McKinsey had recommended.   The Sackler Defendants discussed DEA efforts to stop illegal dispensing of opioids at CVS and Walgreens and how Purdue could get around the new safeguards by shifting to mail-order pharmacies, specialty pharmacies, or Purdue distributing opioids to patients directly.[406]

363.   Meanwhile, McKinsey kept reporting to Purdue on tactics to get more patients on higher doses of opioids.[407]   McKinsey found that Purdue could drive opioid prescriptions higher by targeting the highest-prescribing doctors and sending sales reps to visit each prolific prescriber dozens of times per year.   McKinsey pointed to a "true physician example" in Wareham, Massachusetts, who wrote 167 more OxyContin prescriptions after Purdue sales reps visited him.[408]

364.   **In October**, Mortimer Sackler pressed for more information on dosing and "the breakdown of OxyContin market share by strength."[409]   Staff told the Sackler Defendants that "the high dose prescriptions are declining," and "there are fewer patients titrating to the higher strengths from the lower ones."[410]   In response to the Sackler Defendants' insistent questions, staff explained that sales of the highest doses were not keeping up with the Sackler Defendants' expectations because some pharmacies had implemented "good faith dispensing" policies to double-check prescriptions that looked illegal and some prescribers were under pressure from the DEA.[411]   Staff promised to increase the budget for promoting OxyContin by $50,000,000, and get sales reps to generate more prescriptions with a new initiative to be presented to the Sackler Defendants the following week.[412]

---

[406] 2013-09-12 Board agenda, PPLP004409919; 2013-10-03 Board agenda, PPLP004409965-972.
[407] 2013-08-22 email from Russell Gasdia, PPLPC012000437344 (McKinsey interim report).
[408] 2013-08-22 McKinsey presentation, slide 10, PPLPC012000437356.
[409] 2013-10-28 email from Mortimer Sackler, PPLPC012000448835.
[410] 2013-10-28 email from David Rosen, PPLPC012000448832-833.
[411] 2013-10-28 email from David Rosen, PPLPC012000448833.
[412] 2013-10-23 email from Edward Mahony, PPLPC012000448840.

365.     At the end of the month, the Sackler Defendants met to discuss Purdue's budget for sales and marketing for 2014.[413]   Looking back at sales tactics used in 2013, staff told the Sackler Defendants that a relationship marketing program targeting Boston had increased opioid prescriptions by 959%.[414]   Staff told the Sackler Defendants (again) that Purdue's opioid savings cards kept patients on opioids longer.[415]   Looking ahead at 2014, staff reported to the Sackler Defendants that doctors shifting away from high doses and towards fewer pills per prescription could cost Purdue hundreds of millions of dollars in lost sales.[416]   To fight against that threat, staff told the Sackler Defendants the that they would increase the sales visits by each rep to 7.3 visits per day and visit prescribers 758,164 times in the year.[417]

366.     **In November**, Richard Sackler complained that he was getting too much information about the dangers of Purdue opioids.  Richard had set up a Google alert to send him news about OxyContin, and he objected to a Purdue Vice President: "Why are all the alerts about negatives and not one about the positives of OxyContin tablets?"[418]   Staff immediately offered to replace Richard's alert with a service that provided more flattering stories.[419]

367.     Staff reported to the Sackler Defendants that a key initiative during Q3 2013 was for sales reps to encourage doctors to prescribe OxyContin to elderly patients on Medicare.[420]   Staff also reported to the Sackler Defendants that another key initiative during Q3 2013 was for sales reps to promote OxyContin for patients who had never taken opioids before.[421]

368.     Staff also told the Sackler Defendants that analysis conducted in July 2013 showed that opioid savings cards earned the Sackler Defendants more money by keeping patients on opioids longer; specifically, more patients stayed on OxyContin longer than 60 days.  Staff

---

[413] 2013-10-28 email from Russell Gasdia, PPLPC012000448832; Sales & Marketing Board presentation, PPLP004409987.
[414] 2013-10-29 Analgesic Market Update presentation to the Board, PPLP004410015.
[415] 2013-10-29 OxyContin 2014 Budget Proposal to the Board, PPLP004410062.
[416] 2013-10-29 Sales & Marketing presentation to the Board, PPLP004409989.
[417] 2013-10-29 Sales Force 2014 Objectives presented to the Board, PPLP004409999.
[418] 2013-11-18 email from Richard Sackler, PPLPC023000633066.
[419] 2013-11-18 email from Raul Damas, PPLPC023000633066.
[420] 2013-11-01 Board report, pg. 15, PPLP002000186925.
[421] 2013-11-01 Board report, pg. 14, PPLP002000186924.

reported to the Sackler Defendants that Purdue was pushing opioid savings cards in sales rep visits, through email to tens of thousands of health care providers, and online.[422] . The sales reps did not tell doctors that savings cards led patients to stay on opioids longer than 60 days, or that staying on opioids longer increased the risk of addiction and death.

369.     Staff reported to the Sackler Defendants that Purdue paid their family $399,920,000 during January-September 2013.  But staff told the Sackler Defendants that, from January to September 2013, Purdue lost hundreds of millions of dollars in profits because some prescribers were shifting away from higher doses of Purdue opioids.[423]

370.     Staff told the Sackler Defendants that, in Q4 2013, sales reps would increase the number of visits to prescribers.[424]

371.     Staff also reported to the Sackler Defendants that a key initiative in 2013 was to train sales reps to keep patients on Butrans opioids longer.  They told the Sackler Defendants that, at the same time as the initiative to keep patients on opioids longer, Purdue launched a new high dose of its Butrans opioid; sales reps began promoting the new high dose to physicians using new sales materials; and initial orders were double the company's forecasts.  Staff reported to the Sackler Defendants that marketing and sales activities generated 266,842 additional prescriptions and highlighted that opioid savings cards generate especially "high returns" by keeping patients on opioids longer.[425]

372.     Staff reported to the Sackler Defendants that Purdue had sent more than 880,000 emails to health care professionals to promote its Butrans opioid, and posted online advertising seen more than 5 million times for Butrans and nearly 4 million times for OxyContin.  They told the Sackler Defendants that hundreds of thousands of communications to prescribers nationwide presented the same "key selling messages" designed to get more patients on OxyContin at higher doses for longer periods of time, and specifically promoted Purdue's opioid savings cards.[426]

---

[422] 2013-11-01 Board report, pgs. 15-16, 24-25, PPLPC002000186925-926, -933-934.
[423] 2013-11-01 Board report, pgs. 3, 6, PPLPC002000186913, -916.
[424] 2013-11-01 Board report, pg. 11, PPLPC002000186921.
[425] 2013-11-01 Board report, pgs. 11-13, 27, PPLPC002000186921-923, -937.
[426] 2013-11-01 Board report, pgs. 14, 16, PPLPC002000186924, -926.

373.     Staff reported to the Sackler Defendants that they were working with McKinsey to study ways to sell more OxyContin.  Staff also reported that they had direct access to physician level data to analyze prescriptions by individual doctors.  Staff gave the Sackler Defendants the latest results regarding how opioid savings cards led to patients staying on OxyContin longer.[427]

374.     Staff also reported results from Purdue's marketing through the "OxyContin Physicians Television Network."[428]  Staff told the Sackler Defendants that it increased opioid prescriptions.[429]

375.     Staff also told the Sackler Defendants that they would begin reviews of sales reps according to their sales ranking, with a focus on the bottom ten percent.  Staff reported to the Sackler Defendants that Purdue employed 637 sales reps and, during Q3 2013, they visited prescribers 179,640 times.[430]

376.     **In December**, staff told Richard Sackler that Butrans sales were increasing, and they suspected the increase was caused by Purdue's improved targeting, in which sales reps visited the most susceptible prolific prescribers.[431]

377.     Meanwhile, staff contacted Richard Sackler because they were concerned that the company's "internal documents" could cause problems if investigations of the opioid crisis expanded.[432]  Early the next year, staff told Jonathan Sackler about the same concern.  Jonathan studied collections of news reports and asked staff to assure him that journalists covering the opioid epidemic were not focused on the Sackler Defendants.[433]

---

[427] 2013-11-01 Board report, pgs. 20-23, PPLPC002000186930-933.
[428] 2013-11-01 Board report, pgs. 23-24, PPLPC002000186933-34.
[429] 2013-11-01 Board report, pgs. 23-24, PPLPC002000186933-34.
[430] 2013-11-01 Board report, pgs. 11, 52, 55, PPLPC002000186921, -962, -965.  Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 196,845 visits; and that reps visited 6.9 prescribers per day, on average, compared to a target of 7.1.
[431] 2013-12-04 email from David Rosen, PPLPC012000454676.
[432] 2014-01-03 email from Burt Rosen, PPLPC020000748356 ("I spoke to Richard just before the year end and raised concerns over our internal documents.").
[433] 2014-01-02 email from Jonathan Sackler, PPLPC020000748356.

h.     2014

378.    **In January 2014**, staff reported to the Sackler Defendants on how Purdue's program for complying with state and federal law compared to recent agreements between other drug companies and the government.  Other companies had agreed that sales reps should not be paid bonuses based on increasing doctors' prescriptions, but Purdue still paid reps for generating sales.  Other companies disclosed to the public the money they spent to influence continuing medical education, but Purdue did not.  Other companies had adopted "claw-back" policies so that executives would forfeit bonuses they earned from misconduct; but Purdue had not.  The Boards of other companies passed resolutions each quarter certifying their oversight of the companies' compliance with the law; but the Sackler Defendants did not.[434]

379.    **In February**, staff sent the Sackler Defendants the final results from 2013.[435] Staff told the Sackler Defendants that net sales were hundreds of millions of dollars below budget because doctors were not prescribing enough of the highest doses of opioids and were including too few pills with each prescription, and sales reps were not visiting doctors enough.[436]  Sales VP Russell Gasdia wrote privately to a friend: "Our myopic focus on extended release opioids with abuse deterrent properties has not yielded the results people thought it would in the market.  It's been hard to convince colleagues and the board that our success in this market is over."[437]

380.    To get higher sales, staff told the Sackler Defendants that they had tightened the requirements for sales reps' pay: from now on, sales reps would lose bonus pay if they did not visit "high value" prescribers often enough.[438]

381.    A few days later, staff told the Sackler Defendants that Purdue's marketing had an immense effect in driving opioid prescriptions: according to Purdue's analysis, its sales and marketing tactics generated an additional 560,036 prescriptions of OxyContin in 2012 and 2013.  Nevertheless, staff reported to the Sackler Defendants that net sales for 2013 had been

---

[434] 2014-01-16 quarterly compliance report to the Board, PPLP004410797.
[435] 2014-02-03 email from Edward Mahony, PPLPC020000756510.
[436] 2014-01-30 memo from Edward Mahony, PPLPC020000756512.
[437] 2014-02-27 email from Russell Gasdia, PPLPC012000466164.
[438] 2014-01-30 memo from Edward Mahony, PPLPC020000756513.

$377,000,000 less than budgeted.  Staff again reported that Purdue was losing hundreds of millions of dollars in expected profits because prescribers were shifting away from higher doses of Purdue opioids and including fewer pills per prescription.  Staff told the Sackler Defendants that a "Key Initiative" was to get patients to "stay on therapy longer."[439]

382.    Staff also told the Sackler Defendants that key sales priorities were again to encourage doctors to prescribe Purdue opioids for elderly patients and patients who had not taken opioids before.  Staff reported to Sacklers again that sales reps were continuing the *Individualize The Dose* campaign.[440]  As the Sackler Defendants knew, Purdue designed that campaign to encourage higher doses.[441]  Staff also told the Sackler Defendants that Purdue's eMarketing campaign for OxyContin reached 84,250 health care providers during Q4 2013.  Staff told the Sackler Defendants that they found increasing compliance concerns with Purdue's speaker programs, in which the company paid doctors to promote Purdue opioids to other doctors.[442]

383.    Staff told the Sackler Defendants that Purdue employed 632 sales reps and, during Q4 2013, they visited prescribers 176,227 times.[443]

384.    That February report was the last of its kind.  After Q4 2013, Purdue abolished the detailed Quarterly Reports that had created a paper trail of targets for sales visits and been emailed among the Board and staff.  In 2013, the City of Chicago served Purdue with a subpoena seeking internal documents about Purdue's marketing of opioids.[444]  That provoked a flurry of activity, including discussion among the Sackler Defendants.[445]  Purdue fought the subpoena, and it was withdrawn.[446]  For 2014, Purdue decided to limit many of its official Board reports to numbers

---

[439] 2014-02-04 Board report, pgs. 3, 5, 9, 22, PPLPC002000181037, -039, -043, 056.
[440] 2014-02-04 Board report pgs. 13-14, PPLPC002000181047-048.
[441] 2013-05-22 mid-year sales update, slides 4, 14, PPLPC012000424611, 21.  *See* paragraph 670 below.
[442] 2014-02-04 Board report pgs. 15, 39-40, PPLPC002000181049, -073-074.
[443] 2014-02-04 Board report, pgs. 9, 47, PPLPC002000181043, -081.  Staff told the Sackler Defendants that the sales rep visits compared to a target for the quarter of 183,960 visits; and that reps hit the target of visiting 7.1 prescribers per day, because managers reduced the target for visiting pharmacies to allow more visits to prescribers.
[444] 2015-11-20 email from Robert Josephson, PPLPC004153099; 2013-04-24 email from Burt Rosen, PPLPC012000419813.
[445] 2013-05-07 Executive Committee agenda, PPLPC012000421973; 2013-05-03 Board agenda, PPLPC016000181375.
[446] 2015-11-20 email from Robert Josephson, PPLP004153099.

and graphs, and relay other information orally.  But the Sackler Defendants continued to demand information about sales tactics, and their control of Purdue's deceptive marketing did not change.

385.    **In March and April**, staff told the Sackler Defendants that Purdue was achieving its goals of selling higher doses of OxyContin and more pills of OxyContin per prescription, but weekly prescriptions of Purdue's Butrans opioid were below expectations because of a reduced number of sales rep visits promoting that opioid.[447]  The Sackler Defendants had assumed prescriptions would fall, but staff were concerned that the effect could be greater than anticipated.[448]

386.    **In May**, Richard and Jonathan's father, Raymond Sackler, sent David, Jonathan, and Richard Sackler a confidential memo about Purdue's strategy, including specifically putting patients on high doses of opioids for long periods of time.  The memo recounted that some physicians had argued that patients should not be given high doses of Purdue opioids, or kept on Purdue opioids for long periods of time, but Purdue had defeated efforts to impose a maximum dose limit or a maximum duration of use.  Raymond asked David, Jonathan, and Richard to talk with him about the report.[449]

387.    **In June**, the Sackler Defendants removed Russell Gasdia as Vice President of Sales and Marketing, and began pushing his replacement to sell more opioids faster.[450]  Gasdia warned his replacement that Richard managed the sales operation intensely — "there are times this becomes a tennis match with Dr. Richard."[451]  Sure enough, Richard told Gasdia's replacement that he would be given little time to show that he could increase opioid sales: "it is very late in the day to rescue the failed launch" of Butrans, which was not making as much money

---

[447] 2014-03-07 email from Edward Mahony, PPLPC012000467494-495; 2014-04-06 email from Edward Mahony, PPLPC012000471641.
[448] 2014-04-14 Q1 summary of results, slide 7, PPLPC012000473131.  Staff told the Sackler Defendants that Purdue employed 643 sales reps.  2014-04-14 headcount summary, PPLPC012000473138.
[449] 2014-05-05 email from Raymond Sackler, PWG000412141; 2014-05-04 attached memo from Burt Rosen, PWG000412143.
[450] 2014-06-10 email from Richard Sackler, PPLPC012000483200.
[451] 2014-06-10 email from Russell Gasdia, PPLPC012000483223.

as Richard desired.[452]  CEO Mark Timney tried to caution Richard that it was "a little early" to be attacking the new sales leader, since he'd been at Purdue only two weeks.[453]

388.    That same month, staff sent the Sackler Defendants an "Update on L.A. Times mitigation effort" about tactics to discourage scrutiny of Purdue's misconduct.[454]  Staff wrote to the Sackler Defendants:

> As you may recall, one of our efforts to mitigate the impact of a potential negative *Los Angeles Times* (LAT) story involved assisting a competing outlet in marginalizing the LAT's unbalanced coverage by reporting the facts before the LAT story ran.  The following *Orange County Register* story, developed in close coordination with Purdue, achieved this goal.  This fact-based narrative robs the LAT account of its newsworthiness and contradicts many of the claims we expected that paper to make.[455]

In 2012, the *Los Angeles Times* had studied coroner's records and revealed that overdoses killed thousands of patients who were taking opioids prescribed by their doctors, refuting the Sackler Defendants' lie that patients who are prescribed opioids don't get addicted and die.[456]  The next year, the *Los Angeles Times* revealed that Purdue tracked illegal sales of OxyContin with a secret list of 1,800 doctors code-named *Region Zero*, but did not report them to the authorities.[457]  The "mitigation effort" that the Sackler Defendants ordered was not designed to protect patients from overdoses or from illegal prescribers, but instead to protect the Sackler Defendants from reporters revealing the truth.

389.    **In July**, Richard Sackler called staff to complain about studies that the FDA required for opioids and how they might undermine Purdue's sales.  He emphasized that Purdue Board members felt the requirements to conduct studies were unfair.  Staff tried to reassure

---

[452] 2014-06-10 email from Richard Sackler, PPLPC012000483235.
[453] 2014-06-10 email from Mark Timney, PPLPC012000483235.
[454] 2014-06-30 email from Raul Damas, PPLPC022000741863.  A few weeks after receiving the mitigation update, Richard Sackler demanded that the *L.A. Times* send him all the paper's correspondence with Purdue.  2014-08-14 email from Scott Glover, PPLPC024000872837.
[455] 2014-06-30 email from Raul Damas, PPLPC022000741863.  Years earlier, the Sackler Defendants had tried to influence the *New York Times* to be "less focused on OxyContin/Purdue."  2011-04-22 email from John Stewart, PPLPC019000517894.
[456] 2012-11-11 "Legal drugs, deadly outcomes," by Scott Glover and Lisa Girion.
[457] 2013-08-11 "OxyContin maker closely guards its list of suspect doctors," by Scott Glover and Lisa Girion.

Richard that the studies would take "several years to complete, thereby keeping our critics somewhat at-bay during this time."[458]

390. **In July** and again in **August**, **September**, and **October**, staff warned the Sackler Defendants that two of the greatest risks to Purdue's business were "Continued pressure against higher doses of opioids," and "Continued pressure against long term use of opioids."[459]



> **RISKS**
> i.   Continued pressure against higher doses of opioids,
> ii.  Continued pressure against long term use of opioids,

*Staff report to the Board on risks facing Purdue's business*

Staff told the Sackler Defendants that Purdue's #1 opportunity to resist that pressure was by sending sales reps to visit prescribers; and, specifically, by targeting the most susceptible doctors, who could be convinced to be prolific prescribers, and visiting them many times.[460]

### (1)    Project Tango

391. In September 2014, Kathe Sackler dialed in to a confidential call about *Project Tango*.  *Project Tango* was a secret plan for Purdue to expand into the business of selling drugs to treat opioid addiction.  In their internal documents, Kathe and staff wrote down what Purdue publicly denied for decades: that addictive opioids and opioid addiction are "naturally linked." They determined that Purdue should expand across "the pain and addiction spectrum," to become "an end-to-end pain provider."  Purdue illustrated the end-to-end business model with a picture of a dark hole labeled "Pain treatment" that a patient could fall into — and "Opioid addiction treatment" waiting at the bottom.

---

[458] 2014-07-22 email from Todd Baumgartner, PPLPC002000187479-480.
[459] 2014-07-01 Board Flash Report, slide 5, PPLPC016000244173; 2014-08-05 Board Flash Report, slide 6, PPLPC016000250753; 2014-09-05 Board Flash Report, slide 6, PPLPC016000254916; 2014-10-15 Board Flash Report, slide 7, PPLPC016000259607.
[460] 2014-07-01 Board Flash Report, slide 5, PPLPC016000244173; 2014-08-05 Board Flash Report, slide 6, PPLPC016000250753; 2014-09-05 Board Flash Report, slide 6, PPLPC016000254916.



*Purdue's secret "Project Tango"* [461]

392.    Kathe Sackler and the *Project Tango* team reviewed their findings that the "market" of people addicted to opioids, measured coldly in billions of dollars, had doubled from 2009 to 2014.

---

[461] 2014-09-10 email from Brian Meltzer, PPLPC017000564600; 2014-09-12 presentation, PPLPC016000255303. "ADF" refers to Abuse-Deterrent Formulation, the crush-resistant version of OxyContin, which is no less addictive.



*Purdue's measure of the opioid addiction "market"*

Kathe and the staff found that the catastrophe provided an excellent compound annual growth rate ("CAGR"): "Opioid addiction (other than heroin) has grown by ~20% CAGR from 2000 to 2010."[462]

393.   Kathe Sackler and the staff revealed in their internal documents that Purdue's tactic of blaming addiction on untrustworthy patients was a lie.  Instead, the truth is that opioid addiction can happen to anyone who is prescribed opioids:

> ▪ *"This can happen to any-one – from a 50 year old woman with chronic lower back pain to a 18 year old boy with a sports injury, from the very wealthy to the very poor"*

*Purdue's "Project Tango" patient and clinical rationale*

---

[462] 2014-09-10 presentation, slide 4, PPLPC017000564601.  The Board discussed *Project Tango* in October 2014, but Purdue redacted all 32 pages of those Board materials.  2014-10-01 Board meeting materials, PPLP004411288.

Kathe and the staff concluded that millions of people who became addicted to opioids were the Sackler Defendants' next business opportunity. Staff wrote: "It is an attractive market. Large unmet need for vulnerable, underserved and stigmatized patient population suffering from substance abuse, dependence and addiction." The team identified eight ways that Purdue's experience getting patients *on* opioids could now be used to sell treatment for opioid addiction.[463]

394.    Kathe Sackler instructed staff that *Project Tango* required their "immediate attention." She pressed staff to look into reports of children requiring hospitalization after swallowing buprenorphine — the active ingredient in both Purdue's Butrans opioid and the opioid addiction treatment that the Sackler Defendants wanted to sell, through *Project Tango*, in a film that melts in your mouth.[464] Staff assured Kathe that children were overdosing on pills, not films, "which is a positive for *Tango*."[465]

395.    In February 2015, staff presented Kathe Sackler's work on *Project Tango* to the Board. The plan was for a Joint Venture controlled by the Sackler Defendants to sell the addiction medication suboxone.[466]

396.    The *Tango* team mapped how patients could get addicted to opioids through prescription opioid analgesics such as Purdue's OxyContin or heroin, and then become consumers of the new company's suboxone. The team noted the opportunity to capture customers: even after patients were done buying suboxone the first time, 40-60% would relapse and need it again.[467]

---

[463] 2014-09-10 presentation, slides 2, 4, PPLPC017000564601.
[464] 2014-09-16 email from Kathe Sackler, PPLPC020000834186.
[465] 2014-09-17 email from Mark Timney, PPLPC020000834185-186.
[466] 2015-02-20 email from Stuart Baker, PPLPC026000138391.
[467] 2015-02-24 *Project Tango* presentation, PPLPC002000208957.



*Purdue presentation explaining "Project Tango" patient flow*

397.    The next month, *Project Tango* came to an end.  Kathe, David, Jonathan, and Mortimer Sackler discussed the discontinuation of the project at their Business Development Committee meeting.[468]  But the Sackler's efforts to sell addictive opioids continued.

398.    **In October 2014**, staff sent the Sackler Defendants a Proposed Operating Plan and Budget to be approved by the Board for 2015.[469]  Staff told the Sackler Defendants that a key tactic for 2015 would be to convert patients from short-acting opioids to OxyContin.  Staff warned the Sackler Defendants that prescribers were shifting away from the highest doses of Purdue's opioids, and toward fewer pills per prescription, and those shifts would cost Purdue $99,000,000 a year.  Staff told the Sackler Defendants that a key tactic to increase Butrans sales in 2015 would be for Purdue sales reps to push doctors to "titrate up" to higher doses.  Staff likewise told the Sackler Defendants that visits to doctors by sales reps would be a key tactic to launch Purdue's new Hysingla opioid: the company would: "Leverage Purdue's existing, experienced sales force to drive uptake with target HCPs" and "Add additional contract sales force capacity at launch to

---

[468] 2015-03-03 email from Stuart Baker, PPLPC011000016992.
[469] 2014-10-24 email from Edward Mahoney, PPLPC016000260660.

drive uptake."[470]   Staff proposed that Purdue employ 519 sales reps, paid an average salary of $81,300 plus a bonus of up to an additional $124,600 based on sales.[471]

399.    Meanwhile, sales staff exchanged news reports of a lawsuit accusing Purdue of deceptive marketing in Kentucky.[472]   They quoted Purdue's own attorney and Chief Financial Officer stating that the company faced claims of more than a billion dollars that "would have a crippling effect on Purdue's operations and jeopardize Purdue's long-term viability."[473]   Purdue's communications staff were delighted by the article, because it did not reveal the Sackler Defendants' role in the misconduct.  "I'm quite pleased with where we ended up.  There's almost nothing on the Sackler Defendants and what is there is minimal and buried in the back."[474]

400.    **In November**, staff reported to the Sackler Defendants that their sales tactics were working, and the shift away from higher doses of OxyContin had slowed.[475]

401.    **In December**, staff told the Sackler Defendants that Purdue would pay their family $163,000,000 in 2014 and projected $350,000,000 in 2015.[476]

402.    On New Year's Eve, Richard Sackler told staff that he was starting a confidential sales and marketing project on opioid prices and instructed them to meet with him about it on January 2.[477]

### i.     2015

403.    Early in the morning of **January 2**, staff began scrambling to collect sales data for Richard Sackler.[478]   They didn't move quickly enough.  Days later, Richard demanded a meeting with sales staff to go over plans for selling the highest doses.  Richard asked for an exhaustive examination to be completed within 5 days, including:

---

[470] 2015 Commercial Budget Review, slides 31, 38, 51, 67, PPLPC016000260706, -713, -726, -742.
[471] 2015 Budget Submission, slides 13, 56, PPLPC016000260845, -888.
[472] 2014-10-20 email from John Axelson, PPLPC014000279784.
[473] 2014-10-20 Bloomberg Businessweek report, PPLPC014000279786.
[474] 2014-10-20 email from Raul Damas, PPLPC017000579723.
[475] 2014-11 OxyContin Brand Strategy and Forecast for 2015, PPLP004411419 ("Strength mix shifting toward lower strengths has slowed with 40-80mg share going from 29% in the 10 Year Plan to 33% in the Budget").
[476] 2014-12-03 email from Edward Mahoney, PPLPC016000266402; attached report slide 8, PPLPC016000266403.
[477] 2014-12-31 email from Richard Sackler, PPLPC021000713329-330.
[478] 2015-01-02 email from Saeed Motahari, PPLPC021000713328.

"unit projections by strength, mg by strength … pricing
expectations by strength … individual strength's market totals and
our share going backward to 2011 or 12 and then forward to 2019
or 2020 … the same information for Hysingla … [and] the history
of OxyContin tablets from launch to the present."[479]

404.    The CEO stepped in to say the work would take 3 weeks.[480]  Richard let him know

that wasn't a great response — "That's longer than I had hoped for" — and directed marketing

staff to start sending him materials immediately.[481]

405.    That same month, the Sackler Defendants voted to evaluate employees' 2014

performance on a scorecard that assigned the greatest value to the volume of Purdue opioid sales.

Employees were expected to generate more than one-and-a-half billion dollars.  The Sackler

Defendants also voted to establish the company's scorecard for 2015: once again, the biggest

factor determining employees' payout would be the total amount of Purdue opioid sales.[482]

406.    **In April**, staff told the Sackler Defendants that sales of Purdue's highest dose

80mg OxyContin were down 20% and that the average prescription had declined by eight pills

since 2011.

407.    The Sackler Defendants voted to expand the sales force by adding another 122

reps.[483]  As with every reference to "the Sackler Defendants" after July 2012, that includes

Beverly, David, Ilene, Jonathan, Kathe, Mortimer, Richard, and Theresa Sackler.

408.    Staff told the Sackler Defendants the additional reps would increase net sales of

opioids by $59,000,000.[484]

---

[479] 2015-01-07 email from Richard Sackler, PPLPC022000797067-068.
[480] 2015-01-08 email from Mark Timney, PPLPC022000797067.
[481] 2015-01-08 email from Richard Sackler, PPLPC022000797067.  Mark Timney had started as CEO a year earlier with the idea that he could "separate Board interaction from the organization" so the Sackler Defendants would stop directing sales staff.  2014-01-29 email from Mark Timney, PPLPC012000461846.  That effort failed.
[482] 2015-01-16 Board minutes, PPLP004416118-121.
[483] 2015-04-21 Board materials, PPLPC011000025707 ("It was decided to move forward with an expansion of the sales force by 122 reps"); 2015-05-04 Strategic Plan Update, slide 5, PPLPC017000623090; 2015-04-21 Board decision, PPLP004417512.
[484] 2015-04-21 Board materials, PPLPC011000025703.

409.   **In October**, Purdue executives identified avoiding investigations of Purdue's opioid marketing as a "Key Activity" in the company's Operational Plan.[485]

410.   **In November**, the Sackler Defendants voted on the budget for Purdue for 2016.[486] Staff warned the Sackler Defendants that public concern about opioids could get in the way of Purdue's plans.  Staff told the Sackler Defendants that declining prescriptions of the highest doses and fewer pills per prescription would cost Purdue $77,000,000.[487]

411.   Staff proposed to the Sackler Defendants that, for 2016, Purdue would plan for prescribers to average 60 pills of Purdue opioids per prescription.  They told the Sackler Defendants that they would aim to make enough of those pills be high doses to make the average per pill 33 milligrams of oxycodone.[488]   That way, Purdue could hit its target for the total kilograms of oxycodone it wanted to sell.

412.   To make sure Purdue hit the targets, staff told the Sackler Defendants that sales reps were visiting prescribers 21% more often than before.  Staff told the Sackler Defendants that they had aggressively reviewed and terminated reps who failed to generate prescriptions.  Staff reported to the Sackler Defendants that, in 2015 alone, Purdue replaced 14% of its sales reps and 20% of its District Managers for failing to create enough opioid sales.[489]

413.   Looking ahead, staff told the Sackler Defendants that "the 2016 investment strategy focuses on expanding the Sales Force."  They reported that the proposed budget for sales and promotion was $11,600,000 higher than 2015, "primarily due to the Sales Force expansion."  The top priority for the sales reps would be to visit the highest-prescribing doctors again and again.  Staff proposed to the Sackler Defendants that the #1 overall priority for 2016 would be to sell OxyContin through "disproportionate focus on key customers."  They told the Sackler Defendants that sales reps would also target prescribers with the lowest levels of training, physician's assistants and nurse practitioners, because they were "the only growing segment" in

---

[485] 2015-10-27 Executive Operating Committee presentation, slide 16, PPLPC011000065538.
[486] 2015-11-21 email from Stuart Baker, PPLPC011000069947.
[487] 2015-11 budget for 2016, slides 16, 28, 44, PPLPC011000069967, -979, -995.
[488] 2015-11 budget for 2016, slide 41, PPLPC011000069992.
[489] 2015-11 budget for 2016, slides 7, 39, PPLPC011000069958, -990.  Purdue fired 107 sales reps in 2015.

the opioid market.[490]  Purdue executives expected that, each quarter, the sales reps would visit prescribers more than 200,000 times and would get 40,000 new patients onto Purdue opioids.[491]

414.  **In December**, staff prepared to address wide-ranging concerns raised by the Sackler Defendants.  Kathe and Mortimer Sackler wanted staff to break out productivity data by indication versus prescriber specialty for each drug.  Richard Sackler sought details on how staff was calculating 2016 mg/tablet trends.  Jonathan Sackler sought a follow-up briefing on how public health efforts to prevent opioid addiction would affect OxyContin sales.[492]

415.  Before the year ended, the Sackler Defendants were invited to a "Beneficiaries Meeting" where Purdue staff reported to Sackler family members about the company's efforts to sell opioids.[493]

### j.     2016

416.  **In 2016**, the Sackler Defendants met with the Board in January, March, April, June, August, October, November, and December.[494]

417.  **In April**, the Sackler Defendants considered exactly how much money was riding on their strategy of pushing higher doses of opioids.  The month before, the U.S. Centers for Disease Control announced guidelines to try to slow the epidemic of opioid overdose and death. The CDC urged prescribers to avoid doses higher than 30mg of Purdue's OxyContin twice per day.  The CDC discouraged twice-a-day prescriptions of all three of Purdue's most profitable strengths—40mg, 60mg, and 80mg.  Staff studied how much money Purdue was making from its high dose strategy and told the Sackler Defendants how much was at risk each year.[495]

418.  **In May**, Richard Sackler told staff to circulate a *New York Times* story reporting that opioid prescriptions were dropping for the first time since Purdue launched OxyContin

---

[490] 2015-11 budget for 2016, slides 24, 26, 49, PPLPC011000069975, -69977, -70000.
[491] 2015-11-03 email from Zach Perlman, Executive Committee materials, slide 36, PPLPC011000065030.
[492] 2015-12-09 email from Zach Perlman, PPLPC011000073228 attaching Executive Committee presentation, slides 12-13, PPLPC011000073230.
[493] 2015-10-28 email from Stuart Baker, PPLPC011000063897; *see also* November 2013 Beneficiaries Meeting, PPLP004410528.
[494] 2016-05-19 Executive Committee pre-read, PPLPC011000096794 (Board schedule for 2016).
[495] 2016-04-13 Q1 2016 Commercial Update, slide 74, PPLPC016000286167.

twenty years earlier.  The *Times* wrote: "Experts say the drop is an important early signal that the long-running prescription opioid epidemic may be peaking, that doctors have begun heeding a drumbeat of warnings about the highly addictive nature of the drugs."

419.  **In June**, the Sackler Defendants met to discuss a revised version of *Project Tango*—another try at profiting from the opioid crisis.  This time, they considered a scheme to sell the overdose antidote NARCAN.  The need for NARCAN to reverse overdoses was rising so fast that the Sackler Defendants calculated it could provide a growing source of revenue, tripling from 2016 to 2018.



*Board presentation showing potential sales from acquiring NARCAN*

Like *Tango*, Purdue's analysis of the market for NARCAN confirmed that they saw the opioid epidemic as a money-making opportunity and that the Sackler Defendants understood—in private, when no one was watching—how Purdue's opioids put patients at risk.  The Sackler Defendants identified a "strategic fit" because NARCAN is a "complementary" product to Purdue opioids. They specifically identified patients on Purdue's prescription opioids as the target market for NARCAN.  Their plan called for studying "***long-term script users***" to "better understand target end-patients" for NARCAN.  Likewise, they identified the same doctors who prescribed the most Purdue opioids as the best market for selling the overdose antidote; they planned to "leverage the

current Purdue sales force" to "drive direct promotion to targeted opioid prescribers."  Finally,

they noted that Purdue could profit from government efforts to use NARCAN to save lives.[496]

420.    That same month, staff presented the 2016 Mid-Year Update.  They warned the

Sackler Defendants that shifts in the national discussion of opioids threatened their plans.  The

deception that Purdue had used to conceal the risks of opioids was being exposed.  Staff

summarized the problems on a slide:[497]



| Critical Shifts in The National Discussion about Pain And Opioids | |
|---|---|
| **From** | **To** |
| Undertreatment of Pain | Opioid Epidemic |
| Abuse | Addiction |
| Criminal | Victim |
| FDA | CDC |
| Benefits Outweigh Risks | Lack of Long-Term Evidence |
| ADFs as Part of Solution | ADF Value Unproven |

*2016 Mid-Year Board Update*

421.    *First*, to convince doctors to prescribe dangerous opioids, Purdue promoted its

drugs as the solution to "undertreatment of pain."  Richard Sackler made sure that Purdue bought

the internet address 5thvitalsign.com so it could promote pain as the "fifth vital sign" (along with

temperature, blood pressure, pulse, and breathing rate) to expand the market for opioids.[498]  But

---

[496]  2016-05-27 email from Stuart Baker, PPLPC011000099222; 2016-06 Board Book slides 46-49, 114, PPLPC011000099280-283, -348.  They planned to "Segment opioid patients to better understand target end-patients (e.g., long-term script users)."

[497]  2016-06-08 Mid-Year Update, slide 18, PPLPC011000099783.  "ADF" on the slide refers to abuse-deterrent formulations of opioids, such as Purdue's crush-resistant OxyContin, which do not prevent addiction.

[498]  1999-06-14 email from Richard Sackler, PDD1706189908.

now, staff reported to the Sackler Defendants, doctors and patients were starting to worry more about the epidemic of opioid addiction and death.[499]

422.   *Second*, to conceal the danger of addiction, Purdue falsely blamed the terrible consequences of opioids on drug abuse.   One of Purdue's key messages argued: "It's not addiction, it's abuse."[500]   But now, staff reported to the Sackler Defendants, doctors and patients were realizing that *addiction* was a true danger.[501]

423.   *Third*, to avoid responsibility for Purdue's dangerous drugs, the Sackler Defendants chose to stigmatize people who were hurt by opioids, calling them "junkies" and "criminals."   Richard Sackler wrote that Purdue should "hammer" them in every way possible.[502] But now, staff reported to the Sackler Defendants, Americans were seeing through the stigma and recognizing that millions of families were victims of addictive drugs.   Staff told the Sackler Defendants that nearly half of Americans reported that they knew someone who had been addicted to prescription opioids.[503]

424.   *Fourth*, the Sackler Defendants had long sought to hide behind the approval of Purdue's drugs by the FDA.   But FDA approval could not protect the Sackler Defendants when their deceptive marketing led thousands of patients to become addicted and die.   The U.S. Centers for Disease Control ("CDC") reported that opioids were, indeed, killing people.   The CDC Director said: "We know of no other medication that's routinely used for a nonfatal condition that kills patients so frequently."[504]   The 2016 Mid-Year Update warned that the truth was threatening Purdue.

---

[499] 2016-06-08 Mid-Year Update, slide 18, PPLPC011000099783.
[500] 2008-05-16 email from Pamela Taylor, PPLPC012000183254; 2008-04-16 Executive Committee notes, PPLPC012000183256; 2008-04-16 presentation by Luntz, Maslansky Strategic Research, slide 28, PPLPC012000183259.
[501] 2016-06-08 Mid-Year Update, slide 18, PPLPC011000099783.
[502] 2001-02-01 email from Richard Sackler, PDD8801133516 ("we have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals.").
[503] 2016-06-08 Mid-Year Update, slides 18, 20, PPLPC011000099783.
[504] 2016-03-15 briefing by CDC Director Tom Frieden.

425.    Staff also told the Sackler Defendants that four states had passed laws limiting opioid prescriptions.[505]  In the face of this pressure, staff told the Sackler Defendants that the sales team was focusing on the doctors who prescribe the most opioids.[506]

426.    **In November**, staff prepared statements to the press denying the Sackler Defendants' involvement in Purdue.  Their draft claimed: "Sackler family members hold no leadership roles in the companies owned by the family trust."[507]  That was a lie.  Sackler family members held the controlling majority of seats on the Board and, in fact, controlled the company. A staff member reviewing the draft knew what was up and commented with apparent sarcasm: "Love the … statement."[508]  Staff eventually told the press: "Sackler family members hold no management positions."[509]

427.    Some employees worried about the deception.  When journalists asked follow-up questions about the Sackler Defendants, communications staff deliberated about whether to repeat the "no management positions" claim.  They double-checked that Purdue's top lawyers had ordered the statement.  Then they arranged for one of the Sackler Defendants' foreign companies to issue it, so U.S. employees would not be blamed: "The statement will come out of Singapore."[510]

428.    **In December**, Richard, Jonathan and Mortimer Sackler had a call with staff about another revised version of *Project Tango*.  The new idea was to buy a company that treated opioid addiction with implantable drug pumps.[511]  The business was a "strategic fit," because Purdue sold opioids and the new business treated the "strategically adjacent indication of opioid

---

[505] 2016-06-08 Mid-Year Update, slide 21, PPLPC011000099783.
[506] 2016-06-08 Mid-Year Update, slide 26, PPLPC011000099783 ("Protect OxyContin share among high decile HCPs").
[507] 2016-11-03 email from Robert Josephson, PPLPC023000914978.
[508] 2016-11-03 email from Raul Damas, PPLPC023000914978 ("Love the second statement" – it was the second of two statements in the draft).
[509] 2016-11-28 email from Robert Josephson, PPLPC019001332704.
[510] 2016-12-01 emails from Robert Josephson and Raul Damas, PPLPC020001075830.
[511] 2016-12-22 email from Elliott Ruiz, PPLPC022000980230.

dependence."[512]  The Sackler Defendants kept searching for a way to expand their business by selling both addictive opioids and treatment for opioid addiction.

### k.    2017

429.    **In 2017**, the Sackler Defendants met with the Board in February, March, April, June, July, August, October, November, and December.[513]

430.    **In May 2017**, staff told the Sackler Defendants that an independent nonprofit had concluded that Purdue's reformulation of OxyContin was not a cost-effective way to prevent opioid abuse.[514]  Theresa Sackler asked staff what they were doing to fight back to convince doctors and patients to keep using the drug.[515]

431.    That same month, the Sackler Defendants were looking for a new CEO.  Long-time employee Craig Landau wanted the job and prepared a business plan titled "SACKLER PHARMA ENTERPRISE."  Landau was careful to acknowledge their power: he acknowledged that Purdue operated with "the Board of Directors serving as the 'de facto' CEO."  He proposed that Purdue should take advantage of other companies' concerns about the opioid epidemic through an "opioid consolidation strategy" and become an even more dominant opioid seller "as other companies abandon the space."[516]  The Sackler Defendants made him CEO a few weeks later.

432.    **In June**, staff told the Sackler Defendants that getting doctors to prescribe high doses of opioids and many pills per prescription were still key "drivers" of Purdue's profit.  Purdue's management was concerned that the CDC's efforts to save lives by reducing doses and pill counts would force the company "to adjust down our revenue expectations."[517]

---

[512] 2016-12-22 Braeburn Pharmaceuticals: Structuring Analysis, slide 3, PPLPC022000980233.
[513] 2017 heavily redacted Board minutes, PPLP004416457-502; 2017-01-02 Governance Calendar, PPLPC011000131500.
[514] 2017-05-06 email from Gail Cawkwell, PPLPC011000147096.
[515] 2017-05-06 email from Theresa Sackler, PPLPC011000147096.
[516] 2017-05-02 Landau presentation, PPLPC020001106306.
[517] 2017-06 Board of Directors: Purdue Mid-Year Pre-Read, slides 2, 152, PPLPC011000151189.

433.    Staff told the Sackler Defendants that Purdue's opioid sales were being hurt by cultural trends such as the HBO documentary, *Warning: This Drug May Kill You*."[518]  HBO's film was a problem for Purdue because it showed actual footage from Purdue's misleading advertisements next to video of people who overdosed and died.[519]

434.    Staff felt the pressure of the opioid epidemic, even if the billionaire Sacklers did not.  In one presentation, staff came close to insubordination and told the Sackler Defendants: "Purdue Needs a New Approach."  Their suggestion for a new direction was: "A New Narrative: Appropriate Use."  The Sackler Defendants led Purdue so far into the darkness that employees proposed "appropriate use" of drugs to reinvent the company.  Staff also suggested that the Sackler Defendants create a family foundation to help solve the opioid crisis.[520]

435.    The Sackler Defendants did not redirect the company toward appropriate use or create the suggested family foundation.  Instead, they decided to sell harder.  For 2018, the Sackler Defendants approved a target for sales reps to visit prescribers 1,050,000 times—almost double the number of sales visits they had ordered during the heyday of OxyContin in 2010.[521]

436.    **In October**, Richard Sackler learned that insurance company Cigna had cut OxyContin from its list of covered drugs and replaced it with a drug from Purdue's competitor, Collegium.  Richard read that Collegium had agreed to encourage doctors to prescribe lower doses of opioids, and Collegium's contract with Cigna was designed so Collegium would earn *less* money if doctors prescribed high doses.  Cigna announced that opioid companies influence dosing: "While drug companies don't control prescriptions, they can help influence patient and doctor conversations by educating people about their medications."  Richard's first thought was revenge.  He immediately suggested that Purdue drop Cigna as the insurance provider for the company health plan.[522]

---

[518] 2017-06 Board of Directors: Purdue Mid-Year Pre-Read, slide 6, PPLPC011000151189.
[519]  2017-05-01 "*Warning: This Drug May Kill You* Offers a Close-Up of the Opioid Epidemic," https://www.theatlantic.com/entertainment/archive/2017/05/warning-this-drug-may-kill-you-opioid-epidemic-hbo/524982/.
[520] 2017-06 Board of Directors: Purdue Mid-Year Pre-Read, slides 36-38, PPLPC011000151189.
[521] 2017-06 Board of Directors: Purdue Mid-Year Pre-Read, slide 147, PPLPC011000151189.
[522] 2017-10-07 email from Richard Sackler, PPLPC016000317635.

437.    On October 17, Beverly Sackler served her last day on the Board.[523]  It was the beginning of the end for the Sackler family.  A week later, the *New Yorker* published an article entitled "The Family That Built an Empire of Pain."[524]   The story quoted a former FDA Commissioner: "the goal should have been to sell the least dose of the drug to the smallest number of patients."  The reporter concluded: "Purdue set out to do exactly the opposite."[525]

438.    **In November**, Jonathan Sackler suggested that Purdue launch yet another opioid.[526]  Staff promised to present a plan for additional opioids at the next meeting of the Board.[527]  At the Board meeting that month, the remaining Sackler Board members (Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa) voted to cut the sales force from 582 reps to 302 reps.  Staff gave Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler a map of where the remaining sales reps worked.[528]



*Purdue internal map of planned sales rep territories for 2018*

[523] Declaration of Beverly Sackler dated September 5, 2018.
[524] 2017-10-23 email from Robert Josephson, PPLPC016000318910.
[525] 2017-10-23 email from Robert Josephson, PPLPC016000318910.
[526] 2017-11-21 email from Jonathan Sackler, PPLPC016000321334.
[527] 2017-11-21 email from Craig Landau, PPLPC016000321333.
[528] 2017-11 Board budget, slides 47, 51, PPLPC016000323215.

l.     **2018**

439.     **In January 2018**, Richard Sackler received a patent for a drug to treat opioid addiction—his own version of *Project Tango*.  Richard had applied for the patent in 2007.  He assigned it to a different company controlled by the Sackler family—Rhodes.  Richard's patent application says opioids *are* addictive.  The application calls the people who become addicted to opioids "junkies" and asks for a monopoly on a method of treating addiction.[529]

440.     In January, Richard Sackler also met with Purdue staff about the sales force again.  They discussed plans to cut the force to 275 reps.  In February, Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler decided to lay off 300 sales reps.[530]

441.     **By April**, staff were scared.  Richard Sackler was again asking questions about sales.  Staff prepared a presentation for the Board of Directors ("BoD").  One employee suggested that they add more information about the company's problems.  Another cautioned against that:

> "I think we need to find a balance between being clear about what reality looks like - which I certainly support in [this] situation - and just giving so much bad news about the future that it just makes things look hopeless.  Let's not give the BoD a reason to just walk away."[531]

442.     **On May 3** and again on **June 6 and 8**, all seven remaining Sacklers attended meetings of the Board: Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa.[532]

443.     **In June of 2018**, just as their employees predicted, the Sackler Defendants tried to run.  Richard Sackler was the first to go: he resigned from the Board in July.  David Sackler quit in August.  Theresa Sackler served her last day in September.  As of the date of this filing, Ilene, Jonathan, Kathe, and Mortimer remain.[533]

---

[529] 2018-01-09, U.S. Patent No. 9,861,628 ("a method of medication-assisted treatment for opioid addiction"); 2007-08-29, international patent publication no. WO 2008/025791 Al.
[530] 2018-01-18 email from Jon Lowne, PPLPC016000323973; 2018 budget, PPLPC016000323996; 2018-02-07 email from Craig Landau, PPLPC016000325614; 2018-02-01 entirely redacted Board minutes, PPLP004416509.
[531] 2018-04-10 email from Paul Medeiros, PPLPC023000979571.
[532] 2018-05-03 heavily redacted Board minutes, PPLP004416514-520 (all present in person); 2018-06-06 heavily redacted Board minutes, PPLP004416521-524; 2018-06-08 heavily redacted Board minutes, PPLP004416525.
[533] 2018-09-05 declaration of David Sackler; 2018-09-07 declaration of Theresa Sackler.

C.    **The Sackler Defendants Created Rhodes to Perpetuate and Further Profit Off of the Opioid Market that the Sackler Defendants had Created with Purdue**

444.    In or around November 2007, in the immediate aftermath of the guilty plea by Purdue and its executives regarding the company's false and misleading marketing of OxyContin, the Sackler Defendants established Rhodes.  According to a former senior manager at Purdue, "Rhodes was set up as a 'landing pad' for the Sackler family in 2007, to prepare for the possibility that they would need to start afresh following the crisis then engulfing OxyContin."[534] This landing pad was not immediately necessary though because the Sackler Defendants were able to extract millions from the opioid market for over 10 years after the guilty plea entered by Purdue.

445.    Rhodes was also an advantageous investment for the Sackler Defendants because it provided a new vehicle in which the Sackler Defendants could use to grow the market for opioids. Rhodes allowed the Sackler Defendants to capture profits off of the generic opioid market.

446.    The Sackler Defendants' involvement in Rhodes and its relationship to Purdue was not publicly known until the September 9, 2018 publication of an article in the *Financial Times*. According to the article, "Rhodes has not been publicly connected to the Sackler family before, and their ownership of the company may weaken one of their longstanding defences: that they cannot be held responsible for the opioid crisis because Purdue accounts for a small fraction of the overall prescriptions."[535] The connection between Rhodes and the Sackler Defendants was further cemented by the granting of a patent to Rhodes, which named Richard Sacker as one of the creators on the patent.[536]

---

[534]    David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, Financial Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.
[535]    *Id.*
[536]    Amy Baxter, *Billionaire Drugmaker Granted Patent for Opioid Addiction*, Health Exec (Sept. 10, 2018), https://www.healthexec.com/topics/healthcare-economics/billionaire-drugmaker-granted-patent-addiction.

### 1.   Similarities Between Rhodes and Purdue

447.   Despite being registered as a separate company from Purdue, the Sackler Defendants run Rhodes in the same manner as Purdue and "little distinction is made internally between the two companies."[537]

448.   Staff from Rhodes and Purdue use the same employee handbook.[538] Many of the drugs for Rhodes are made in factories owned by Purdue.[539] While Purdue produces the brand name products, such as OxyContin, Rhodes became one of the largest producers of off-patent generic opioids in the United States.[540]

449.   Plaintiffs allege upon information and belief that the Sackler Defendants were—and still are—directly involved with the daily operations and sales of Rhodes, just as they were with Purdue as discussed above. The Sackler Defendants took great care to conceal their involvement with Rhodes after the concerns of personal liability attributed to the Sackler Defendants in the early 2000s. While much of Rhodes business and practices have been concealed from the public, the information that is available shows that there is no reason to think the Sackler Defendants treated Rhodes any differently from Purdue in the Sackler Defendants' management of both companies.

### 2.   How The Sackler Defendants Used Purdue and Rhodes Together to Further the Sackler Defendants' Scheme to Falsely Market Opioids

450.   According to the *Financial Times*, in 2016, Rhodes had a substantially larger share of prescriptions in the U.S. prescription opioid market than Purdue.[541] Purdue has often argued that it is a relatively small producer of opioids in the United States. However, when combined with Rhodes, the Sackler Defendants control up to six percent of the United States opioid market,

---

[537] *Id.*

[538] *Id.*

[539] David Crow, *Billionaire Sackler Family Owns Second Opioid Drugmaker*, Financial Times (Sept. 9, 2018), https://www.ft.com/content/2d21cf1a-b2bc-11e8-99-ca-68cf89602132.

[540] *Id.*

[541]   Crow, 'One-two' Punch, *supra* note 534.

accounting for 14.4 million prescriptions in 2016 alone.[542] The combined Rhodes and Purdue companies put the Sackler Opioid Enterprise (defined below) at seventh place among opioid makers in terms of market share—well ahead of other pharmaceutical groups such as Johnson & Johnson and Endo.[543]

451.    The Sackler Defendants utilized both Rhodes and Purdue to grow the general market for opioids so that the Sackler family would profit off improvements in the entire market. Purdue sales representatives were incentivized to expand the sales not only of Purdue products, but to expand the sales of opioids as a whole.[544] Part of a Purdue sales representative's bonus was calculated based on the size of the overall opioid market.[545] Therefore, the sales representatives were incentivized to sell doctors on all opioids, which translated to profits for the Sackler Defendants off of both name brand and generic opioid sales.

452.    Plaintiffs allege upon information and belief that the structure of incentives to promote overall opioid market growth was created by the Sackler Defendants with the express intention of growing not only Purdue sales, but also generic sales at Rhodes. While the Sackler Defendants have largely abandoned Purdue as of 2018, Plaintiffs allege upon information and belief that the Sackler Defendants continue to operate the Sackler Opioid Enterprise through Rhodes. The "landing pad" status of Rhodes has been activated. The Sackler Defendants hired a corporate restructuring expert in August of 2018 to restructure Rhodes.[546] The issuance of new patents on opioid-related drugs to Rhodes and the Sackler Defendants also indicates that the Sackler Opioid Enterprise is far from finished.

---

[542] Crow, *Billionaire*, *supra* note 539.

[543] *Id.*

[544] Crow, '*One-two' Punch*, *supra* note 534.

[545] *Id.*

[546] *Id.*

## V.      CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Public Nuisance**
**(Against All Defendants)**

453.     Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

454.     Defendants, individually and acting through their employees and agents, and in concert with each other, have intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injure the property, health, safety or comfort of a considerable number of persons in each of Plaintiffs' jurisdictions by their production, promotion, and marketing of opioids for use by residents of each Plaintiff's jurisdiction.

455.     Defendants' acts and omissions offend, substantially interfere with, or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals or endanger or injure the property, health, safety or comfort of a considerable number of persons.

456.     Defendants' conduct is unreasonable, intentional, and unlawful.

457.     Defendants knew of the public health hazard their conduct would create.

458.     The public nuisance is substantial and unreasonable. Defendants' actions caused and continue to cause the public health epidemic described in this Complaint.

459.     Defendants' conduct has persisted over a long period of time and caused wide-spread harm.  It has caused deaths, serious injuries, and a severe disruption of public peace, order and safety; it is ongoing, and it is producing permanent and long-lasting damage.

460.     Defendants knew and should have known that their promotion of opioids was false and misleading and that their deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance – i.e., the opioid epidemic.

461.    Defendants' conduct constitutes a public nuisance.

462.    Defendants' conduct directly and proximately caused injury to each Plaintiff and their residents.

463.    Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. Defendants' actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Defendants therefore participated to a substantial extent in creating and maintaining the public nuisance. Without Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

464.    Plaintiffs each suffered special injuries distinguishable from those suffered by the general public.

465.    The public nuisance created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

## SECOND CAUSE OF ACTION

### Violation of RICO, 18 U.S.C. § 1961 et seq.
### Sackler Opioid Enterprise
### (Against the Sackler Defendants)

466.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

467.    The Sackler Defendants—through their knowledge of and control over the activities of Purdue and Rhodes—conducted a an association-in-fact enterprise composed of the Sackler Defendants together with Purdue and Rhodes, and/or a legal entity enterprise consisting of Purdue and its affiliated entities, including Rhodes, that were operated by the Sackler Defendants (each alternative form of enterprise referred to collectively as the "Sackler Opioid Enterprise"). At all relevant times, the Sackler Defendants conducted and/or participated in the conduct of the enterprise through a pattern of illegal activities (the predicate acts of mail and wire

fraud, and violation of the Controlled Substances Act) to carry out the common purpose of the Sackler Opioid Enterprise, *i.e.* to unlawfully increase their personal profits and revenue from the increased and continued prescription and use of opioids manufactured by Purdue and Rhodes through: (1) disseminating false representations about the risks of using prescription opioids for long-term treatment of chronic pain; and (2), and refusing to report suspicious orders of prescription opioids that the Sackler Opioid Enterprise was aware of through the suspicious order monitoring systems in place at Purdue and Rhodes and through other sources by which Purdue and Rhodes were actually aware of diversion occurring throughout the United States and in Plaintiffs' jurisdictions.

468.    Through the racketeering activities of the Sackler Opioid Enterprise, the Sackler Defendants sought to increase and continue to derive as much unlawful profit from the manufacture and sale of prescription opioids as possible through a fraudulent scheme to increase the market for the prescription opioids marketed, manufactured and sold by the Sackler Opioid Enterprise by increasing prescriptions and use of prescription opioids through the dissemination of false marketing representations about the risks of prescription opioid use.   Then, simultaneously while improperly growing the market for prescription opioids through false marketing, the Sackler Opioid Enterprise was also directed by the Sackler Defendants to ignore suspicious orders of prescription opioids instead of identifying, reporting and halting those orders despite actual knowledge of the same.   In so doing, each of the Sackler Defendants knowingly conducted and participated in the conduct of the Sackler Opioid Enterprise by engaging in mail and wire fraud in violation of 18 U.S.C. §1962(c) and (d)

469.    The Sackler Opioid Enterprise, alleged above, is an association-in-fact enterprise that consists of the Sackler Defendants and the companies that they controlled as their alter-egos, including Purdue and Rhodes.

470.    Each of the Sackler Defendants conducted and participated in the conduct of the Sackler Opioid Enterprise by: (1) creating and directly contributing to the false narrative that prescription opioids are safe for general use, including the nine categories of misrepresentations

discussed above; (2) personally directing the sales strategies of Purdue and Rhodes to increase sales of prescription opioids despite repeated warnings of the dangers and addiction risks; (3) developing and implementing a sales strategy that incentivized growing the entire market for prescription opioids, including generic brands; (4) developing and implementing suspicious order monitoring systems for Purdue and Rhodes but then systematically ignoring those systems and refusing to report suspicious orders of controlled substances; (5) directing the regular payment of Purdue's profits, each payment consisting of hundreds of millions of dollars, directly to the Sackler family; and (6) actively concealing the acts of the enterprise, especially concealing the involvement of the Sackler family in the false marketing and creation of the opioid epidemic.

471.   This conduct directly furthered the common purpose of increasing profit and sales by increasing the volume of prescriptions written and corresponding use of prescription opioids manufactured by Purdue and Rhodes through the use of knowing and intentional dissemination of false and misleading information about the drugs Purdue and Rhodes manufactured, and by a knowing and willful refusal to identify and report suspicious orders.

472.   Specifically, the Sackler Defendants worked together to exercise control over the activities of Purdue and Rhodes such that Purdue operated as a front for the Sackler Defendants and allowed them to coordinate their approach to the marketing and sale of prescription opioids by Purdue.  The Sackler Defendants utilized Purdue to increase the market and demand for prescription opioids in general and to capture profits from name brand opioid prescriptions, such as OxyContin. Then, the Sackler Defendants established Rhodes to extract further profits from the opioid market, created from the deceptive marketing issued through Purdue, as one of the largest producers of generic opioids in the market. Through all of these activities, the Sackler Defendants maintained a continuous pattern of controlling and directing Purdue and Rhodes to refuse to report suspicious orders of controlled substances.

473.   The Sackler Defendants conducted and directed the affairs of Purdue and Rhodes such that the Sackler Defendants caused them to carry out the acts of the Sackler Opioid Enterprise and to obscure the involvement of each of the Sackler Defendants in the creation and

perpetuation of the opioid epidemic. The Sackler Defendants stripped Purdue of any profits made from the sales of prescription opioids and transferred those profits directly to the Sackler Opioid Enterprise, to wit the Sackler family. The Sackler Defendants also secretly established Rhodes as a vehicle to continue the Sackler Opioid Enterprise should Purdue's role in the enterprise be compromised due to legal action or criminal prosecution.

474.    At all relevant times, the Sackler Opioid Enterprise: (a) had an existence separate and distinct from the individual Sackler Defendants, Purdue, and Rhodes; (b) was separate and distinct from the pattern of racketeering in which the Sackler Opioid Enterprise engaged; (c) was an ongoing and continuous organization consisting of individuals, persons, and legal entities, including each of the Sackler Defendants; (d) was characterized by interpersonal relationships between and among each member of the Sackler Opioid Enterprise, including between the Sackler Defendants; and (e) had sufficient longevity for the enterprise to pursue its purpose and function as a continuing unit.

475.    The Sackler Defendants engaged in the Sackler Opioid Enterprise are systematically linked through contractual relationships, financial ties, personal relationships, and continuing coordination of activities in relation to Purdue and Rhodes, as spearheaded by the Sackler Defendants.

476.    The Sackler Defendants conducted and participated in the conduct of the Sackler Opioid Enterprise through a pattern of racketeering activity, including violations of 18 U.S.C. § 1961(1)(B) and (C), including: (1) Mail Fraud – 18 U.S.C. 1341; (2) Wire Fraud – 18 U.S.C. § 1343; and (3) Felonious manufacture, importation, receiving, concealment, buying selling, or otherwise dealing in a controlled substance or listed chemical punishable under any law of the United States, including but not limited to 21 U.S.C. § 843(a)(4)(A) ("Controlled Substance Felony").

477.    The Sackler Defendants' conduct and participation in the Sackler Opioid Enterprise allowed them to increase profits and revenue by changing prescriber behavior and public perception regarding the use of prescription opioids—resulting in an expanding market for

prescription opioids through false representations—while simultaneously directing the Sackler Opioid Enterprise to refrain from identifying and reporting suspicious orders of prescription opioids that the Sackler Opioid Enterprise was aware of through the suspicious order monitoring systems in place at Purdue and Rhodes and through other sources by which Purdue and Rhodes were actually aware of diversion occurring throughout the United States and in Plaintiffs' jurisdictions.

478.   The Sackler Defendants each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.* violations of 18 U.S.C. §§ 1341 and 1343, and 21 U.S.C. § 843(a)(4)(A)) within the past ten years.  The multiple acts of racketeering activity that the Sackler Defendants, committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by the Sackler Defendants control over and participation in the Sackler Opioid Enterprise and through the regular use of the facilities, services, distribution channels, and employees of the Sackler Opioid Enterprise, and the U.S. Mail and interstate wire facilities.

479.   The Sackler Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

- Mail Fraud: The Sackler Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

- Wire Fraud: The Sackler Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

- Controlled Substance Felony: The Sackler Defendants violated 21 U.S.C. § 843(a)(4)(A) by knowingly and/or intentional causing Purdue to furnish false or fraudulent information in and/or omit material information from, documents filed with the DEA.

480.    The Sackler Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through the Sackler Opioid Enterprise.

481.    The Sackler Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principles in the violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 21 U.S.C. § 843(a)(4)(A).

482.    The Sackler Defendants hid from the general public and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities about the reality of the impact caused by the Sackler Opioid Enterprise's misrepresentations and the suspicious orders that the Sackler Defendants directed the Sackler Opioid Enterprise to fill on a daily basis—leading to the diversion of hundreds of millions of doses of prescriptions opioids into the illicit market. The Sackler Defendants also took great care to hide from the public their ownership and involvement with Rhodes and the sale of generic opioids. Their involvement with Rhodes was not discovered until September of 2018, and thus the full extent of the Sackler Opioid Enterprise was hidden from the public and regulators alike.

483.    The Sackler Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

484.    Indeed, for the Sackler Defendants' fraudulent scheme to work, each of the Sackler Defendants had to agree to implement the tactics described herein.  For example, if just one member of the Sackler Opioid Enterprise had broken ranks, they would have toppled the entire enterprise and uncovered the level of direction and control exercised by the Sackler Defendants, and the illegal activities that the Sackler Defendants directed the Sackler Opioid Enterprise to engage in.

485.    As described herein, the Sackler Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities that supported the common purpose of obtaining significant amounts of unlawful money and revenue through two complimentary activities regarding the marketing, manufacture and sale or

highly addictive and dangerous drugs while refusing to identify and report suspicious orders, all conducted with the common purpose of allowing the Sackler Defendants to unlawfully enrich themselves from the conduct of the Sackler Opioid Enterprise.  The predicate acts all had similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

486.    The predicate acts all had the purpose of creating an unchecked demand and supply for highly addictive controlled substances— i.e. the opioid epidemic—which substantially injured Plaintiffs' business and property, and contributed to its duration and severity.  These predicates acts had the foregoing effect while simultaneously generating billion-dollar revenue and profits for the Sackler Defendants. The predicate acts were committed or caused to be committed by the Sackler Defendants through their control over and direction of the Sackler Opioid Enterprise and in furtherance of its fraudulent scheme.

487.    The pattern of racketeering activity alleged herein and the Sackler Opioid Enterprise are separate and distinct from each other. Likewise, the Sackler Defendants are distinct from the enterprise.

488.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

489.    Many of the precise dates of the Sackler Defendants' criminal actions at issue here have been hidden by Defendants and cannot be alleged without access to the Sackler Defendants' books and records. Indeed, an essential part of the successful operation of the Sackler Opioid Enterprise alleged herein depended upon secrecy.

490.    By knowingly and willfully directing the Sackler Opioid Enterprise to disseminate false marketing statements and refuse to report and halt suspicious orders of the prescription drugs sold by the Sackler Opioid Enterprise, the Sackler Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

491.    It was foreseeable, and even intended, by the Sackler Defendants that Plaintiffs would be harmed when they refused to report and halt suspicious orders, because their marketing misconduct and violation of the duties imposed by the CSA and Code of Federal Regulations allowed widespread diversion of prescription opioids out of appropriate medical channels and into the illicit drug market—causing the opioid epidemic that the CSA was intended to prevent.

492.    The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

493.    The Sackler Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property. The Sackler Defendants' pattern of racketeering activity, including the marketing misrepresentations and refusal to identify, report, and halt suspicious orders – all of which occurred under the control and at the direction of the Sackler Defendants – logically, substantially and foreseeably cause an opioid epidemic.  Plaintiffs were injured by the Sackler Defendants' pattern of racketeering activity and the opioid epidemic that they created.

494.    The Sackler Defendants knew that the opioids manufactured and sold by the Sackler Opioid Enterprise were unsuited to treatment of long-term, chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse.  Nevertheless, the Sackler Defendants engaged in a scheme of deception, that utilized the mail and wires as part of their fraud, in order to increase sales of their opioid products by refusing to identify, report suspicious orders of prescription opioids that they knew were highly addictive, subject to abuse, and were actually being diverted into the illegal market.

495.    The Sackler Defendants' predicate acts and pattern of racketeering activity were a cause of the opioid epidemic which has injured Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic.

496.   Specifically, Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include or may include:

(a)   Losses caused by the decrease in funding available for Plaintiffs' public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

(b)   Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

(c)   Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

(d)   Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

(e)   Costs associated with emergency responses by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

(f)   Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

(g)   Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

(h)   Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the current opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

145

(i)     Costs associated with increased burden on Plaintiffs' judicial systems, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

(j)     Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

(k)     Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiffs' communities;

(l)     Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

(m)     Losses caused by diminished property values in the form of decreased business investment and tax revenue.

497.    Plaintiffs' injuries were proximately caused by the Sackler Defendants' racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries. But for the opioid-addiction epidemic created by the Sackler Defendants' conduct, Plaintiffs would not have lost money or property.

498.    Plaintiffs' injuries were directly caused by the Sackler Defendants' pattern of racketeering activities.

499.    Plaintiffs are most directly harmed and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

500.    Plaintiffs seek all legal and equitable relief as allowed by law, including, inter alia, actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest, including, inter alia:

(a)     Actual damages and treble damages, including pre-suit and post-judgment interest;

(b)      An order enjoining any further violations of RICO;

(c)      An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

(d)      An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

(e)      An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

(f)      An order enjoining any future marketing of opioids through non-branded marketing including through Front Groups, Key Opinion Leaders, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

(g)      An order enjoining any future marketing to vulnerable populations, including but not limited to, persons over the age of fifty-five, anyone under the age of twenty-one, and veterans;

(h)      An order compelling the Defendants to make corrective advertising statements that shall be made in the form, manner and duration as determined by the Court, but not less than print advertisements in national and regional newspapers and medical journals, televised broadcast on major television networks, and displayed on their websites, concerning: (1) the risk of addiction among patients taking opioids for pain; (2) the ability to manage the risk of addiction; (3) pseudoaddiction is really addiction, not a sign of undertreated addiction; (4) withdrawal from opioids is not easily managed; (5) increasing opioid dosing presents significant risks, including addiction and overdose; (6) long term use of opioids has no demonstrated improvement of function; (8) use of time-released opioids does not prevent addiction; (9) abuse-deterrent formulations do not prevent opioid abuse; and

(10) that manufacturers and distributors have duties under the CSA to monitor, identify, investigate, report and halt suspicious orders and diversion but failed to do so;

(i)     An order enjoining any future lobbying or legislative efforts regarding the manufacturer, marketing, distribution, diversion, prescription, or use of opioids;

(j)     An order requiring all Defendants to publicly disclose all documents, communications, records, data, information, research or studies concerning the health risks or benefits of opioid use;

(k)     An order prohibiting all Defendants from entering into any new payment or sponsorship agreement with, or related to, any: Front Group, trade association, doctor, speaker, CME, or any other person, entity, or association, regarding the manufacturer, marketing, distribution, diversion, prescription, or use of opioids;

(l)     An order establishing a National Foundation for education, research, publication, scholarship, and dissemination of information regarding the health risks of opioid use and abuse to be financed by the Defendants in an amount to be determined by the Court;

(m)    An order enjoining any diversion of opioids or any failure to monitor, identify, investigate, report and halt suspicious orders or diversion of opioids;

(n)     An order requiring all Defendants to publicly disclose all documents, communications, records, information, or data, regarding any prescriber, facility, pharmacy, clinic, hospital, manufacturer, distributor, person, entity or association regarding suspicious orders for or the diversion of opioids;

(o)     An order divesting each of the Sackler Defendants of any interest in, and the proceeds of any interest in, the Sackler Opioid Enterprise, including any

interest in property associated with Purdue and Rhodes, or any other pharmaceutical company in which any of the Sackler Defendants have an ownership stake;

(p)     Dissolution and/or reorganization of any trade industry organization, Front Group, or any other entity or association associated with the Sackler Opioid Enterprise identified in this Complaint, as the Court sees fit;

(q)     Dissolution and/or reorganization of any Company Defendant named in this Complaint as the Court sees fit;

(r)     Suspension and/or revocation of the license, registration, permit, or prior approval granted to any Defendant, entity, association or enterprise named in the Complaint regarding the manufacture or distribution of opioids;

(s)     Forfeiture as deemed appropriate by the Court; and

(t)     Attorney's fees and all costs and expenses of suit.

## THIRD CAUSE OF ACTION

### Negligent Misrepresentation
### (Against All Defendants)

501.    Plaintiffs incorporate herein by reference all of the allegations in this complaint.

502.    A defendant is liable for negligent misrepresentation where, in the course of its business, profession or employment, or in any other transaction in which it has a pecuniary interest, it supplies false information for the guidance of others in their business transactions and where the defendant fails to exercise reasonable care or competence in obtaining or communicating the false information at issue.

503.    Defendants are liable for the pecuniary loss caused to Plaintiffs by their justifiable reliance upon the information.  In the course of their businesses, Defendants made and caused to be made affirmatively false statements about prescription opioids, including, but not limited to, statements and omissions concerning the safety and efficacy of prescription opioids and the risk

of addiction and overdose associated therewith.  Defendants failed to exercise reasonable care and competence in communicating the false information.

504.    Defendants wrongfully concealed the falsity of its statements, the truth about which Plaintiffs did not discover until recently despite exercising due diligence.  Plaintiffs, their agents, persons on whom Plaintiffs and their agents justifiably relied and the public justifiably relied on the false information the Defendants provided, both directly and indirectly.  As a result, Plaintiffs proceeded under the misapprehension that the opioid crisis was a result of conduct by persons other than defendants.  As a result, each Plaintiff was prevented from taking more effective and earlier steps to respond to the opioid crisis.

505.    Had Plaintiffs known the truth about the concealed facts, each Plaintiff would have taken steps to correct the false and misleading information and also would not have authorized and paid for certain prescription opioid treatments for its employees and inhabitants.

506.    Each Defendant's dissemination of false statements demonstrated a conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm.

507.    As a direct and proximate result of the Defendants' affirmatively false statements, each Plaintiff suffered damages.

**FOURTH CAUSE OF ACTION**

**Fraudulent Concealment**
**(Against All Defendants)**

508.    Plaintiffs incorporate herein by reference all of the allegations in this complaint.

509.    At all times relevant, each Defendant concealed and intentionally failed to disclose material facts known to it including that: (a) there was no basis for making claims as to prescription opioids' safety or efficacy for the treatment of certain indications for which each Defendant promoted them; and (b) there was no basis for its representations concerning the risk

of addiction and overdose resulting from the use of prescription opioids, which each Defendant substantially understated.

510.    Each Defendant intended the omission of the concealed facts to deceive each Plaintiff.

511.    Plaintiffs were unaware of the concealed facts.  Plaintiffs, their agents, persons on whom Plaintiffs and their agents justifiably relied and the public justifiably relied on the false information the Defendants provided, both directly and indirectly, as Defendants intended.  As a result, each Plaintiff proceeded under the misapprehension that the opioid crisis was a result of conduct by persons other than defendants and was prevented from taking more effective and earlier steps to respond to the opioid crisis.

512.    Had Plaintiffs known the truth about the concealed facts, each Plaintiff would have taken other steps to correct the false information and also would not have authorized and paid for certain prescription opioid treatments for its employees and inhabitants.

513.    Each Defendant's failure to disclose information about the true level of addictiveness of prescription opioids deceived Plaintiffs and was a substantial factor in causing each Plaintiff to pay for prescription opioids for uses that were not medically necessary. Each Plaintiff was damaged due to its justified reliance on each of Defendant's concealments, which were made with oppression, fraud or malice.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment
### (Against All Defendants)

514.    Plaintiffs incorporate herein by reference all of the allegations in this complaint.

515.    As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the increase in the distribution  and purchase of opioids within Plaintiffs' communities, including from opioids foreseeably  and deliberately diverted within and into Plaintiffs' communities.

516.     Unjust enrichment arises not only where an expenditure by one party adds to  the property of another, but also where the expenditure saves the other from expense or loss.

517.     Plaintiffs have expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct.

518.     These expenditures include the provision of healthcare services and treatment services to people who use opioids.

519.     These expenditures have helped sustain Defendants' businesses.

520.     Plaintiffs have conferred a benefit upon Defendants by paying for Defendants' externalities:  the cost of the harms caused by Defendants' improper distribution practices.

521.     Defendants were aware of these obvious benefits, and their retention of the benefit is unjust.

522.     Plaintiffs have paid for the cost of Defendants' externalities and Defendants  have benefited from those payments because they allowed them to continue providing customers with a high volume of opioid products. Because of their deceptive marketing of prescription  opioids, Defendants obtained enrichment they would not otherwise have obtained. Because  of their conscious failure to exercise due diligence in preventing diversion, Defendants obtained enrichment they would not otherwise have obtained. The enrichment was without justification and Plaintiffs lack a remedy provided by law.

523.     Defendants have unjustly retained benefits to the detriment of Plaintiffs,  and Defendants' retention of such benefits violates the fundamental principles of justice, equity,  and good conscience.

524.     Defendants' misconduct alleged in this case is ongoing and persistent.

525.     Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence.  Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

526.    Plaintiffs have incurred expenditures for special programs over and above Plaintiffs' ordinary public services.

527.    Plaintiffs seek an order compelling Defendants to disgorge all unjust enrichment to Plaintiffs; and awarding such other, further, and different relief as this Honorable Court may deem just.

## PRAYER FOR RELIEF

528.    Plaintiffs respectfully request that this Court enter an order of judgment  granting all relief requested in this complaint, and/or allowed at law or in equity, including:

      (a)    abatement of the nuisance;

      (b)    actual damages;

      (c)    treble or multiple damages and civil penalties as allowed by statute;

      (d)    punitive damages;

      (e)    exemplary damages;

      (f)    disgorgement of unjust enrichment;

      (g)    equitable and injunctive relief in the form of Court-enforced corrective action, programs, and communications;

      (h)    forfeiture, disgorgement, restitution and/or divestiture of proceeds and assets;

      (i)    attorneys' fees;

      (j)    costs and expenses of suit;

      (k)    pre- and post-judgment interest; and

      (l)    such other and further relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all claims so triable.

Dated: <u>October 9, 2019</u>

<u>/s/ Celeste A. Evangelisti</u>
Celeste A. Evangelisti, NY Reg. # 4168399
Russell W. Budd
J. Burton LeBlanc, IV
Christine C. Mansour
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
<u>cevangelisti@baronbudd.com</u>
<u>rbudd@baronbudd.com</u>
<u>bleblanc@baronbudd.com</u>
<u>cmansour@baronbudd.com</u>

Anthony J. Majestro
J.C. Powell
James S. Nelson
Christina L. Smith
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Tel.: 304-346-2889
Fax: 304-346-2895
<u>amajestro@powellmajestro.com</u>
<u>jcpowell@powellmajestro.com</u>
<u>jnelson@powellmajestro.com</u>
<u>csmith@powellmajestro.com</u>

Roland K. Tellis
Mark P. Pifko
Sterling Cluff
Jay M. Lichter
Elizabeth Smiley
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Los Angeles, CA 91436
Tel.: 818-839-2333
Fax: 818-986-9698
<u>rtellis@baronbudd.com</u>
<u>mpifko@baronbudd.com</u>
<u>scluff@baronbudd.com</u>
<u>jlichter@baronbudd.com</u>
<u>esmiley@baronbudd.com</u>

R. Edison Hill (WVSB No. 1734)
James C. Peterson (WVSB No. 2880)
Harry C. Deitzler (WVSB No. 981)
Aaron L. Harrah (WVSB No. 9937)
Sandra B. Harrah (WVSB No. 7130)
Douglas A. Spencer (WVSB No. 9369)
**HILL, PETERSON, CARPER,**
**BEE & DEITZLER, PLLC**
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311
Tel.:  304-345-5667
Fax:  304-345-1519
<u>jcpeterson@hpcbd.com</u>
<u>rehill@hpcbd.com</u>
<u>HGDeitzler@hpcbd.com</u>
<u>aaron@hpcbd.com</u>
<u>sandra@hpcbd.com</u>
<u>doug@hpcbd.com</u>

Peter J. Mougey
Troy Rafferty
Archie C. Lamb, Jr.
Page A. Poerschke
Laura S. Dunning
Jeffrey Gaddy
**LEVIN, PAPANTONIO, THOMAS,**
**MITCHELL, RAFFERTY & PROCTOR, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7068
Fax: 850-436-6068
<u>pmougey@levinlaw.com</u>
<u>trafferty@levinlaw.com</u>
<u>alamb@levinlaw.com</u>
<u>ppoerschke@levinlaw.com</u>
<u>ldunning@levinlaw.com</u>
<u>jgaddy@levinlaw.com</u>

Paul T. Farrell, Jr.
**GREENE, KETCHUM, FARRELL,**
**BAILEY & TWEEL, LLP**
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, West Virginia 25724-2389
Phone:  800.479.0053 or 304.525.9115
Fax:      304.529.3284
paul@greeneketchum.com

Michael J. Fuller, Jr.
Amy J. Quezon
**MCHUGH FULLER LAW GROUP, PLLC**
97 Elias Whiddon Rd.
Hattiesburg, MS  39402
Tel.: 601-261-2220
Fax: 601-261-2481
mike@mchughfuller.com
amy@mchughfuller.com